WISE, Presiding Judge.
The appellant, Demetrius Avery Jackson, Jr., was convicted of capital murder in connection with the killing of Officer Mary Smith of the Fairfield Police Department. The murder was made capital because he killed Smith while she was on duty as a police officer or because of some official or job-related act or performance. See § 13A-5-40(a)(5), Ala.Code 1975. He was also convicted of attempted murder, a violation of §§ 13A-4-2 and 13A-6-2(a)(l), Ala.Code 1975, with regard to the shooting of Officer Eric Burpo of the Fairfield Police Department. By a vote of 10-2, the jury recommended that Jackson be sentenced to imprisonment for life without the possibility of parole on the capital murder conviction. The trial court overrode the jury’s recommendation and sentenced him to death on the capital murder conviction. The trial court also sentenced him to serve a term of life in prison on the attempted murder conviction. This appeal followed.
Jackson raises numerous issues in his brief to this court. However, our initial review of the record reveals that we must remand this case to the trial court for additional action so that we may properly address one of the issues he raises in his brief.
Jackson argues that the prosecution used its peremptory challenges in a racially discriminatory manner, in violation of Batson v. Kentucky, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986). Specifically, he contends that the prosecution exercised a large number of challenges to remove black veniremembers, inquired about the race of a veniremember during the voir dire proceedings, struck veniremembers who had nothing in common other than race, and engaged in disparate treatment of similarly situated black and white veniremembers. Jackson also alleges that the Jefferson County District Attorney’s *14 Office has a history of discrimination. Therefore, he concludes that we should remand this case for a Batson hearing.
The State notes that Jackson did not raise a Batson objection at trial. Therefore, it argues that we may review his argument only for plain error. See Rule 45, Ala. R.App. P. Plain error is
“error that is so obvious that the failure to notice it would seriously affect the fairness or integrity of the judicial proceedings. Ex parte Taylor, 666 So.2d 73 (Ala.1995). The plain error standard applies only where a particularly egregious error occurred at trial and that error has or probably has substantially prejudiced the defendant. Taylor.”
Ex parte Trawick, 698 So.2d 162, 167 (Ala.1997). The State contends that, “[u]pon information and belief, the black venire-members struck by the State shared attributes that led to the State to strike them.” (State’s brief at p. 24.) However, it asserts that, “because these attributes do not appear in the record, the State has no objection to a remand for the limited purpose of holding a hearing on the Bat-son issue and allowing the State to offer its reasons for striking these venire members.” (State’s brief at pp. 24-25.)
“In Batson the United States Supreme Court held that black veniremembers could not be struck from a black defendant’s jury because of their race. In Powers v. Ohio, 499 U.S. 400, 111 S.Ct. 1364, 113 L.Ed.2d 411 (1991), the court extended its decision in Batson to apply also to white defendants.... The United States Supreme Court in Georgia v. McCollum, 505 U.S. 42, 112 S.Ct. 2348, 120 L.Ed.2d 33 (1992), held that the protections of Batson were also available to defense counsel in criminal trials. The Alabama Supreme Court has held that the protections of Batson apply to the striking of white prospective jurors. White Consolidated Industries, Inc. v. American Liberty Insurance Co., 617 So.2d 657 (Ala.1993).”
Grimsley v. State, 678 So.2d 1194, 1195 (Ala.Crim.App.1995).
“The burden of persuasion is initially on the party alleging discriminatory use of a peremptory challenge to establish a prima facie case of discrimination. In determining whether there is a prima facie case, the court is to consider ‘all relevant circumstances’ which could lead to an inference of discrimination. See Batson, 476 U.S. at 93, 106 S.Ct. at 1721, citing Washington v. Davis, 426 U.S. 229, 239-42, 96 S.Ct. 2040, 2047-48, 48 L.Ed.2d 597 (1976). The following are illustrative of the types of evidence that can be used to raise the inference of discrimination:
“1. Evidence that the ‘jurors in question share[d] only this one characteristic — their membership in the group — and that in all other respects they [were] as heterogeneous as the community as a whole.’ [People v.] Wheeler, 22 Cal.3d [258,] at 280, 583 P.2d [748,] at 764, 148 Cal.Rptr. [890,] at 905 [ (1978) ]. For instance ‘it may be significant that the persons challenged, although all black, include both men and women and are a variety of ages, occupations, and social or economic conditions,’ Wheeler, 22 Cal.3d at 280, 583 P.2d at 764, 148 Cal.Rptr. at 905, n. 27, indicating that race was the deciding factor.
“2. A pattern of strikes against black jurors on the particular venire; e.g., 4 of 6 peremptory challenges were used to strike black jurors. Bat-son, 476 U.S. at 97, 106 S.Ct. at 1723.
“3. The past conduct of the offending attorney in using peremptory challenges to strike all blacks from the jury venire. Swain [v. Alabama, 380 *15 U.S. 202, 85 S.Ct. 824, 13 L.Ed.2d 759 (1965) ].
“4. The type and manner of the offending attorney’s questions and statements during voir dire, including nothing more than desultory voir dire. Batson, 476 U.S. at 97, 106 S.Ct. at 1723; Wheeler, 22 Cal.3d at 281, 583 P.2d at 764, 148 Cal.Rptr. at 905.
“5. The type and manner of questions directed to the challenged juror, including a lack of questions, or a lack of meaningful questions. Slappy v. State, 503 So.2d 350, 355 (Fla.Dist.Ct.App.1987); People v. Turner, 42 Cal.3d 711, 726 P.2d 102, 230 Cal.Rptr. 656 (1986); People v. Wheeler, 22 Cal.3d 258, 583 P.2d 748, 764, 148 Cal.Rptr. 890[905] (1978).
“6. Disparate treatment of members of the jury venire with the same characteristics; or who answer a question in the same or similar manner; e.g., in Slappy, a black elementary school teacher was struck as being potentially too liberal because of his job, but a white elementary school teacher was not challenged. Slappy, 503 So.2d at 352 and 355.
“7. Disparate examination of members of the venire; e.g., in Slappy, a question designed to provoke a certain response that is likely to disqualify a juror was asked to black jurors, but not to white jurors. Slappy, 503 So.2d at 355.
“8. Circumstantial evidence of intent may be proven by disparate impact where all or most of the challenges were used to strike blacks from the jury. Batson, 476 U.S. at 93, 106 S.Ct. at 1721; Washington v. Davis, 426 U.S. [229,] at 242[, 96 S.Ct. 2040, 2049, 48 L.Ed.2d 597 (1976) ].
“9. The offending party used peremptory challenges to dismiss all or most black jurors, but did not use all of his peremptory challenges. See Slappy, 503 So.2d at 354, Turner, supra.”
Ex parte Branch, 526 So.2d 609, 622 (Ala.1987).
Because Jackson did not raise a Batson objection at trial, the State did not have an opportunity to respond to his allegations and, if required by the trial court, to state its reasons for its exercise of its peremptory challenges. Also, the trial court, which is in a better position to evaluate such arguments because it was present during the jury selection proceedings, did not have an opportunity to hear and rule on the allegations. Finally, based on the limited record before us, we cannot properly review Jackson’s allegations. ..
Nevertheless, our review of the record indicates that, if the defense had filed a Batson motion at trial raising the arguments he now raises, the trial court would have been obligated to require the prosecution to state the reasons for each of its peremptory challenges. Although the State may very well have race-neutral and nondiscriminatory reasons for its challenges, we conclude that a remand for a Batson hearing is necessary in light of the many levels of judicial scrutiny that occur when a defendant is convicted of a capital offense and sentenced to death.
Accordingly, we remand this case to the trial court for that court to conduct a Batson hearing and to make written findings regarding Jackson’s allegations. If the prosecution cannot provide race-neutral reasons for its use of peremptory challenges against black veniremembers, Jackson shall be entitled to a new trial. See, e.g., Lewis v. State, 24 So.3d 480 (Ala.Crim.App.2006), aff'd, 24 So.3d 540 (Ala.2009). The trial court shall take all necessary action to see that the circuit clerk *16 makes due return to this court at the earliest possible time and within 84 days after the release of this opinion. The return to remand shall include a transcript of the Batson hearing and the trial court’s written findings of fact.
REMANDED WITH INSTRUCTIONS.
WELCH, WINDOM, KELLUM, and MAIN, JJ., concur.

On Return to Remand

BURKE, Judge.
Demetrius Avery Jackson, Jr., was convicted of capital murder for the intentional murder of Officer Mary Smith of the Fair-field Police Department, while she was on duty, in violation of § 13A-5-40(a)(5), Ala. Code 1975. The jury returned an advisory verdict of life imprisonment without the possibility of parole by a vote of ten in favor of life without parole and two in favor of a sentence of death. Following a separate sentencing hearing before the trial court, the court determined that the two aggravating circumstances found to exist, that the capital offense was committed by a person under a sentence of imprisonment, § 13A-5-49(l), Ala.Code 1975, and that the capital offense was committed to disrupt or hinder the lawful exercise of any governmental function or the enforcement of laws, § 13A-5-49(7), Ala.Code 1975, outweighed the nonstatutory mitigating circumstances. The trial court determined that no statutory mitigating circumstances were present or proved in this case; however, several nonstatutory mitigating circumstances were considered and found to be present. The nonstatutory mitigating circumstance accorded the most weight was the jury’s advisory verdict. Jackson was thereafter sentenced to death. Jackson was also convicted of the attempted murder of Officer Eric Burpo, §§ 13A-6-2 and 13A-4-2, Ala.Code 1975, and was sentenced to life imprisonment on that conviction.
The evidence presented at trial indicated that, on the morning of October 23, 2006, Officer Mary Smith, of the Fairfield Police Department, responded to a call concerning a suspicious person or persons. Patricia Elaine Crear, the dispatcher for the Fairfield Police Department, testified that she had received a call from a female citizen describing two men in black ski masks who were close to her mother’s home. Crear dispatched two units, Officer Mary Smith in her police vehicle and Officer Eric Burpo in his police vehicle, to the scene. Officer Smith arrived first and got out of her vehicle. Officer Burpo testified that, as he neared the scene, he saw her approach two black males who were standing on a corner, and she instructed the men to come to her vehicle and put their hands on the hood of her car. Officer Burpo testified that one of the men was older[1] and that he complied and placed his hands on the front of the vehicle’s hood. He further heard Officer Smith instructing the younger man, who was wearing a face mask, to get his hands away from his pockets. Officer Burpo then began to get out of his vehicle, and he saw the younger man reach into a front pocket of his jacket and pull out a gun. The man shot Officer Smith once and then turned and began shooting at Officer Burpo. He walked up to Officer Burpo, who was slumped across the front seat of his vehicle, and shot him. Officer Burpo testified that because the man was wearing a mask, he was only able to see “his eyes and the pinks of his lips.” *17 (R. 521.) After the man shot Officer Bur-po, he watched the man turn and walk back to Officer Smith, step over her body, and close the trunk of his vehicle; Officer Burpo described the vehicle as a brown “Chevy Caprice, old body style, the long box style with the long taillights on the back.” (R. 521.) Officer Burpo then watched the man drive away.
As he did so, Officer Burpo attempted to call in to dispatch that officers were “down” (R. 525), as well as to inform them of the license tag number of the vehicle; a description of the vehicle, and its direction of travel. However, other calls were coming into dispatch at the same time, so he was being cut off while attempting to convey the information. He testified that he had twice stated the tag number to be “1 Golf 0067 Tango.” (R. 521.)[2] Officer Burpo testified that after the Caprice drove away, he attempted to get out of his vehicle but was unable to do so.' He further testified that the older man ran up to the front passenger window of Officer Bur-po’s vehicle and stood there. Officer Bur-po pointed his weapon at the older man, instructed him not to move, and asked him for help. He laid his weapon down to respond to the police radio, and the man ran away. Officer Burpo testified that he was shot in the back and the thigh during the offense.
Subsequently, Officer Burpo was shown a photographic lineup and was asked to identify the older man, but he was unable to identify anyone. He was also shown a photographic lineup and asked if he could identify the shooter. He stated that he was “about 90 percent sure” (R. 543) that it was one man, but because the man wore a mask and he could only see the shooter’s eyes, the dark skin, and the pinks of his lips, and could tell that he had a fat face, he could not be certain. The man he identified was not Jackson.
Demetrius Avery Jackson, Sr. (“Jackson, Sr.”), Jackson’s father, testified that he was in business with his father, Trice Jackson, and his brother, Elice Jackson (“Elice”).[3] Their business involved roofing, as well as cutting down and removing trees. On the morning of the offense, Jackson, Sr., stated that Jackson telephoned him and told him that Elice needed a ladder for a job they were doing for Vannie Newton, specifically to’ remove a tree from her roof. Jackson, Sr., testified that he did not know if Jackson was with Elice at the job. He acknowledged that Jackson drove a brown or maroon Caprice Classic. Jackson, Sr., testified that he drove to the house with a ladder approximately 30 minutes to an hour after receiving the call. He stated that when he drove up to the house in his truck, he saw what he believed to be a roadblock down the street. He then saw Elice standing by the sidewalk and Newton standing on her porch. According to Jackson, Sr., Elice got into the truck and Jackson, Sr., then drove away. Jackson, Sr., testified that, after leaving the scene,[4] Elice told him that “[t]he police just got shot” and that he saw someone wearing a mask shoot them. He also told Jackson, Sr., that he was *18 standing in Newton’s driveway when a Fairfield Police Officer drove up and asked him to approach the police vehicle. He was instructed to place his hands on the hood of the vehicle. After placing his hands on the front hood, Elice heard shots but did not move because he did not know who was shooting or where the shots were coming from. When he turned, he saw a man wearing a mask and a lady lying in the street. Elice walked to the other police car, looked into it and saw Officer Burpo lying in the seat. He walked over to look at Officer Smith and then walked down the street to Newton’s house. Jackson, Sr., testified that, as he drove away from the scene, his “main concern was ... to know where [his] dad was, [he] wanted to know where [his] son was.” (R. 609.)
Jackson, Sr., testified that he drove to the home of Santana Pendleton, the mother of Jackson’s baby, in order to find Jackson. He testified that Jackson’s car was there. He had a brief conversation with Jackson and, when Jackson asked him for money, he gave Jackson $100.
Newton testified that she went to her porch within minutes of hearing the shots and that Jackson, Sr.’s truck was in her driveway and that she questioned Jackson, Sr., and the other man with him concerning what had happened. They told her that someone had been shot and then they loaded up something from her porch and left. She heard Officer Burpo screaming for help at the same time.
Sgt. McKenzie Marbury, of the Fairfield Police Department, testified that on the morning of the offense he had heard the dispatch concerning the suspicious persons and that two units had responded. He then heard the distress call from Officer Burpo and responded to the scene. He arrived within approximately two minutes of the distress call. Sgt. Marbury testified that he heard Officer Burpo screaming for help. He did not see a Chevrolet Caprice vehicle or a truck present at that time.
Santana Pendleton testified that Jackson came to her home on the morning of the offense around 11:00.[5] She testified that he was wearing dark clothing and a black cap with white writing on it, and was driving his brown Chevrolet Caprice. She testified that she “had a gut feeling that something had already done went down.” (R. 720.) Jackson was holding his head down and cursing. Upon arriving, he asked her “to turn to the news.” (R. 715.) A few minutes later, Elice and Jackson, Sr., arrived. Jackson parked his car in the backyard, which he had never done, and instructed Pendleton to tell her aunt, with whom she lived, that something was wrong with the car. Approximately 30 minutes later, he left, but he left his car in the backyard. He telephoned her later that day and asked “has anybody been over there?” (R. 721.) He told her that, if anyone asked about his car, to say that “it had been there like two days.” (R. 721.) He also told her to tell anyone who asked that he had arrived at her house at 10:00 a.m. and left at 1:00 p.m. However, Pen-dleton informed Jackson that her aunt had told her that Jackson had to come get his car or to get someone else to remove it from the backyard. Before the police arrived at her home, Jackson’s car was gone. Detective Henry Lucas, of the homicide unit of the Birmingham Police Department, testified that Jackson’s vehicle was found “two blocks behind [Pendleton’s apartment] and two blocks up.” (R. 797.)
Officer Charles Randall Underwood, a crime-scene investigator with the Birmingham Police Department, testified that he *19 lifted fingerprints from the hood of Officer Smith’s vehicle. These prints were later examined by Cynthia Calhoun, a latent-fingerprint examiner with the Birmingham Police Department, and compared to known prints from Elice, Jackson, and Jackson, Sr. The prints were determined to match those of Elice.
Jackson, Sr., was later taken to the Bessemer jail and was to be prepared for transport to the Birmingham jail by Corrections Officer Benny Hopper. Officer Hopper testified that Jackson, Sr., stated that he did not know why he was in custody because “his son was the shooter.” (R. 864.) Officer Hopper reported the statement.
Crystal Prevo testified that she had been friends with Jackson from the time that they were in elementary school. She testified that on the night of the offense, Jackson telephoned her and asked that she meet him at a gas station. When she arrived at the station just before midnight, Prevo did not see Jackson or his “rusty brown kind of color Caprice.” (R. 936.) She went into the station and when she returned to her vehicle, Jackson was sitting in her car. She did not see his car there. Jackson told her that it was cold at his apartment so Prevo took him to her apartment to spend the night. After letting him in the apartment, however, she left to spend the night at her mother’s home because Prevo’s daughter was there. She testified that Jackson was dressed in a number of layers of clothing, because it was cold, and she described his clothing as dark-colored.
Prevo testified that, following a conversation with her mother the next day, she panicked and went to a friend’s apartment where she and her friend placed a telephone call to the police. Her friend’s apartment was located in the same complex as was Prevo’s apartment. Prevo saw a line of police cars pull up in front of her building. She subsequently went to the Fairfield Police Department. A black hooded jacket was collected by Officer Roxann Murray from Prevo’s apartment. Prevo testified that the jacket did not belong to her and that it was not in her apartment before she left it the previous night.
Courtney Amos testified that he knew Jackson through a mutual acquaintance and that in October 2006, Jackson telephoned him and asked to borrow $10. Jackson told Amos that he would return it within a few hours; however, he never did. Amos testified that he later asked Jackson about the money, but that Jackson then called him on the telephone and threatened him. Amos was subsequently driving his mother’s green Buick Century automobile when he saw Jackson get into his Chevrolet Caprice;[6] Elice was in the passenger’s seat of Jackson’s car. Amos testified that Jackson “reached up over his uncle and shot at” him “through the vehicle ... about five or six times.” (R. 815.) A bullet “scraped” (R. 815) Amos’s side and three of the bullets hit his mother’s car. Amos took the car to be repaired the following morning and the police arrested him soon after. He picked both Jackson and Elice out of photographic lineups. He subsequently signed complaints against Jackson and Elice[7] for attempted murder.
Courtney Amos’s mother’s vehicle was collected from the shop where repairs were being made. There were defects in the driver’s door. It was placed in police lockup, where the police were able to “really concentrate on the vehicle[,] look *20 ing at the defects to see exactly where the projectile went once it entered the vehicle” and to look for bullets. (R. 783.) A shell easing was found that was subsequently tested.
Heather Harrelson, a firearms and tool-marks expert with the Alabama Department of Forensic Sciences, testified that she examined the cartridge cases from Amos’s mother’s vehicle and Officer Bur-po’s bullet-proof vest and the bullet from Officer Smith’s bullet-proof vest, compared them, and determined that they were fired from the same firearm.
Dr. Gary T. Simmons, a forensic pathologist and Jefferson County coroner, testified that he performed the autopsy on Officer Smith. He concluded that she died as a result of a gunshot wound to her chest that was inflicted above her bullet-proof vest. The bullet passed completely through her body and was stopped by the back of the bullet-proof vest as it exited the body.
Runyan M. Richardson, a convicted felon at the Birmingham Jefferson County jail, testified that he sent a letter the week of trial to the prosecutor, informing the prosecutor of a conversation he had with Jackson while they were housed in the same cell block. Richardson testified that Jackson told him that he was locked up for shooting and killing Officer Smith. He told Richardson, “That’s how I do.” (R. 986.) Richardson explained that he believed that Jackson meant by that phrase that he had killed her. Richardson also testified that he had been present with Jackson at the jail, watching television, when a news report of the murder was telecast, and Jackson “cursed the lady, called the lady a bitch, ‘That bitch.’ And he made a gesture with his hand like this here (indicating) aiming at the TV while they showed the lady’s face.” (R. 987.)
Cpl. Scott Bartle, of the Alabama Bureau of Investigation, and William K. Bryan, of the Federal Bureau of Investigation, interviewed Jackson on the day following the offense, The interview took place at the Bessemer Division of the Jefferson County Sheriffs Department and was video recorded. Jackson denied involvement in the offense. He further told Cpl. Bartle that he was stopped by a roadblock from entering the crime scene and that the transmission and the reverse gear were “out” in his vehicle, so that he could go no faster than 30 miles per hour. (R. 1041.)
The State also presented the testimony of a “state probation parole officer” (R. 993) that on the date of the offense, Demetrius Avery Jackson, Jr., was on probation. He also testified that a condition of Jackson’s probation was that he not carry a firearm.
At trial, Jackson presented an alibi defense through the testimony of Sandra Windham, who testified that Jackson was giving her a ride to the Birmingham municipal courthouse at the time of the offense.
I.
Jackson argued that the prosecution used its peremptory challenges in a racially discriminatory manner, in violation of Batson v. Kentucky, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986). On December 17, 2010, this court remanded this case to the circuit court to conduct a Batson hearing and to make written findings as to Jackson’s allegations that the prosecution struck a large number of black venire-members, inquired about the race of a veniremember during the voir dire proceedings, struck veniremembers who had nothing in common other than race, engaged in disparate treatment of similarly situated black and white veniremembers, *21 and had a history of discrimination. Jackson v. State, 169 So.3d 1 (Ala.Crim.App.2010). The trial court conducted a hearing on January 18, 2011,. and the prosecutor presented his reasons for all his strikes of potential jurors.[8] The prosecutor stated as follows:
“Number 235 ... identified as a black male. The State struck [Number 235] for the following reasons: that he’d indicated in response to questions that he’d had a family member or friend prosecuted, he had a sister who is a lawyer, and he said that he had three cousins and one friend who had been in the Department of Corrections. So family members and a friend in prison.
[[Image here]]
“Number 237 ... His father was shot in May of 1999. A person was arrested but not prosecuted for the crime. And he also indicated that he had other family members who had been charged with crimes. My notes also indicate that ... regarding my perceptions of [Number 237], he had gold teeth and he’s, wearing an earring.
“Number 240 is ... identified as a black female. [She] was brought back in individual voir dire. During individual voir dire, she indicated that the State should have a tougher burden in capital cases. She said that the State should prove their case ... beyond all doubt and that she even understood that that was more than the law required. She also indicated that she heard about the case and had heard that this case was about a police chase. All jury members were asked about whether or mot they heard anything about the case, and most responded with a, T heard, but I don’t know any specifics,’ but [Number 240] had indicated that she thought she knew something specific. As it turns out, what she knew was not consistent with the facts of the case. So those were the reasons why we struck [number 240]. “The next strike ... is Number 245, black female.... [Number 245] had indicated that she felt there should be a tougher burden in capital cases. She also indicated in individual voir dire, I think the Court asked her the question of where she worked, at [a restaurant] in Fairfield. So she worked in the same city where this crime occurred. And I indicated that she had said there should be a tougher burden in capital cases.
[[Image here]]
“Strike Number 7 was Number 251. [Number 251] indicated that she needed more evidence, or thought there should be more evidence in a capital case than in other cases, there should be a tougher burden of proof. I think what she said in individual voir dire was that capital cases are extreme and require more evidence. And also she indicated that her cousin was a lawyer by the name of [J.A.,] who I would ask the Court to take judicial notice for the record that Ms. [J.A.] was a criminal defense lawyer here in Bessemer for a number of years. And that was a reason we struck her. “THE COURT: I’ll take note of that, that [J.A.,] defense attorney, practices before this Court, frequently in the past, not so much now.
“[Prosecutor]: .... Our next strike was Number 252 ... identified as a black female. [Number 252] indicated that her father was killed by a stray bullet and no one was ever caught in the case. *22 She also indicated in individual voir diré that back as a teenager she felt the police could have done more than they did investigating the case. She also indicated that she had family members arrested and charged with crimes and that there should be a tougher burden in capital cases. And those were the reasons we struck [Number 252].
“.... [Number] 271 ... is identified as a black male. [He] indicated that he had we were asking the jurors whether or not they had a conflict with the next week in case the case rolled into the next week. He indicated that he had National Guard duty the next week and that he had to be where he needed to be next week on Thursday or as late as Friday. And since we didn’t feel he could give his full attention to this case and that he had to go off on Guard duty, we struck ... Number 271.
[[Image here]]
“Also for the record, if I could go back to ... Number 252, I used [her] in my circumstantial evidence example, and for that reason I struck [her]. So I struck both [Number 263], who’s a white female, and [Number 252], who’s a black female, because I used them, basically picked on them in jury selection.
“My next strike was Number 278, ... who was identified as a black [male]. [Number 278] told us that he had a sister who was raped and no one was ever caught or prosecuted for that. He also indicated that, in his words, he had a number of family members who had been in and out of jail.
[[Image here]]
“The next, Number 282 ... identified as a black female. She indicated that she had a relative in prison. She also indicated that she worked in Fairfield, and in fact, in her words, she worked right around the corner from where this happened. She also said, I believe her words were, her uncle was a thief who had been convicted everywhere.
“Number 284, black female. She had a brother who was shot, and no one was ever caught or prosecuted for that. I believe that same brother, she also indicated, was convicted by Judge Petelos in this very courtroom, was her indication ... And in that he was prosecuted in this courtroom, [another prosecutor] and I both prosecute cases in this courtroom and we feel that she may have held that against us.
[[Image here]]
“[Other prosecutor]: Judge, for the record, he’s a white male, but he’s also identified in the record as an ‘unidentified juror.’ He’s the one that raised a question in the record about some, ‘Why don’t you ask the questions and quit beating around the bush?’ And he sort of got into it with—
“[Prosecutor]: And my notes reflect that that’s the man.
“[Other prosecutor]: That’s the man that did it. The record doesn’t reflect who it was, though.
“THE COURT: All right.
“[Prosecutor]: ... Number [292], who is identified as a black male. He ... raised his hand when he was asked who has heard about the case. Then he was brought back for individual voir dire, and he said — he was asked, ‘Did you hear anything about this case,’ and his response was he did not hear anything about the case. And then he changed his response and said, “Well, I’d be lying if I said I didn’t hear anything about this case.’ So it would indicate to us that at least at some level he was being dishonest with the Court or ... gave conflicting answers. Also during individual voir dire my notes reflected that he was wearing sweatpants. And wear *23 ing sweatpants to a capital murder case where somebody is looking at the death penalty, I thought was not appropriate for a juror, I didn’t think that juror would be taking this ease sufficiently seriously wearing sweatpants. He also indicated that he had testified in this very courtroom in a manslaughter case. And from the way of his answers, it indicated that he had testified as a defense witness in this courtroom, in a manslaughter case. And for those reasons we struck [Number] 292.
“[Number] 243 is ... identified as a black male. [He] indicated that he had a cousin and lawyer a cousin who was a lawyer. He also said he had cousins who were in jail or prison. And also he had indicated that he worked in the autopsy office and knows Dr. Brissie, Dr. Brissie was not one of our witnesses in this case, but if he knows Dr. Brissie, then he could have known all the other coroners in the office, and we struck him for that reason. He was asked if he knew Dr. Simmons, and he said he didn’t recognize the name. But the fear was that once Dr. Simmons testified, he may recognize him by face.
“[Number] 261, black female ... did not respond to the question, ‘Do you have friends or a relative arrested and charged with a crime?’ However, when she was asked if she had a relative in prison, a friend or relative in prison, she raised her hand and indicated that she had a relative in prison. But it begs the question how she could have a relative in prison who had never been arrested and charged with a crime. Also the judge, the Court in this ease recognized that [Number 261] looked very young. In fact, the Court’s perception was that [she] looked twelve years old. And for those reasons the State struck Number 261 ...
“[0]ur final strike 276, black female.... [S]he was going to be the State’s alternate. I believe our last strike was the alternate. She indicated that she was the victim of a crime in the Bessemer Cutoff, a case that our office would be prosecuting. She said she had not been to court yet. But due to the fact that she has contact with our office, or would be having contact with our office, and it could be while the case was going on, we felt that she would be an appropriate strike.”
(Record on Remand, 6-17.)
Thereafter, at the hearing, defense counsel responded to the prosecutor’s stated reasons for the striking of each black potential juror. The majority of defense counsel’s refutations of the reasons given by the prosecutor were that white potential jurors who responded similarly were not struck by the State. Defense counsel also indicated that many of the reasons proffered by the prosecutor actually indicated that the potential juror would have been a beneficial State’s juror. Finally, defense counsel questioned whether the prosecutor’s reasons concerning the appearance of two black potential jurors were pretextual. Defense counsel concluded that the prosecutor had not met his “heavy burden to rebut the prima facie case here.” (Record on Return to Remand, 34-35.) He argued that the State had used approximately 68 percent of its strikes to remove 82 percent of black potential jurors who remained after the strikes for cause. Defense counsel also alleged that the disparity in the ages, occupations, and marital statuses of the struck black veniremembers was evidence that the strikes were not race neutral.
Following the hearing, the circuit court issued an order finding that the prosecutor had “articulated a clear, specific and legitimate race neutral reason for *24 each strike.” (Record on Return to Remand, 2.) The court further determined that Jackson “failed to satisfy the trial court that the proffered race neutral reasons by the State were a pretext to justify discriminatory strikes.” (Record on Return to Remand, 3.) The court, in its order, thoroughly evaluated the challenges that Jackson made as to the prosecutor’s reasons for each of his strikes. It then opined that the attorneys had used “their common sense, experience and instinct to evaluate potential jurors.” (Record on Return to Remand, 8.) Moreover, the court noted that “it is not only the words spoken; it is the tone and attitude of the speaker [and] [o]ften ... what a potential juror leaves unsaid that is telling.” (Record on Return to Remand, 8.)
“ ‘ “After a prima facie case is established, there is a presumption that the peremptory challenges were used to discriminate against black jurors. Batson, 476 U.S. at 97, 106 S.Ct. at 1723. The State then has the burden of articulating a clear, specific, and legitimate reason for the challenge which relates to the particular case to be tried, and which is nondiscriminatory. Batson, 476 U.S. at 97, 106 S.Ct. at 1723. However, this showing need not rise to the level of a challenge for cause. Ex parte Jackson, [516 So.2d 768 (Ala.1986) ].”
“ ‘Ex parte Branch, 526 So.2d 609, 623 (AIa.1987).
“ ‘ “Within the context of Batson, a ‘race-neutral’ explanation ‘means an explanation based on something other than the race of the juror. At this step of the inquiry, the issue is the facial validity of the prosecutor’s explanation. Unless a discriminatory intent is inherent in the prosecutor’s explanation, the reason offered will be deemed race neutral.’ Hernandez v. New York, 500 U.S. 352, 360, 111 S.Ct. 1859, 1866, 114 L.Ed.2d 395 (1991). ‘In evaluating the race-neutrality of an attorney’s explanation, a court must determine whether, assuming the proffered reasons for the peremptory challenges are true, the challenges violate the Equal Protection Clause as a matter of law.’ Id. ‘[Evaluation of the prosecutor’s state of mind based on demeanor and credibility lies “peculiarly within the trial judges’s province.” ’ Hernandez, 500 U.S. at 365, 111 S.Ct. at 1869.”
“ ‘Allen v. State, 659 So.2d 135, 147 (Ala.Crim.App.1994).’
“Martin v. State, 62 So.3d 1050, 1058-59 (Ala.Crim.App.2010).
“ ‘ “When reviewing a trial court’s ruling on a Batson motion, this court gives deference to the trial court and will reverse a trial court’s decision only if the ruling is clearly erroneous.” Yancey v. State, 813 So.2d 1, 3 (Ala.Crim.App. 2001). “A trial court is in a far better position than a reviewing court to rule on issues of credibility.” Woods v. State, 789 So.2d 896, 915 (Ala.Crim.App.1999). “Great confidence is placed in our trial judges in the selection of juries. Because they deal on a daily basis with the attorneys in their respective counties, they are better able to determine whether discriminatory patterns exist in the selection of juries.” Parker v. State, 571 So.2d 381, 384 (Ala.Crim.App.1990).
“ ‘ “Deference to trial court findings on the issue of discriminatory intent makes particular sense in this context because, as we noted in Batson, the finding will ‘largely turn on evaluation of credibility.’ 476 U.S., at 98, n. 21. In the typical challenge inquiry, the decisive question will be whether *25 counsel’s race-neutral explanation for a peremptory challenge should be believed. There will seldom be much evidence bearing on that issue, and the best evidence often will be the demeanor of the attorney who exercises the challenge.”
“ ‘Hernandez v. New York, 500 U.S. 352, 365 (1991).
“Dosier v. State, 72 So.3d 50, 73-74 (Ala. Crim.App.2010).
“ ‘[W]hen more than one reason was given for striking some venire-members, we need only find one race neutral reason among those asserted to find that the strike was race-neutral; we need not address any accompanying reasons that might be suspect. See Poxoell v. State, 608 So.2d 411 (Ala.Cr.App.1992); Davis v. State, 555 So.2d 309 (Ala.Cr.App.1989).’
“Zumbado v. State, 615 So.2d 1223, 1231 (Ala.Crim.App.1993). ‘ “So long as there is a non-racial reason for the challenge, the principles of Batson are not violated.” ’ Jackson v. State, 686 So.2d 429, 430 (Ala.Crim.App.1996) (quoting Zanders v. Alfa Mut. Ins. Co., 628 So.2d 360, 361 (Ala.1993)).
“ ‘Once the prosecutor has articulated a race-neutral reason for the strike, the moving party can then offer evidence showing that those reasons are merely a sham or pretext.’ Ex parte Branch, 526 So.2d 609, 624 (Ala.1987). ‘A determination regarding a moving party’s showing of intent to discriminate under Batson is “ ‘a pure issue of fact subject to review under a deferential standard.’” Armstrong v. State, 710 So.2d 531, 534 (Ala.Crim.App.1997), quoting Hernandez v. New York, 500 U.S. 352, 365 (1991).’ Williams v. State, 55 So.3d 366, 371 (Ala.Crim.App.2010). ‘The trial court is in a better position than the appellate court to distinguish bona fide reasons from sham excuses.’ Heard v. State, 584 So.2d 556, 561 (Ala.Crim.App.1991).”
Thompson v. State, 153 So.3d 84, 123-24 (Ala.Crim.App.2012).
Here, the case was remanded for the prosecutor to come forward with specific and clear race-neutral reasons for his strikes, and he did so. Defense counsel then argued that the reasons were shams because white jurors who answered similarly or who shared the same circumstances were not struck. However, the circuit court addressed each of these alleged disparities and distinguished the answers or circumstances of the struck juror •and the white jurors • named by defense counsel. Jackson challenged the striking of 14 black potential jurors by the State.
As to the first, Juror 235, the prosecutor stated as a reason that the prospective juror had family members and a friend who was in prison. The fact that a prospective juror has a relative who has been convicted of a crime is a race-neutral reason for a peremptory strike. See Ex parte Brown, 686 So.2d 409, 418 (Ala.1996); Ex parte McNair, 653 So.2d 353, 356 (Ala.1994). This circumstance was shared by white jurors who were not struck. However, the prosecutor also stated that this potential juror had a sister who was an attorney, who did criminal defense work, and who practiced in “this court.” (Record on Return to Remand, 3.) Although Jackson also argued that white jurors related to attorneys were not struck, the circuit court found the relationships between the white jurors and the attorneys who they were related to and the relationship of the black juror to the attorney who he was related to were substantially different. The former involved a daughter’s boyfriend, a cousin, and an uncle who lived in Tennessee — whereas the *26 latter was the potential juror’s sister. The court’s finding that this strike was not racially motivated was not clearly erroneous. See Blackmon v. State, 7 So.3d 397, 423-25 (Ala.Crim.App.2005). See also Ex parte Crews, 797 So.2d 1119, 1122 (Ala.2000) (“In reviewing a trial court’s ruling on a Batson challenge, an appellate court may rely on a valid reason when both suspect reasons and valid reasons have been given. Dellar-Calce v. State, 654 So.2d 54 (Ala.Crim.App.1994); Talley v. State, 687 So.2d 1261 (Ala.Crim.App. 1996).”). Moreover, the court also found as to Juror 251, who was struck by the prosecutor, that this reason was race neutral because her cousin was “a prominent defense attorney” who had often tried cases before the same circuit judge and against the same prosecutors. (Record on Return to Remand, 4.) Cf. Wright v. State, 678 So.2d 1216, 1219 (Ala.Crim.App. 1996) (“[E]ven though Addie Glover was a secretary in the district attorneys office and not a lawyer who would try the case, the appellant would have been justified in exercising a peremptory strike to remove a juror related to an employee of the district attorney’s office and the grandmother of that employee’s child.”). See Hamilton v. State (No. 09-96-016CR, October 2, 1996) (Tex.App. 1996) (not reported in S.W.2d) (“According to the prosecutor, he struck juror number one because his juror information card (which was not admitted into evidence) reflected he was a client of local attorney Barry Bryan, whose practice was ninety percent criminal.... Although the defense attorney noted ‘[tjhere were other lawyers in this town who [have] something to do with criminal law matters,’ defense counsel did not demonstrate disparate treatment by identifying particular venire-persons who were clients of attorneys with a criminal practice.”). A Batson inquiry
“does not demand an explanation that is persuasive, or even plausible. ‘At this [second] step of the inquiry, the issue is the facial validity of the prosecutor’s explanation. Unless a discriminatory intent is inherent in the prosecutor’s explanation, the reason offered will be deemed race neutral.’ Hemandez[ v. New York ], 500 U.S. [352], at 360, 111 S.Ct. [1859], at 1866 [(1991)] (plurality opinion); id., at 374, 111 S.Ct., at 1874 (O’CONNOR, J., concurring in judgment) .... It is not until the third step that the persuasiveness of the justification becomes relevant — the step in which the trial court determines whether the opponent of the strike has carried his burden of proving purposeful discrimination. Batson, supra, at 98, 106 S.Ct., at 1723; Hernandez, supra, at 359, 111 S.Ct., at 1865 (plurality opinion) ... What it means by a ‘legitimate reason’ is not a reason that makes sense, but a reason that does not deny equal protection. See Hernandez, supra, at 359, 111 S.Ct., at 1866....”
Purkett v. Elem, 514 U.S. 765, 768, 115 S.Ct. 1769,131 L.Ed.2d 834 (1995).
A number of black potential jurors were struck by the State at least partially based on their relationship to crime victims whose perpetrators had not been prosecuted. Trawick v. State, 698 So.2d 151, 158 (Ala.Crim.App.1995) (“A prospective juror’s dissatisfaction with law enforcement constitutes a valid reason for striking that person. Gaston v. State, 581 So.2d 548 (Ala.Cr.App.1991).”). See Sharp v. State, 151 So.3d 342, 354 (Ala.Crim.App.2010) (“the courts have upheld challenges in cases where a juror was struck because he or she had a family member who was the victim of a violent crime”). Jackson contended that a similarly situated white juror was not struck for this reason; however, as noted by the court, the relation *27 ship between this white potential juror and the victim was not known. The perpetrator in the case involving the relative of the white potential juror was never apprehended, and the crime committed was never stated. However, Juror 237 was struck by the State because his father was shot and the perpetrator was never prosecuted despite having been apprehended. See Jackson v. State, 791 So.2d 979, 1007-08 (Ala.Crim.App.2000). See also U.S. v. Baskerville, 448 Fed.Appx. 243, 248 (3d Cir.2011) (finding no discriminatory intent by prosecutor’s strike of black potential juror “because her sister was serving a federal drug sentence not unlike that which Baskerville himself faced. The white juror to whom Baskerville compares Juror 33/36, however, had relatives who only served state sentences for crimes less like Baskerville’s in their nature and severity.”). ‘““[FJailing to strike a white juror who shares some traits with a struck [non-white juror] does not itself automatically prove the existence of discrimination.” United States v. Stewart, 65 F.3d 918, 926 (11th Cir.1995).’ United States v. Novaton, 271 F.3d 968, 1004 (11th Cir.2001).” Whatley v. State, 146 So.3d 437, 455 (Ala.Crim.App.2010) (opinion on return to remand). Further, although Jackson alleged that this potential juror may have been pro-prosecution, the juror stated that the perpetrator was never prosecuted although he was taken into custody; the court noted that, had there been a conviction, the juror might have been pro-prosecution. The circuit court properly determined that the prosecutor’s reasons were race neutral as to this potential juror.
The court similarly properly determined that the prosecutor’s strike removing Juror 252 was not racially motivated because the potential juror’s father had been killed by a stray bullet, and “the court could sense that she might be disgruntled with the criminal justice system.” (Record on Return to Remand, 5.) The court was able to see her demeanor and to hear the tone of her responses. See Morris v. State, 60 So.3d 326, 380 (Ala.Crim. App.2010) (“The trial court, which is able to view the potential juror’s demeanor as he or she answers the questions posed on voir dire and subsequently if necessary, is in a better position to evaluate his or her beliefs or convictions.”).
Furthermore, the court also determined that the prosecutor’s strike of Juror 278 was race neutral because he had a sister who had been raped, and no one had been apprehended or prosecuted for the crime. The court distinguished this potential juror’s situation from that of the white potential juror cited by Jackson in that the black potential juror would have been in his twenties when his sister was raped, whereas the white potential juror would have been five or six years old and less capable of developing an opinion concerning the handling of the situation by law enforcement and the justice system. Additionally, Juror 278 also stated, as noted by the circuit court, that he had family members who had been “in and out of jail.” (Record on Return to Remand, 5.)
As to Juror 276, who was struck by the prosecutor, the court noted that this juror was to serve as an alternate if necessary. The juror had a friend or family member who had been the victim of a crime, and she stated that the individual had not yet been to court on that case. Jackson argued that this reason for the strike was pretextual because she would have been sympathetic toward the prosecution. The court, however, determined that Jackson did not properly show that the prosecutor’s reason was a sham and stated:
“Merely because the State is prosecuting a case does not mean that the victim’s family and friends are happy with *28 the State. Victims often complain about not being fully engaged or informed in the process. Victims are at times unhappy with the length of time that a case takes to be resolved and they are not always happy with a resolution.... [CJounsel contends that having a friend or family as a victim would make [potential juror] identify with the prosecutor. The Court notes that in theory this would be possible, but based on reality this is not always the ease.”
(Record on Return to Remand, 7.) This finding by the circuit court was not clearly erroneous.
Juror 240 was struck because she stated that she would have to be convinced beyond any doubt of Jackson’s guilt in order to convict him. The trial court noted that she was emphatic as to her resolution that this should be the standard rather than the reasonable-doubt standard. Jackson argued that three white potential jurors who made similar statements were not struck. However, in determining that the prosecutor’s reason was race neutral, the trial court distinguished the other jurors’ remarks, finding:
“[One potential white juror] expressed a desire for substantial evidence, and [another potential white juror] expressed nervous hesitation but said she would not require the State to meet any extraordinary burden. [The third potential white juror] initially expressed that she expected the State to meet a high burden, but after individual voir dire, she seemed to clearly understand the burden of proof was ‘beyond a reasonable doubt.’ ”
(Record on Return to Remand, 4.) “ ‘The trial court is in a better position than the appellate court to distinguish bona fide reasons from sham excuses.’” Harris v. State, 2 So.3d 880, 899 (Ala.Crim.App.2007). “‘[T]he fact that a veniremember would hold the State to a higher burden of proof is a race-neutral reason for striking that veniremember.’ Blanton v. State, 886 So.2d 850, 874 (Ala.Crim.App.2003), cert. denied, 886 So.2d 886 (Ala.2004), cert. denied, Blanton v. Alabama, 543 U.S. 878, 125 S.Ct. 119, 160 L.Ed.2d 131 (2004).” Whatley v. State, 146 So.3d 437, 456 (Ala.Crim.App.2010) (opinion on return to remand). The court’s determination that this reason was facially valid was not clearly erroneous.
As to Juror 245, the circuit court’s finding that the State’s reason was race neutral was proper because the court found that, in light of the juror’s employment at a restaurant in' the small town wherein the murder of the police officer occurred, it was concerning that she knew no specifics about the case. The court opined that this indicated that she was either inattentive or not candid.
The prosecutor struck several black potential jurors because they had family members who were prosecuted for having committed criminal acts and some of those family members were in jail. Jackson contended that this reason was pretextual because three potential white jurors, who also indicated that they had family members or friends who were in jail, were not struck. However, the court properly found that the prosecutor’s reason was race neutral and distinguished the white potential jurors who merely raised their hands to answer. Juror 282, who was struck by the prosecutor, stated that she had an uncle who had 'been convicted of theft “everywhere,” and the court noted that she was “very specific regarding the prolific criminal career of her uncle.” (Record on Return to Remand, 6.) See United States v. Rowe, 437 Fed.Appx. 800, 802 (11th Cir.2011) (not selected for publication in the Federal Reporter) (“Rowe’s comparison of the second challenged black *29 venire member with a white juror fails because their responses to the pertinent question — about criminal charges against the venire member’s family members— were substantially different. The questionnaire of the venire member who was challenged indicated only that her son had been charged with a crime and that charges had been dismissed. The white comparison juror, by contrast, stated that his sister had been charged with an offense, ‘but I don’t know the details. We aren’t close.’ ”). Moreover, the court found that, like the prosecutor’s reason for striking Juror 245, another black potential juror, this juror worked in Fairfield and had only heard about the murder on the news. The court determined that this lack of knowledge indicated either a lack of candor or inattentiveness. As to Juror 284 who was struck by the prosecutor, the court affirmed that she “has a brother who has been prosecuted in this very court and sent to prison by the undersigned. Her brother was prosecuted by this District Attorney’s office.” (Record on Return to Remand, 6.) These reasons are race neutral.
The prosecutor’s strike of Juror 271 was based on the juror’s response that he had National Guard duty the following week and was concerned about meeting his responsibilities in that regard. Jackson countered the validity of this reason based on the response of a white potential juror that she had expressed concern about missing work. However, as found by the circuit court, the white potential juror was a school teacher who had indicated that she would miss the children rather than being concerned about her responsibilities. Further, she stated that she had always wanted to serve on a jury. A review of the record indicates that the court’s finding was not a distinction without a difference. Jackson did not show the prosecutor’s reason to have been pretextual.
The prosecutor’s reasons for striking Juror 292 concerned his clothing and appearance, the conflicting nature of his answers, and his statement that he had testified as a defense witness in a manslaughter trial held in the same courtroom as in the present trial. Jackson questioned the propriety of such a reason. The circuit court refused to address the validity of this reason, stating that “[t]he Court excludes any consideration of the clothing of [Juror 292] as there is no way the Court can evaluate the appearance of [Juror 292] as compared to other jurors some three years later.” (Record on Return to Remand, 6.) The court, however, found that the potential juror was removed for a nonracial reason because the potential juror answered questions inconsistently. Specifically, the court found:
“[Juror 292] stated that he was a witness in a manslaughter case; however on individual voir dire, it became clear that there was not a death involved but some sort of vehicular assault. The juror also vacillated on whether he had heard anything about the case (Pg. 443-444). It was difficult to discern if he was confused, dishonest or apathetic. The Court finds that his confusion or lack of veracity on both the ‘manslaughter’ response and the case at hand are race neutral reasons for the State to strike [him].”
(Record on Return to Remand, 6.)
This Court stated in Martin v. State, 62 So.3d 1050 (Ala.Crim.App.2010):
“It is well settled that ‘[a]s long as one reason given by the prosecutor for the strike of a potential juror is sufficiently race-neutral, a determination concerning any other reason given need not be made.’ Johnson v. State, 648 So.2d 629, 632 (Ala.Crim.App.1994). See also Jack *30 son v. State, 791 So.2d 979, 1009 n. 6 (Ala.Crim.App.2000); Brown v. State, 705 So.2d 871, 874 (Ala.Crim.App.1997); and Wood v. State, 715 So.2d 812, 816 (Ala.Crim.App.1996), aff’d, 715 So.2d 819 (Ala.1998). “Where a prosecutor gives a reason which may be a pretext, ... but also gives valid additional grounds for the strike, the race-neutral reasons will support the strike.’ Battle v. State, 574 So.2d 943, 949 (Ala.Crim.App.1990).”
62 So.3d at 1059-60. Here, although the reason concerning Juror 292’s clothing and appearance might have been suspect, the prosecutor’s other reasons were race neutral, and the court’s determination that those reasons were not pretextual was not clearly erroneous. See Maddox v. State, 708 So.2d 220, 227 (Ala.Crim.App.1997) (“[T]he veniremember’s inconsistent answers regarding his employment renders his removal race-neutral.”).
The circuit court determined that, although a number of reasons were given by the prosecutor for striking of Juror 243, the most compelling was that the juror had stated that, although he worked in the autopsy division of the coroner’s office, he did not recognize the witness from the coroner’s office by name. The court found that “[t]he possibility that he might recognize the witness upon his arrival at court could create a very serious problem during the course of the trial, and based on this the Court finds that the State articulated a race neutral reason for the striking.” (Record on Return to Remand, 6.) See Temmis v. State, 665 So.2d 953 (Ala.Crim.App.1994) (noting that the fact that a prospective juror knows a witness is a valid race-neutral reason for removing the juror). This reason was based on the circumstances of this trial and was race neutral.
As to the reason given for striking Juror 261, the court determined that her inconsistency in responding that she had friends or family members in prison but none that were ever charged with a crime was an inadvertent failure to respond, but that this reason was not race-based. Moreover, the prosecutor also stated as a reason that the trial court recognized that she looked very young, specifically that she appeared to be 12 years old. ‘Age, place of employment and demeanor of the potential juror have been held to be sufficiently race-neutral reasons for exercising a peremptory challenge.” Sanders v. State, 623 So.2d 428, 432 (Ala.Crim.App.1993). See Floyd v. State, [Ms. CR-05-0935, September 28, 2007] — So.3d -, - (Ala.Crim.App.2007) (finding no improper reason for strike when “prosecutor stated that he struck juror no. 5 because of her age and because his initial impression of her was that she would not make a favorable juror for the State”). Although, as argued by Jackson, there was a white juror who was of similar age, the court found:
“Of the fifty (50) jurors remaining when the panel was struck, [Juror 261] is the only juror that this Court commented on the extremely youthful appearance of the juror. Articulating impressions about appearance, dress or demeanor by this Court is unusual. Failing to articulate impressions will not give future persons reviewing the case the opportunity to fully appreciate the influence that the appearance of a potential juror has. The Court finds that the State had a race neutral reason for striking prospective juror [261].”
(Record on Return to Remand, 7.) Strikes based on visual or auditory cues that do not appear in a record are entirely proper and permissible under Batson.
“Indeed, this sort of situation is precisely why Batson jurisprudence requires reviewing courts to give ‘great defer- *31 enee’ to a trial judge’s determination of no racial motivation in a peremptory strike. See, e.g., United States v. Bernal-Benitez, 594 F.3d 1303, 1312 n. 5 (11th Cir.2010) (recognizing importance of deference because ‘[t]he judge presiding over jury selection is in a better position than we are to consider the relevant evidence — -including the interactions between counsel and the venire during voir dire, counsels’ questions and comments, and the venire persons’ demeanors’); [United States v. ]Cordoba-Mosquera, 212 F.3d [1194] at 1198 [(11th Cir.2000)] (‘Deference is particularly warranted here, where the proffered race-neutral explanation centered on ... behaviors that are especially given to on-the-spot interpretation.’).”
Lee v. Thomas (No. 10-0587-WS-M, May 30, 2012) note 24 (11th Cir.2012) (not reported in F.Supp.3d).
In the present case, the State met its burden of coming forward with facially valid, race-neutral reasons for its strikes of black potential jurors. Jackson then made arguments suggesting that these reasons were pretextual and shams. The circuit judge, who was in a better position to have evaluated the venire examination, including the demeanor, body language, and tone of the potential jurors and the prosecutor when he stated his reasons, determined that the strikes were not racially motivated. The court addressed each strike and explained its decision as to each. Compare United States v. Corley, 519 F.3d 716, 723 (7th Cir.2008) (“Although it would be more helpful for the district courts in these Batson cases to explicitly make credibility determinations, and perhaps state on the record the basis for rejecting the comparisons with the similarly-situated jurors, there is no ambiguity in this record. The court accepted the government’s argument, that determination is supported by the record, and it is not clearly erroneous.”). The court’s determination was not clearly erroneous.
II.
Jackson argues that hearsay statements of Elice Jackson were improperly admitted into evidence at trial. Specifically, he contends that Jackson, Sr.’s testimony as to statements made by Elice Jackson to him in his truck just following the offense were inadmissible hearsay, were not made in furtherance of a conspiracy, were admitted in violation of his rights to confront Elice Jackson, and were not harmless error. Jackson alleges that Jackson, Sr.’s statement that Elice’s hands were on the hood of the police vehicle when a masked man shot Officer Smith establish that Jackson was not the shooter.
“‘Hearsay’ is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted.” Rule 801(c), Ala. R. Evid. The State argued at trial and on appeal that Jackson, Sr.’s testimony as to Elice’s statements were admissible as a coconspirator’s statements made in furtherance of a conspiracy. According to Rule 801(d)(2)(E), Ala. R. Evid., a statement is not hearsay if it “is offered against a party and is ... a statement by a coconspirator of a party during the course and in furtherance of the conspiracy.” The Commentary to this Rule states:
“This subdivision continues the historic coconspirator rule, admitting against one conspirator the statements of another if made ‘during the course and in furtherance of the conspiracy.’ See Lundy v. State, 539 So.2d 324 (Ala.Crim.App.1988); Stokley v. State, 254 Ala. 534, 49 So.2d 284 (1950); C. Gamble, McElroy’s Alabama Evidence § 195.03 (4th ed. 1991). As recognized by both state and *32 federal authority, admissibility is denied to statements made after the objectives of the conspiracy have either failed or been achieved. See Wong Sun v. United States, 371 U.S. 471, 490 (1963); Eaton v. State, 280 Ala. 659, 197 So.2d 761 (1967).”
Criminal conspiracy is set out in § 13A-4-3, Ala.Code 1975:
“(a) A person is guilty of criminal conspiracy if, with the intent that conduct constituting an offense be performed, he agrees with one or more persons to engage in or cause the performance of such conduct, and any one or more of such persons does an overt act to effect an objective of the agreement.”
Thus, there must be some sort of mens rea or agreement, although it need not be spoken between the coconspirators. The Commentary to this statute states:
“The vagueness and uncertainty of the common law definition of conspiracy has been exacerbated by.the fact that the offense may be proved inferentially or by circumstantial evidence, Smith v. State, [8 Ala.App. 187, 62 So. 575 (1913)]. Often the proof is sprawling, and defendant is confronted with a hodgepodge of various acts and statements by others which he may never have authorized or even known about, but which are held to persuade the jury of the existence of the conspiracy itself; i.e., a conspiracy is often proved by evidence that is admissible only upon assumption that the conspiracy existed. Krulewitch[ v. United States, 336 U.S. 440 (1949)].
“Section 13A-4-3(a), therefore, defines conspiracy in terms of an agreement to cause the performance of criminal conduct, with a prescribed mens rea required for each defendant.”
Further, in the Commentary to § 13A-2-23, Ala.Code 1975, which defines complicity and establishes the legal accountability of one person for the criminal activity of another, primarily dealing with the intent of promoting and assisting, the law concerning conspiracy is described as follows:
“Moreover, often the courts ambiguously have treated conspiracy, which properly is an inchoate crime, as a basis for complicity liability for the commission of the substantive crime contemplated, or other crimes which resulted from the unlawful agreement. Stokley v. State, [254 Ala. 534, 49 So.2d 284 (1951)]; Berness v. State, 40 Ala.App. 198, 113 So.2d 178 [(1958)], cert. denied, 269 Ala. 694, 113 So.2d 183 (1959). ‘In the gestative stage those who act jointly in and about the commission of a crime are denoted as conspirators.... Our penal code makes all concerned in a felony equally punishable whether principal or accessories.’ Leonard v. State, 43 Ala.App. 454, 192 So.2d 461 (1966). Each co-conspirator is liable ‘for everything which may consequently and proximately result from such unlawful purpose, whether specifically contemplated or not, and whether actually perpetrated by all or less than all of the conspirators.’ Mabry v. State, 40 Ala.App. 129, 110 So.2d 250, cert. denied, 268 Ala. 660, 110 So.2d 260 (1969) (19[5]9). Thus a co-conspirator is equated to an aider and abettor which under the facts he often, but not necessarily, is. Properly, conspiracy is an incomplete crime, independent of the object crime, and is not a valid theory of complicity. See commentary following § 13A-4-3, subsection (f). And under the Proposed New Federal Criminal Code § 410, a co-conspirator is not liable for the conduct of another unless he meets the other requirements for complicity, i.e., induces, procures, *33 aids, etc., thereby rejecting the doctrine of Pinkerton v. United States, 328 U.S. 640 (1946), that mere membership in a conspiracy creates liability for all specific offenses committed in furtherance of the conspiracy. And cf. § 1004. Also, Proposed Revision Texas Penal Code § 7.02(b).”
Here, the prosecutor acknowledged that Elice Jackson likely had no idea that Jackson would shoot the police officers. Elice Jackson complied with Officer Smith’s orders to place his hands on the hood of her vehicle. Under the State’s theory of the case, Jackson shot the officers because he was on probation and was prohibited from carrying a firearm; he shot the officers rather than be sent back to prison for violating the terms of his probation. However, although Elice Jackson was not a eoeonspirator to the capital murder and the attempted murder, the State argues that Elice Jackson was a coconspirator with Jackson as to the offense of hindering prosecution.
First-degree hindering prosecution, a Class C felony, is defined by § 13A-10-43, Ala.Code 1975, as follows:
“A person commits the crime of hindering prosecution in the first degree if with the intent to hinder the apprehension, prosecution, conviction or punishment of another for conduct constituting a murder or a Class A or B felony, he renders criminal assistance to such person.”
(Emphasis added.) Thus, Elice Jackson, pursuant to the State’s evidence, committed first-degree hindering prosecution; however, the evidence does not indicate that he committed the inchoate crime of conspiracy to commit first-degree hindering prosecution with Jackson.[9] Jackson did not intend to hinder the apprehension or conviction of another; rather the evidence indicates that he escaped to protect himself. Therefore Rule 801(d)(2)(E) does not apply to Elice Jackson’s statements.
Moreover, Elice Jackson’s statements do not fall within one of the exceptions to the hearsay rule that are contained in Rule 803, Ala. R. Evid., or the exceptions for an unavailable witness as set out in Rule 804(b), Ala. R. Evid. However, despite Jackson’s argument to the contrary, any error caused by the admission of Jackson, Sr.’s testimony concerning Elice Jackson’s statements was harmless. Elice Jackson’s statement that he was ordered to place his hands on the hood of the police vehicle and complied with those orders was cumulative evidence. Officer Burpo testified that the older man had his hands on the front hood of Officer Smith’s vehicle when the younger, masked man shot him. Further, the prints taken from the hood of Officer Smith’s vehicle matched those of Elice Jackson. “The admission of cumulative evidence constitutes harmless error. See Dawson v. State, 675 So.2d 897, 900 (Ala.Crim.App.1995), affirmed, 675 So.2d 905 (Ala.1996). ‘The harmless error rule applies in capital cases.’ Musgrove v. State, 519 So.2d 565, 575 (Ala.Crim.App.1986), affirmed, 519 So.2d 586 (Ala.1986), cert. denied, Musgrove v. Alabama, 486 U.S. 1036, 108 S.Ct. 2024, 100 L.Ed.2d 611 (1988).” Whatley v. State, 146 So.3d 437, 464 (Ala.Crim.App.2010) (opinion on return to remand).
“The harmless-error rule provides, in pertinent part:
“ ‘No judgment may be reversed or set aside ... on the ground of ... improper admission or rejection of evidence, nor for error as to any matter of pleading or procedure, unless in the opinion of the court to which the ap *34 peal is taken or application is made, after examination of the entire cause, it should appear that the error complained of has probably injuriously affected substantial rights of the parties.’
“Rule 45, Ala. R.App. P. See also Chapman v. California, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967).
“In Ex parte Crymes, 630 So.2d 125 (Ala.1993), the Alabama Supreme Court stated:
“ ‘In determining whether the admission of improper testimony is reversible error, this Court has stated that the reviewing court must determine whether the “improper admission of the evidence ... might have adversely affected the defendant’s right to a fair trial,” and before the reviewing court can affirm a judgment based upon the “harmless error” rule, that court must find conclusively that the trial court’s error did not affect the outcome of the trial or otherwise prejudice a substantial right of the defendant.’
“630 So.2d at 126. See also Ex parte Greathouse, 624 So.2d 208, 210 (Ala.1993) (holding that the proper harmless-error inquiry is whether it is clear beyond a reasonable doubt that the jury would have returned a verdict of guilty absent the improperly introduced evidence).”
Naylor v. State, 108 So.3d 1063, 1077 (Ala.Crim.App.2012).
The jury, beyond a reasonable doubt, would not have returned a different verdict if it had not heard testimony regarding Elice Jackson’s statement that he placed his hands on the hood of the vehicle. The jury was informed of these actions through other testimony and fingerprint evidence. Moreover, Jackson was not prejudiced by Elice Jackson’s statement because Elice told Jackson, Sr., that a masked man had shot the officers. Jackson, Sr., also testified that Elice did not tell him that Jackson shot the police officer or identify Jackson as the shooter.
The admission of testimony concerning Elice Jackson’s statement also did not violate Jackson’s Confrontation Clause rights under Crawford v. Washington, 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004). Elice Jackson was deceased at the time of trial and was therefore clearly unavailable. Also, his statements to Jackson, Sr., were not made to further a criminal investigation and thus were not testimonial hearsay. “[Rjesponses to inquiries by family members under the circumstances of the instant case do not bear the indicia of ‘formal statements] to government officers,’ but are instead more analogous to ‘a casual remark to an acquaintance.’ Crawford, 541 U.S. at 51, 124 S.Ct. 1354.” Styron v. State, 34 So.3d 724, 732 (Ala.Crim.App.2009). Thus, Elice Jackson’s statements made to Jackson, Sr., were not testimonial and were more reliable as they were being made in private to his brother. Crawford, 541 U.S. at 57 (“[W]e considered reliability factors beyond prior opportunity for cross-examination when the hearsay statement at issue was not testimonial. See Dutton v. Evans, 400 U.S., at 87-89, 91 S.Ct. 210 [(1970)] (plurality opinion).”). “Where nontestimo-nial hearsay is at issue, it is wholly consistent with the Framers’ design to afford the States flexibility in their development of hearsay law ... as would an approach that exempted such statements from Confrontation Clause scrutiny altogether.” Crawford, 541 U.S. at 68.
Moreover, this statement did not probably injuriously affect Jackson’s substantial rights. Rule 45, Ala. R.App. P.; Reynolds v. State, 114 So.3d 61, 158 (Ala.Crim.App. *35 2010). The harmless-beyond-a-reasonable-doubt standard for harmless error, Chapman v. California, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967), applies to violations of the Confrontation Clause. D.G. v. State, 76 So.3d 852, 859 (Ala.Crim.App.2011), quoting T.P. v. State, 911 So.2d 1117, 1124 (Ala.Crim.App.2004). Had this been error, it would have been harmless.
III.
Jackson argues that hearsay statements of Jackson, Sr., were improperly allowed into evidence at trial through the testimony of Corrections Officer Benny Hopper. Jackson refers to Officer Hopper’s testimony that while Jackson, Sr., was at the jail following the offense, Hopper asked him how he had gotten “drawed up in this,” and Jackson, Sr., responded, “I can’t figure that out. My son’s the shooter.” (R. 863.) The prosecutor then asked the witness whether Jackson, Sr., had stated to him that his son was the alleged shooter or the shooter; Officer Hopper responded that Jackson, Sr., had stated that his son was the shooter. Officer Hopper also testified that he then made a report of this statement. On appeal, Jackson argues that the testimony by Correction Officer Hopper was inadmissible hearsay that did not fit within any exception to the exclusionary rule. Moreover, he alleges, it was not admissible as a prior inconsistent statement because it was not made under oath and because Jackson, Sr., was called to testify by the State and the prosecutor could not impeach his own witness. Jackson contends that the probative value of this evidence was far outweighed by its prejudicial effect. He notes that no limiting instructions were given as to the testimony concerning Jackson, Sr.’s statement to Officer Hopper.
Jackson did not object to this testimony at trial; therefore, this issue is to be evaluated under the plain-error standard of review. Rule 45A, Ala. R.App. P., states that in all cases in which the death penalty has been imposed, this Court “shall notice any plain error or defect in the proceedings under review, whether or not brought to the attention of the trial court, and take appropriate appellate action by reason thereof, whenever such error has or probably has adversely affected the substantial right of the appellant.”
“‘“‘Plain error’ has been defined as error ‘ “so obvious that the failure to notice it would seriously affect the fairness or integrity of the judicial proceedings.”’ Ex parte Womack, 435 So.2d 766, 769 (Ala.1983), quoting United States v. Chaney, 662 F.2d 1148, 1152 (5th Cir.1981). ‘To rise to the level of plain error, the claimed error must not only seriously affect a defendant’s “substantial rights,” but it must also have an unfair prejudicial impact on the jury’s deliberations.’ Hyde v. State, 778 So.2d 199, 209 (Ala.Crim.App.1998), aff’d, 778 So.2d 237 (Ala.2000). This Court has recognized that the ‘ “plain-error exception to the contemporaneous-objection rule is to be ‘used sparingly, solely in those circumstances in which a miscarriage of justice would otherwise result.’”’ Burton v. State, 651 So.2d 641, 645 (Ala.Crim.App.1993), aff’d, 651 So.2d 659 (Ala.1994), quoting United States v. Young, 470 U.S. 1, 15, 105 S.Ct. 1038, 84 L.Ed.2d 1 (1985), quoting in turn United States v. Frady, 456 U.S. 152, 163 n. 14, 102 S.Ct. 1584, 71 L.Ed.2d 816 (1982).”
“‘Eggers v. State, 914 So.2d 883, 890-91 (Ala.Crim.App.2004).’”
Revis v. State, 101 So.3d 247, 261-62 (Ala.Crim.App.2011), quoting Eatmon v. State, 992 So.2d 64, 69-70 (Ala.Crim.App.2007).
Jackson, Sr., testified as follows:
*36 “Q. [Prosecutor] Did you ever tell anybody who the shooter was?
“A. I couldn’t have told nobody because I don’t know who the shooter was.
“Q. Do you remember telling one of the deputies when you were at the jail who the shooter was, Mr. -Jackson?
“A. No, sir.
“Q. In fact, you told one of the deputies that you don’t know why they got you over at the jail because your son was the shooter—
“A. No, sir.
“Q. —isn’t that a fact?
“A. No, sir. I didn’t make a statement like that, period.
“Q. You never made that statement?
“A. No, sir.”
(R. 636.) Defense counsel then questioned Jackson, Sr., who testified that he had asked the officers why he was there, because he had been told by officers that his son was being accused of the offense. Thereafter on redirect examination by the State, Jackson, Sr., again denied having told an officer that his son had committed the offense and testified:
“Q. [Prosecutor] And you told the deputy, T don’t know why you got me down here; my son was the shooter’?
“A. No, sir. I never made that statement.”
(R. 637.) Therefore, Jackson, Sr.’s testimony concerning his statement to Correction Officer Hopper was inconsistent with, and impeached by, the later hearsay testimony by Officer Hopper as to what Jackson, Sr., had said.
In Trawick v. State, 86 So.3d 1105 (Ala.Crim.App.2011), this Court stated:
“‘Rule 607[, Ala.R.Evid.,] authorizes a party to bring against his own witness all weapons from the arsenal of impeachment that historically were reserved generally for opposing witnesses. This power resides in the prosecution in a criminal case, the criminal defense, and any civil party. One may, for example, impeach his own witness by showing that the witness made a statement or performed an act that is inconsistent with the witness’ present testimony. Bias-indicating acts or statements could likewise be used for such an attack. Other witnesses may be called to contradict the witness’ version of the facts.’
“Charles W. Gamble, McElroy’s Alabama Evidence § 165.01(6)(a) (6th ed. 2009).
“ ‘ “Prior inconsistent statements of a witness made out of court are admissible in evidence for the purpose of showing that the witness is not worthy of belief — that is, for impeachment purposes. Such evidence is not classed as hearsay.”
‘“29 Am.Jur.2d Evidence, § 500 (1967). (Emphasis supplied.) See also McElroy’s Alabama Evidence, supra, at § 149.01(10). This type statement is not offered to prove the truth of the things said, and so does not fit the definition of hearsay.’
“Jones v. State, 531 So.2d 1251, 1254 (Ala.Crim.App.1988).
“‘In Burgin [v. State, 747 So.2d 916 (Ala.Crim.App.1999)], this court was persuaded by the federal courts’ interpretation of Rule 607 of the Federal Rules of Evidence, which is identical to the Alabama Rule:
“““[Rule] 607 allows the government to impeach its own witness. See Fed.R.Evid. 607. However, “ ‘the government must not knowingly elicit testimony from a witness in order to impeach him with otherwise inadmissible testimo *37 ny.’” United States v. Gomez-Gallardo, 915 F.2d 553, 555 (9th Cir.1990) (quoting United States v. Whitson, 587 F.2d 948, 952-53 (9th Cir.1978)). Impeachment is improper when employed as a guise to present substantive evidence to the jury that would be otherwise inadmissible. Id. A determination must be made as to whether the government examined the witness for the primary purpose of placing before the jury substantive evidence which is otherwise inadmissible. Id.’ ”
“‘Btorgin, 747 So.2d at 918, quoting United States v. Gilbert, 57 F.3d 709, 711 (9th Cir.), cert. denied, 515 U.S. 1110, 115 S.Ct. 2264, 132 L.Ed.2d 269 (1995). As this court stated in Bur-gin, “'[i]t would be an abuse of the rule ... for the prosecution to call a witness that it [knows will] not give it useful evidence, just so it [can] introduce hearsay evidence against the defendant in the hope that the jury would miss the subtle distinction between impeachment and substantive evidence.’ ” Id.’
“Smith v. State, 745 So.2d 922, 935 (Ala.Crim.App.1999).”
86 So.3d at 1109-10.
Here, Jackson, Sr., was called by the State to testify and, as Jackson’s father, would be presumed to be an adverse witness to the State. Compare Jarrell v. State, 251 Ala. 50, 56, 36 So.2d 336, 341 (1948) (concerning the availability of Jar-rell’s father as a witness to both parties, “since the father is so closely related to the son by blood ... he is bound to be hostile to the State.... ”).
In Weaver v. State, 466 So.2d 1037, 1040-41 (Ala.Crim.App.1985), this Court stated:
“ ‘The characterization of a witness as adverse or hostile is not dependent upon the unfavorable or “hostile” nature of his testimony, but rather upon the characterization of the nature and manner of the witness himself. Anderton v. State Ala.Cr.App. 390 So.2d 1083, cert. denied, Ala., 390 So.2d 1087 (1980); and authorities cited therein. It is a common occurrence that a witness may partially or totally answer questions unfavorably, propounded by the party calling him. Such would not immediately create the adverse or hostile situation requisite for the party to be given the use of the tools of cross-examination. It does not create a ground of hostility if a witness does not now testify to the same statement or statements which he had previously made. See generally, R. v. Smith, 2 Crim.App. 86 (1909).’ (Footnote omitted).
“Wiggins[ v. State, 398 So.2d 780, 782 (Ala.Crim.App.1981)].
“We hold that the trial judge properly allowed the State to impeach Payne by using her prior inconsistent statement. There is no doubt in this court’s mind that Payne was a hostile witness. The determination of hostility did not result solely from her unfavorable testimony to the State but from her obvious bias for the appellant. Payne was the appellant’s girlfriend and lived with him at the time of the trial just as she had for some time. Because of this relationship, Payne was clearly inclined to testify falsely against the State and in favor of the appellant. Therefore, the Adverse Witness rule was correctly applied in this case.
“The appellant goes to great lengths in his brief to contend that the State should not have been allowed to impeach Payne because it was not ‘surprised’ by her testimony.
*38 “ ‘The party calling the witness need now show that he was surprised by the witness’ testimony as a condition precedent to impeaching the witness under the Adverse Witness Rule. Nothing in the two decisions dealing with the rule even faintly suggests that such surprise is necessary. Indeed, in Anderton the party that called the witness clearly was not “surprised” ’ (Footnotes omitted).
“Gamble, [McElroy’s Alabama Evidence] supra at 15.”
Rule 607, Ala. R. Evid., allows the party who called a witness to attack the wit7 ness’s credibility. According to C. Gamble, McElroy’s Alabama Evidence (6th ed. 2009), § 165.01(6)(a):
“Rule 607 authorizes a party to bring against his own witnesses all weapons from the arsenal of impeachment that historically were reserved generally for opposing witnesses. This power resides in the prosecution in a criminal case, the criminal defense, and any civil party. One may, for example, impeach his own witness by showing that the witness made a statement or performed an act that is inconsistent with the witness’s present testimony.... Other witnesses may be called to contradict the witness’ version of the facts.... Inconsistencies, whether in the form of statements or acts, likewise could be used to impeach one’s own witness.”
Under similar facts, in Burgin v. State, 747 So.2d 916 (Ala.Crim.App.1999), this Court determined that the State could properly treat its own witness as hostile and impeach her, despite Burgin’s claims that
“the trial court erred in allowing the prosecution to impeach its own witness and then to offer the impeachment evidence as substantive evidence. Specifically, Burgin argues that the prosecutor was improperly allowed to call as a witness Pearlie Reed, Burgin’s girlfriend and the mother of his child, knowing that she was a hostile witness and that she would refuse to testify. Burgin argues that Reed was called as a prosecution witness so that the prosecutor could introduce as impeachment evidence a prior statement of Reed’s in which she recounted a confession Burgin had made to her.”
747 So.2d at 918. This Court noted the necessity to guard against a party’s abuse of allowing the impeachment of its own witness as a guise for improperly introducing substantive evidence. This court stated:
“However, a prosecutor may call a witness it knows may be hostile, and it may impeach that witness’s credibility. Surprise is not a necessary prerequisite to impeaching one’s own witness under Rule 607. United States v. Palacios, 556 F.2d 1359 (5th Cir.1977). Even if the prosecution had reason to believe that a witness would be reluctant to testify, it should not be bound by that knowledge when deciding to call a witness, because ‘an attorney is entitled to assume that a witness will testify truthfully’ once the witness is in a court of law and is under oath. United States v. Patterson, 23 F.3d 1239, 1245 (7th Cir.), cert. denied, 513 U.S. 1007, 115 S.Ct. 527, 130 L.Ed.2d 431 (1994). A prosecutor’s decision to call such a witness is subject to a good-faith standard, and it is ‘always open for the defendant to argue that the probative value of the evidence offered to impeach the witness is clearly outweighed by the prejudicial impact it might have on the jury, [pursuant to Rule 403, Ala.R.Evid.j, because the jury would have difficulty confining use of the evidence to impeachment.’ *39 United States v. Webster, 734 F.2d [1191,] 1193 [(7th cir.1984)].”
747 So.2d at 919.
Here, Jackson, Sr., gave testimony that was highly relevant and probative to the State’s case. He testified for the State and verified that Jackson had telephoned him just before the offense, stating the Elice Jackson needed a ladder for a job at a location in close proximity to where the offense occurred. Elice did not call Jackson, Sr., but was able to have Jackson call his father; thus, the implication was that Jackson was with Elice. Jackson, Sr., also testified that, as he drove away from the scene, his “main concern was ... to know where ... [his] son was.” (R. 609.) He further gave testimony that when he located Jackson shortly after the shootings, Jackson had his car which had been seen at the offense by Officer Burpo. Jackson, Sr.’s testimony was introduced for purposes other than to introduce his statement made to Corrections Officer Hopper. Moreover, although Jackson, Sr.’s refutation of having told Officer Hopper that his son had shot the officer was introduced on redirect examination, “[t]his power to impeach one’s own witness arises on redirect as well as direct examination.” C. Gamble, McElroy’s Alabama Evidence, 165.01(6)(a), n. 13. See Smith v. State, [Ms. CR-97-1258, December 22, 2000] — So.3d - (Ala.Crim.App.2000), affirmed in part, reversed on other grounds and remanded, Ex parte Smith, [Ms. 1010267, March 14, 2003] — So.3d - (Ala.2003).
Following Jackson, Sr.’s testimony, the State introduced the testimony of Vannie Newton stating that Jackson, Sr., was present at the time of the offense. She indicated that Jackson, Sr., was at her house when she ran to her porch immediately after she heard gunshots. She questioned him as to what had occurred, and he then retrieved his property from her porch and drove away. By this testimony, the prosecution suggested that Jackson, Sr., had been present at the time of the offense and was protecting his son. Thus, the prosecution sought to further impeach its own witness to clarify the motive behind his testimony rather than to introduce substantive testimony. The State called Jackson, Sr., to introduce other relevant testimony that was important to the prosecution’s case. The weight of that evidence was not outweighed by the prejudicial effect of the impeaching evidence from Officer Hopper. Moreover, any indication of Jackson’s guilt was cumulative to the testimony of Jackson’s fellow inmate, who stated that Jackson had, while watching a televised account of the offense, made a statement indicating that he had committed her murder.
IV.
Jackson argues that he is entitled to a new trial because, he says, the prosecutor improperly concealed evidence inside an exhibit that was presented to the jury during closing arguments that had not been admitted at trial. Specifically, Jackson refers to the introduction into evidence of the black jacket recovered from his friend’s apartment where he apparently was found following the offense. Jackson alleges that the State never proved that the jacket belonged to him, but nonetheless, during closing arguments, reached into a bag containing the jacket and pulled out test results from DNA testing on the jacket. The results, not admitted at trial, indicated that some hairs had been found on the jacket, but that none were suitable for DNA testing.
The record indicates that the black jacket was collected by an officer from Crystal Prevo’s home. Prevo testified that the jacket did not belong to her and that it had not been present in her home before she *40 left Jackson there for the night. Moreover, Cpl. Bartle testified that the jacket was submitted to the Department of Forensic Sciences for analysis and yielded negative results.
During defense counsel’s closing argument, he alleged that there were a number of holes and shortcomings in the State’s case, and argued:
“Well, what did they not do? What did they not do? They checked some stuff that looked like wax on it for blood and didn’t find any presence of blood. But you know what? Nowhere did you hear that they got a — what you call specialists in fibers and hair? I guarantee you, when you wear a jacket that much and wear it often, a few of your hairs will pull off on the inside of that jacket. So, if they wanted DNA evidence that connected that man to this crime, how come they didn’t go for hair samples on that jacket and show conclusively, beyond a reasonable doubt, that this defendant was wearing that jacket? Because that other — that girl couldn’t say whether he was ever wearing that jacket or not. Now, that’s not excluding every reasonable hypothesis. When you start to think about things, you see all of the failures in the State’s case.”
(R. 1172.)
Thereafter, the prosecutor in closing argument responded by arguing:
“The jacket. The jacket — this is part of the evidence, by the way. And if this — in this bag, he said, why didn’t they do something? Part of this bag is debris collected from the jacket. Some hairs noted, but none suitable for DNA analysis.' Apparently, he just — he didn’t see that. But, you know, let’s talk about the facts. Let me tell you what is significant about this jacket. First of all, Crystal Prevo doesn’t know where this jacket came from. And it’s on the floor — the pictures showed you it’s on the floor in her master bedroom. Do you remember Eric Burpo’s testimony. He said that gun came out of a pouch or a pocket in the front of the jacket, and he went like that (indicating). Well, it’s got a Velcro lock on it right there (indicating). That’s where the gun was, ladies and gentlemen. This is the jacket that he left in her apartment when he goes over there because he told her it was too cold at his home in Fairfield. That’s what he said.”
(R. 1190-91.) After closing arguments, defense counsel made a motion for mistrial based on the prosecutor’s pulling the test results out of the evidence bag and showing this evidence to the jury. The following transpired:
“[Defense counsel]: ... I commented on their failure about hair samples. Judge, when this right here (indicating) was admitted into evidence, it was admitted into evidence — I make a mistrial on this also, motion for mistrial. It was identified as a jacket only. They slipped a dang Department of Forensic Science result into the pocket of it—
“[Prosecutor]: It was in the bag, [defense counsel].
“[Defense counsel]: It was not identified — it was not identified during the testimony of the predicate laid for this. You don’t ever put results into a basket with the — with the clothing. They bring a forensic report up here. Someone testifies to that fact. But to stick the results into a bag where they admitted it as a jacket is grounds for a mistrial. I’ve never had it done in the history of trying a capital murder case ever. And that — I don’t know who in Forensics did that, but that was the most improper thing. And then he got the comment, well, I guess [prosecutor] didn’t read the results that we just kind of stuck in here *41 and slipped away into this bag here. And how am I supposed to get a fair trial when they’re slipping things like that, conclusions into a bag where clothing is put that is vital evidence?
[[Image here]]
“[Defense counsel]: I want — I want the record to reflect and mark this for my motion for a mistrial, that was in— its like — I’m trying to see the State’s number — State’s Exhibit 121, where this was never identified as being in that bag through the predicate. Now they’ve got to get up here and make an argument and come back to me after I’m sitting here making a perfectly good argument based on the evidence.
[[Image here]]
“[Defense counsel]: And I move for a mistrial for the proper admission of forensic conclusions that was — that was put into evidence illegally. And I move for a mistrial on it.
“THE COURT: All right. Do you want to respond?
[[Image here]]
“[Prosecutor]: [Exhibit] 121 was offered into evidence and, I believe, over no objection, Your Honor. And that included — that was everything that was in that bag. And then he gets up— because he hasn’t looked in the bag and doesn’t know what’s in there, he wants to get up in his closing arguments and say, oh, we didn’t do this, and we didn’t do that. It’s right there in the exhibit. It’s been there the whole time. It never was in a pocket. It was in the bottom of this bag with the — which is now part of State’s evidence, or State’s Exhibit 121. It’s been there the whole time, Your Honor.
“[Defense counsel]: Judge, any time you’re admitting something into evidence out of a bag, you’ve got to identify everything that’s in that bag through proper identification and laying the proper predicate. You can’t put results of any forensic type thing and hide it away in the bottom of a bag. I’ve never seen this done in history. I know I’ve tried at least 40 something capital murder trials, and I’ve never seen anything like that done ever.
“THE COURT: All right. Any other response?
“[Prosecutor]: It wasn’t hidden, Your Honor, and the results — the only item that’s in the bag is in evidence. Every bit of that bag is in evidence.. So, it goes back to the jury.
“THE COURT: All right. I will reserve ruling on this motion. I’m going to look at some caselaw, review some— when the jacket was offered, testimony. And I would rule on that in the morning.”
(R. 1209-12.) The following day, defense counsel repeated his argument, and the prosecutor again responded that the items were in evidence and that he did not know that defense counsel was unaware of what was in the bag. Moreover, the prosecutor noted that Cpl. Bartle had testified without objection that no DNA analysis had been performed on the jacket. The court clarified, by reading Cpl-.Bartle’s prior testimony, that he had testified that a request had been made for forensic-biology analysis on the jacket and that the results had been negative. The court further determined that the evidence contained in the bag showing these results, however, had not been admitted into evidence. This evidence stated: “Jacket, debris collected, some hairs noted, but none suitable for DNA analysis, JMB, date 2/5/07.” (R. 1220.) The court admonished the prosecutor to guard against showing the jury any items that were neither admitted nor acknowledged to be part of an admitted item of evidence. However, the court found *42 that “this is not detrimental to the defendant. If anything, it helps the defendant. It says that there’s no evidence that it was his jacket. So, I’m not going to declare á mistrial.” (R. 1223.) The court also allowed the evidence to go to the jury as the results had been presented to it.
Although defense counsel’s motion for mistrial was made after the prosecutor’s closing argument and was therefore untimely, the plain-error rule applies to this ruling. Rule 45A, Ala. R.App. P. Cooper v. State, 912 So.2d 1150, 1159 (Ala.Crim.App.2005) (declaring untimely motion for mistrial based “on the grounds that the prosecutor had made comments during closing argument that were not based on the evidence” made after closing argument); Miles v. State, 715 So.2d 913, 918 (Ala.Crim.App.1997) (“[B]ecause no objection was made to the prosecutor’s reference to ‘dirty lawyer tricks’ during closing argument, that issue is ... not preserved for this Court’s review.... Defense counsel did renew his motion for a mistrial after the prosecutor concluded his argument.... However, ... such a motion is untimely unless it is made immediately after the objectionable statement or question is made.”).
“ ‘This court has stated that “[i]n reviewing allegedly improper prosecutorial comments, conduct, and questioning of witnesses, the task of this Court is to consider their impact in the context of the particular trial, and not to view the allegedly improper acts in the abstract.” Bankhead v. State, 585 So.2d 97, 106 (Ala.Crim.App.1989), remanded on other grounds, 585 So.2d 112 (Ala.1991), aff’d on return to remand, 625 So.2d 1141 (Ala.Crim.App.1992), rev’d on other grounds, 625 So.2d 1146 (Ala.1993). See also Henderson v. State, 583 So.2d 276, 304 (Ala.Crim.App.1990), aff’d, 583 So.2d 305 (Ala.1991), cert. denied, 503 U.S. 908, 112 S.Ct. 1268, 117 L.Ed.2d 496 (1992). “In judging a prosecutor’s closing argument, the standard is whether the argument ‘so infected the trial with unfairness as to make the resulting conviction a denial of due process.’” Bankhead, 585 So.2d at 107, quoting Darden v. Wainwright, 477 U.S. 168, 181, 106 S.Ct. 2464, 2471, 91 L.Ed.2d 144 (1986) (quoting Donnelly v. DeChristoforo, 416 U.S. 637, 94 S.Ct. 1868, 40 L.Ed.2d 431 (1974)). “A prosecutor’s statement must be viewed in the context of all of the evidence presented and in the context of the complete closing arguments to the jury.” Roberts v. State, 735 So.2d 1244, 1253 (Ala.Crim.App.1997), aff’d, 735 So.2d 1270 (Ala.), cert. denied, 538 [528] U.S. 939, 120 S.Ct. 346, 145 L.Ed.2d 271 (1999). Moreover, “statements of counsel in argument to the jury must be viewed as delivered in the heat of debate; such statements are usually valued by the jury at their true worth and are not expected to become factors in the formation of the verdict.” Bankhead, 585 So.2d at 106.’”
Moody v. State, 95 So.3d 827, 848-49 (Ala.Crim.App.2011), quoting Ferguson v. State, 814 So.2d 925, 945-46 (Ala.Crim.App.2000) (emphasis omitted.)
Even if it was error for the prosecutor to reveal the evidence of the test results from the bag during his closing argument, any error in doing so was neither plain error nor reversible error. As the trial court noted there was testimony at trial as to the test results. Moreover, those results did not connect Jackson to the jacket and, thus, he was not prejudiced by the revelation of these results. In Snyder v. State, 893 So.2d 488 (Ala.Crim.App.2003), Snyder argued that the prosecutor improperly argued facts not in evidence when he referred to a third necklace that had never been presented into evidence and *43 when he mentioned in closing argument State’s exhibit number 196, which was never offered or admitted at trial. Testimony-had been presented at trial concerning the necklace and the exhibit. This Court determined that any error was harmless and stated:
“If any error did occur in mentioning the exhibit before it was formally identified it was at most harmless. ‘Testimony that may be apparently inadmissible may be rendered .innocuous by subsequent or prior lawful testimony to the same effect or from which the same facts can be inferred.’ Yeomans v. State, 641 So.2d 1269, 1272 (Ala.Crim.App.1993). ‘The erroneous admission of evidence that is merely cumulative is harmless error.’ Dawson v. State, 675 So.2d 897, 900 (Ala.Crim.App.1995), aff’d, 675 So.2d 905 (Ala.1996). There was no reversible error here.”
893 So,2d at 545. See also Wilson v. State, 874 So.2d 1155, 1161 (Ala.Crim.App.2003) (holding that the prosecutor’s misstatement of the evidence during his closing argument was not reversible error because there was other evidence admitted at trial from which the existence of the subject of the misstatement could be inferred).
On appeal, Jackson also argues that he was prejudiced by the prosecutor’s revealing the test results to the jury, because defense counsel had argued that no testing had been done on the jacket. Thus, Jackson suggests that the prosecutor’s actions made defense counsel look foolish.
“‘“One of the most prevalent arguments to a jury is that the position and argument of the adversary is unwarranted, silly, fanciful or illogical.” Crook v. State, 276 Ala. 268, 270, 160 So.2d 896, 897 (1963). “[A] prosecutor’s remarks during closing argument pointing out the flaws in the defense’s theory of the case do not constitute improper argument.” Reeves v. State, 807 So.2d 18, 45 (Ala.Crim.App.2000). See also Hall v. State, 820 So.2d 113, 142 (Ala.Crim.App.1999), aff’d, 820 So.2d 152 (Ala.2001) (prosecutor’s reference to the defense as a “smoke screen” was not improper) (emphasis omitted); West v. State, 793 So.2d 870, 884 (Ala.Crim.App.2000) (prosecutor’s comment that a statement made by defense counsel was “part of the fairy tale that y’all have been hearing from the defense side” was not improper or prejudicial) (emphasis omitted); Woodall v. State, 730 So.2d 627, 650 (Ala.Crim.App.1997), aff’d in pertinent part, rev’d on other grounds, 730 So.2d 652 (Ala.1998) (prosecutor’s comment that defense’s theory was “an attempt to sell the jury ‘oceanfront property in Arizona’ ” was not improper or prejudicial); Smith v. State, 588 So.2d 561, 569 (Ala.Crim.App.1991) (prosecutor’s reference to defense counsel as “ ‘merchants of reasonable doubt’ ” was not improper); Haywood v. State, 501 So.2d 515, 519 (Ala.Crim.App.1986) (prosecutor’s comment that “ ‘devious tricks to distort the truth’ ” had occurred during the trial was not improper); Thomas v. State, 393 So.2d 504, 508-09 (Ala.Crim.App.1981) (prosecutor’s comments “‘Judge, I think this lawyer needs to have a little lesson in proper evidence’ ” and that trial counsel had “ ‘lied’ ” were not prejudicial); and Crook, 276 Ala. at 269, 160 So.2d at 896-97 (prosecutor’s comments “ ‘You don’t listen to some new fangled, disgusting theory that springs out from the minds of the imaginative lawyers’ ” and “ ‘We aren’t supposed to tamper around with any kind of disgusting new fangled theory’ ” were not improper) (emphasis omitted).’”
*44 Harris v. State, 2 So.3d 880, 923-24 (Ala.Crim.App.2007), quoting Minor v. State, 914 So.2d 372, 423-24 (Ala.Crim.App.2004). See also McGriff v. State, 908 So.2d 961 (Ala.Crim.App.2000), reversed on other grounds, 908 So.2d 1024 (Ala.2004) (“McGriff argue[d] that the prosecutor improperly stated that McGriff was laughing when the jurors were not in the courtroom, evidence, he contended], that was never properly before the jury.” 908 So.2d at 1015. However, a court security officer had testified concerning McGriffs demeanor and therefore the prosecutor’s comments during closing that McGriff was attempting to “ ‘ “slick” ’ ” and “ ‘ “fool” ’ ” the jury were legitimate. 908 So.2d at 1016).
V.
Jackson argues that the admission into evidence of his fingerprint card was erroneous because it showed that he had previously been charged with attempted murder and with firing into an occupied dwelling; it listed his aliases as well as his prison number; and it showed that he had been convicted of violating probation for first-degree burglary and for first-degree theft of property.
The record indicates that the fingerprint card was introduced at trial because it had been used for comparison purposes by the State’s expert when examining prints lifted from evidence relevant to the case. Jackson did not object to the admission of this card, so any error must rise to the level of plain error. Rule 45A, Ala. R.App. P.
In the present case there was no testimony concerning any specific facts or information as to the fingerprint card. See Buchannon v. State, 554 So.2d 477, 482 (Ala.Crim.App.1989), overruled as to another ground, Pardue v. State, 571 So.2d 333 (Ala.1990) (holding that introduction of fingerprint card that contained information indicating that Buchannon had had prior contact with the police was harmless error based on his incriminating statement and the “unemphasized nature” of the prior arrest). See also Ex parte Belisle, 11 So.3d 323, 337 (Ala.2008) (finding that the admission of Belisle’s fingerprint card was harmless error and that “the fingerprint card in this case was admitted as an exhibit along with ‘several other documents — a time card, a two-page letter to the Alabama Public Safety Department, a fingerprint-examination request form, and a copy of a fingerprint card for Annette with little testimony regarding the exhibit and apparently no specific mention of Belisle’s fingerprint card. Belisle, 11 So.3d at 289”). Further, the State’s theory of the case was that Jackson’s motive in committing the offenses was that he was on probation when he shot the officers and a condition of his probation was that he not be in possession of a gun. Therefore, when he was approached by the officers, he shot them to avoid their discovering his gun and sending him back to prison. The State properly admitted testimony that Jackson was on probation to show motive. See Reese v. State, 549 So.2d 148, 154 (Ala.Crim.App.1989), overruled on other grounds, Huntley v. State, 627 So.2d 1013 (Ala.1992) (“The jury could reasonably have inferred that rather than have his true identity discovered, face probation revocation proceedings, and be prosecuted for possession of an illegal firearm under § 13A-11-63, 1975 Code of Alabama, Reese attempted to kill the arresting officers. The shotgun was admissible for the same reason that the probation violátion warrant was admissible. Both tended to show Reese’s motive for the charged offense. See Ford v. State, 514 So.2d 1057 (Ala.Cr.App.), cert. denied, Ex parte Ford, 514 So.2d 1060 (Ala.1987) (in prosecution for murder of police officer who was pursuing accused, *45 evidence of earlier shooting admissible to show motive); De Silvey v. State, 245 Ala. 163, 16 So.2d 183, 184 (1943) (in prosecution for murder of woman who had previously charged accused with sexual assault, evidence of the assault indictment against him, along with his statement that if victim were out of the State, indictment would be dropped, admissible on issue of motive); Ott v. State, 36 Ala.App. 531, 60 So.2d 382, 383 (1952) (in prosecution for assault with intent to murder a police officer engaged in executing a search warrant at residence of accused, evidence of illegal whiskey later found at residence admissible on issue of motive).”). Thus, the jury was aware that Jackson had a prior conviction and there was no specific testimony concerning the fingerprint card, other than that it contained his fingerprints and was used for comparison purposes. Thus, there is no indication that Jackson’s substantial rights were prejudiced or adversely affected or that the introduction of the card rose to the level of plain error.
VI.
Jackson alleges that the admission of the evidence that he was on probation was improper because he was not provided adequate notice under Rule 404(b), Ala. R.Evid., and because the prejudicial effect of the evidence outweighed its probative value.
Jackson acknowledges that defense counsel was sent a letter by the prosecutor before trial informing him pursuant to Rule 404(b) that the State intended to use “any and all evidence, dealing — with the Defendant’s prior criminal history and any and all evidence regarding defendant’s attempted murder charge in the Birmingham Division of Jefferson County that occurred just days before the incident made the basis of the above-referenced cases, said evidence relevant to show motive, opportunity, intent, preparation, plan, knowledge, identity or. absence of mistake or accident.” (S.R. 336.) However, Jackson contends that this letter was too vague to give notice that the State intended to introduce testimony concerning his probationary status to prove motive. He submits that he was unable to adequately prepare a defense to counter this prejudicial evidence.
At trial, when the prosecutor informed the court that the probation officer would be the next witness and made a proffer as to his testimony, one of Jackson’s defense counsel argued that the prosecutor had improperly sent the letter to only his co-counsel. He argued that his cocounsel had forgotten to tell him about the letter and so before trial at a motion to continue hearing, he had demanded notice. He alleged that, had the prosecutor filed the letter with the circuit clerk instead of sending it to cocounsel, he would have received notice. Finally, he argued that even if he had received the notice, it did not specifically state that a probation officer was being called as a witness. Thus, he stated, the testimony was unduly prejudicial. The prosecutor responded that the letter had been sent to cocounsel well in advance of trial and that when a demand of notice was subsequently made, another copy of the letter had been faxed prior to trial. The prosecutor also argued that the evidence was admissible to show motive because it explained Jackson’s reasons for shooting the officers when Officer Smith approached and questioned him and ordered him to place his hands on her vehicle’s hood. The trial court determined that the defense had properly been put on notice of the State’s intent to introduce the Rule 404(b) evidence. The court also allowed the probation officer’s testimony that Jackson was on probation and the conditions of the probation but allowed no specifics of the basis of the underlying *46 offenses. After the testimony, the court gave the jury the following limiting instructions:
“Ladies and gentlemen, one thing I want to say before we come with the next witness is that the testimony of Mr. Griffin [the probation officer] who just testified, that testimony is not offered to prove the guilt of the defendant. But the defendant — but the State is offering that testimony for the limited purposes of motive, and that’s the only purpose for which you may consider his testimony. All right?”
(R. 994-95.)
Notice is required by Rule 404(b) “upon request by the accused, [and] the prosecution in a criminal case shall provide reasonable notice in advance of trial, or during trial if the court excuses pretrial notice on good cause shown, of the general nature of any such evidence it intends to introduce at trial.” Here, the trial court properly determined that Jackson’s defense counsel had been afforded “reasonable notice” of “the general nature” of the evidence. The letter notified Jackson that the State intended, to introduce “any and all evidence dealing with the Defendant’s prior criminal history ... relevant to show motive.... ”
Moreover, the evidence indicating that Jackson was on probation at the time of the offense was relevant to and probative of Jackson’s motive for shooting the officers. Although evidence of other crimes or bad acts is not admissible to prove a defendant’s bad character, it may be admitted for other purposes, including motive. In Thompson v. State, 153 So.3d 84 (Ala.Crim.App.2012), this Court discussed the motive exception to the exclusionary rule and stated:
“ ‘Motive is defined as “an inducement, or that which leads or tempts the mind to do or commit the crime
charged.” Spicer v. State, 188 Ala. 9, 11, 65 So. 972, 977 (1914). Motive has been described as “that state of mind which works to ‘supply the reason that nudges the will and prods the mind to indulge the criminal intent.’ ” [Charles Gamble, Character Evidence: A Comprehensive Approach 42 (1987).]
“‘Furthermore, testimony offered for the purpose of showing motive is always admissible. McClendon v. State, 243 Ala. 218, 8 So.2d 883 (1942). Accord, Donahoo v. State, 505 So.2d 1067 (Ala.Cr.App.1986). “‘It is permissible in every criminal case to show that there was an influence, an inducement, operating on the accused, which may have led or tempted him to commit the offense.’ McAdory v. State, 62 Ala. 154 [(1878)].” Nickerson v. State, 205 Ala. 684, 685, 88 So. 905, 907 (1921).’
“Bowden v. State, 538 So.2d 1226, 1235 (Ala.1988). ‘[T]he fact that evidence tending to show a motive to do an act charged to a person would also tend to prove that person guilty of another crime is no bar to the admission of such evidence.’ C. Gamble, McElroy’s Alabama Evidence § 45.01(7) (6th ed. 2009).
[[Image here]]
“ ‘ “Furthermore, testimony offered for the purpose of showing motive is always admissible. McClendon v. State, 243 Ala. 218, 8 So.2d 883 (1942). Accord, Donahoo v. State, 505 So.2d 1067 (Ala.Cr.App.1986). ‘“It is permissible in every criminal case to show that there was an influence, an inducement, operating on the accused, which may have led or tempted him to commit the offense.” McAdory v. State, 62 Ala. 154 [(1878)].’ Nickerson v. State, 205 Ala. 684, 685, 88 So. 905, 907 (1921).”’
*47 “Hatcher v. State, 646 So.2d 676, 679 (Ala.1994) (quoting Bowden v. State, 538 So.2d 1226, 1235 (Ala.1988)). ‘In Harden v. State, 211 Ala. 656, 101 So. 442 [(1924)], it was said that “if there is any evidence tending to support a reasonable inference that the homicide was committed to conceal another crime, evidence of such other crime is admissible.”’ Duncan v. State, 278 Ala. 145, 172, 176 So.2d 840, 866 (1965).
[[Image here]]
“More recently, the Alabama Supreme Court again addressed the admission of Rule 404(b) evidence. In Ex parte Billups, 86 So.3d 1079 (Ala.2010), the Alabama Supreme Court held that in admitting Rule 404(b) evidence the court must instruct the jury on the purpose for which the evidence was admitted and not merely recite to it the ‘laundry list’ of Rule 404(b) exceptions....
“Here, the State was required to prove that Thompson intended to kill the three victims. Thompson’s defense was that his PTSD rendered him in a dissociative state with no specific intent to kill. The admission of the Rule 404(b) evidence to establish Thompson’s motive and intent was crucial to the State’s case. Moreover, the circuit court gave a detailed instruction on the use of such evidence in compliance with Ex parte Billups. The circuit court did not abuse its discretion in allowing this Rule 404(b) evidence to be admitted at Thompson’s trial.”
153 So.3d at 135-37.
In the present case, Jackson’s probationary status was evidence of his only motive for shooting the officers after Officer Smith had ordered him to place his hands on her vehicle. Jackson would have surmised that she intended to pat him down and that she thus would have found his gun. Because refraining from carrying a gun was a condition of his probation, Jackson would have faced 10 years’ imprisonment for this violation. The court properly gave limiting instructions to the jury concerning this evidence, and the probative value of this evidence outweighed its prejudicial effect.
VII.
Jackson argues that impermissible victim-impact testimony was introduced through the testimony of Officer Smith’s family and her employer. Specifically, Jackson refers to the testimony of several witnesses during the penalty phase: one witness, a State “political representative,” considered himself the patriarch of Officer Smith’s family, and the other witness was the Fairfield police chief. Jackson alleges that the wrongful testimony was that of the State representative indicating that he did not want Jackson to get a sentence of life imprisonment without parole and that Jackson should be sentenced to death; that police officers told him that if Jackson went to prison for killing a police officer, he would be considered a “kingpin” in prison; that he referred to Jackson as a cold-blooded killer who had no remorse and who knew how to kill a police officer; and that he stated that Jackson had no remorse. Other family members referred to Jackson’s lack of remorse, his selfishness, his lack of responsibility, his callousness, and characterized him as a sociopath and a bad man. As to Fairfield Police Chief Mardis, he lamented the lack of excuse for the murder of a law-enforcement officer who had volunteered her life to make the community better; the senselessness of the crime because Jackson could have run away; Jackson’s lack of remorse; and Jackson’s appearance as a cold-blooded killer. Finally, Jackson notes the following testimony by Police Chief Mardis:
*48 “Judge, we are asking you, on behalf of law enforcement, that you send a message that killing not only a law enforcement officer, but any murder is inexcusable. We need to send a message today, ‘Avery, this is what we do.’ We are asking for the death penalty. We are asking that the punishment fits the crime. And there is only one punishment that could fit this crime, and that is the death penalty.”
(R. 1361.)
Initially, it should be noted that Jackson did not object to any of this testimony; therefore, it must be analyzed pursuant to the plain-error rule. Rule 45A, Ala. R.App. P. It should also be noted that none of the testimony that Jackson cites occurred during the guilt phase of his trial.
“‘The conduct of the accused or the accused’s demeanor during the trial is a proper subject of comment.’ Wherry v. State, 402 So.2d 1130, 1133 (Ala.Crim.App.1981).” Thompson v. State, 153 So.3d 84, 175 (Ala.Crim.App.2012.) The testimony at sentencing concerning Jackson’s lack of remorse was not improper. Testimony from a fellow inmate had indicated that Jackson had made disparaging remarks about Officer Smith after her murder. In Perkins v. State, 808 So.2d 1041 (Ala.Crim.App.1999), affirmed Ex parte Perkins, 808 So.2d 1143 (2001), vacated on other grounds, Perkins v. Alabama, 536 U.S. 953, 122 S.Ct. 2653, 153 L.Ed.2d 830 (2002), this Court stated:
“Contrary to Perkins’s contention, remorse is a proper subject of argument during the sentencing phase of a capital trial. See Dobyne v. State, 672 So.2d 1319 (Ala.Cr.App.1994), on return to remand, 672 So.2d 1353 (Ala.Cr.App.1994), aff’d, 672 So.2d 1354 (Ala.1995), cert. denied, 517 U.S. 1169, 116 S.Ct. 1571, 134 L.Ed.2d 670 (1996); Taylor v. State, 666 So.2d 36 (Ala.Cr.App.1994), aff’d, 666 So.2d 73 (Ala.1995), cert. denied, 516 U.S. 1120, 116 S.Ct. 928, 133 L.Ed.2d 856 (1996); and Harris v. State, 632 So.2d 503 (Ala.Cr.App.1992), aff’d, 632 So.2d 543 (Ala.1993), aff’d, 513 U.S. 504, 115 S.Ct. 1031, 130 L.Ed.2d 1004 (1995). In Harris, this court held that a reference to the defendant’s lack of remorse during the sentencing stage of the trial was not improper argument because the comment ‘was a proper inference from the evidence, because testimony had been introduced at trial that the appellant’s reaction to being informed of her husband’s death was so unemotional that she was questioned concerning her reaction.’ 632 So.2d at 536. Similarly, in Dobyne, this court held that a prosecutor’s comment, during the sentencing phase of the trial, on the defendant’s lack of remorse was a proper comment ‘on the appellant’s demeanor when he made his statement to police.’ 672 So.2d at 1349.
“Here, we find that the prosecutor’s remark about Perkins’s lack of remorse was a proper comment on the evidence presented by Perkins’s own expert. Ed Owens, a social worker, testified to exactly what the prosecutor stated in his closing arguments — that Perkins had no sense of compassion, no empathy, no social conscience, no respect for personal feelings, a total disregard for the boundaries of normal decency, and that he lacked a normal sense of guilt or remorse. Perkins cannot complain about the prosecutor reiterating his own expert’s testimony.”
808 So.2d at 1132-33.
The testimony characterizing Jackson as a cold-blooded killer was also not improper. See Melson v. State, 775 So.2d 857, 889 (Ala.Crim.App.1999) (holding as not improper the prosecutor’s reference to the defendant as a “cold-blooded murderer”). *49 Nor was it plain error to allow testimony during the penalty phase suggesting that Jackson should be sentenced to death. See Belisle v. State, 11 So.3d 256, 318 (Ala.Crim.App.2007) (finding no error as to Belisle’s claim that “the prosecutor improperly argued that Belisle should be sentenced to death based on victim-impact testimony” because trial judges are presumed to know and to follow the law). Further, the testimony that it was particularly egregious to kill an officer of the law was not improper. See Hyde v. State, 778 So.2d 199, 215 (Ala.Crim.App.1998) (finding no impropriety in claimed erroneous victim-impact testimony by witness who “simply testified about the Whitten [the victim] family’s involvement with law enforcement and the impact Andrew Whit-ten’s murder had on the law enforcement community”).
In McMillan v. State, 139 So.3d 184 (Ala.Crim.App.2010), this Court stated:
“McMillan alleges that the prosecutor improperly introduced victim-impact evidence by eliciting testimony from the victim’s father during the penalty phase that indicated a comparison between the fact that the victim’s mother had left his family when the victim was a child, as had McMillan’s mother. McMillan argues that this testimony served only to point out harm caused to the victim’s family by the offense. McMillan also alleges that the prosecutor emphasized this impropriety by diminishing the hardships of McMillan’s childhood by stating that he was not the only child who had been a ‘victim’ of a dysfunctional family and that others had not grown ‘up to be sociopathic killers.’ (R. 1520-21.)
“‘In Payne v. Tennessee, 501 U.S. 808, 111 S.Ct. 2597, 115 L.Ed.2d 720 (1991), the United States Supreme Court held:
“‘“[A] State may properly conclude that for the jury to assess meaningfully the defendant’s moral culpability and blameworthiness, it should have before it at the sentencing phase evidence of the specific harm caused by the defendant. ‘[T]he State has a legitimate interest in counteracting the mitigating evidence which the defendant is entitled to put in, by reminding the sentencer that just as the murderer should be considered as an individual, so too the victim is an individual whose death represents a unique loss to society and in particular to his family.’ Booth [v. Maryland], 482 U.S. [496, 517, 107 S.Ct. 2529, 96 L.Ed.2d 440 (1987)] (White, J., dissenting) (citation omitted). By turning the victim into a ‘faceless stranger at the penalty phase of a capital trial,’ [South Carolina v.] Gathers, 490 U.S. [805, 821, 109 S.Ct. 2207, 104 L.Ed.2d 876 (1989)] (O’Connor, dissenting), Booth deprives the State of the full moral force of its evidence and may prevent the jury from having before it all the information necessary to determine the proper punishment for a first-degree murder.”
“‘501 U.S. at 825, 111 S.Ct. 2597. The Supreme Court further stated:
“ ‘ “We thus hold that if the State chooses to permit the admission of victim impact evidence and prosecu-torial argument on that subject, the Eighth Amendment erects no per se bar. A State may legitimately conclude that evidence about the victim and about the impact of the murder on the victim’s family is relevant to the jury’s decision as to whether or not the death penalty should be imposed. There is no reason to treat *50 such' evidence differently than other relevant evidence is treated.”
“‘Payne, 501 U.S. at 827, 111 S.Ct. 2597. The Supreme Court recognized that victim-impact evidence “is designed to show instead each victim’s ‘uniqueness as an individual human being,’ whatever the jury might think the loss to the community resulting from his death might be.” Payne, 501 U.S. at 823, 111 S.Ct. 2597.’
“Woods v. State, 13 So.3d 1, 35 (Ala.Crim.App.2007).”
139 So.3d at 238-39.
Moreover, in its written “Order of Court on Imposition of Death Penalty,” the court, in determining Jackson’s sentence, stated that it “disregard[ed] pleas or references to the Court to consider this sentence on basis of passion or prejudice.” (Supp. R. 27.) See Washington v. State, 95 So.3d 26, 71 (Ala.Crim.App.2012) (“This Court has found no error in the admission of victim-impact evidence when there is no indication in the sentencing order that the remarks were considered by the sentencing court. See Arthur v. State, 711 So.2d 1031 (Ala.Crim.App.1996) (no error in the admission of statements in presentence report that victim’s family wished that the defendant be sentenced to death when there was no indication in the sentencing order that the court considered these statements).”).
There was no error as a result of the testimony of the victim’s employer or family members in this case.
VIII.
Jackson argues that the State failed to allow him the opportunity to examine exculpatory evidence that was not timely disclosed, in violation of Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). Jackson refers to the discs containing video from the Birmingham Municipal Court that he argues confirmed his alibi for the time of the offense. He alleges that because the State failed to produce the 13 discs[10] until the second day of trial, he was effectively unable to present this evidence to the jury.
The record indicates that the trial began on January 14, 2008, and that on January 22, 2008, Jackson made a motion to recess the trial for two days so that defense counsel could view the discs from the Birmingham Municipal Court. Jackson alleged that the discs should verify his allegation that he drove a friend to the courthouse at the time of the offense. Defense counsel at the hearing on this matter stated that the prosecutor had not given him the discs until January 15, 2008, although the Alabama Bureau of Investigation or the State had possessed them previously for a year-and-a-half. He complained that he had to prepare for cross-examination during the nights of the trial and that, on the weekend, he was only able to watch several hours of the discs because his computer would not play them and his mother was injured in a fall and hospitalized.
The prosecutor responded that he had been told by the Alabama Bureau of Investigation that the discs had been viewed and that they were inconclusive as to Jackson’s presence or that of his vehicle at the Birmingham Municipal Court.[11] He further explained:
*51 “[I]t wasn’t that Scott Bartle, the ABI [Alabama Bureau of Investigation], had not turned over these tapes. They were in a box. I didn’t know they existed. I thought that he had just viewed these tapes himself at the municipal building. I informed [defense counsel] on the next day that we had these tapes. And he had said — he advised me that he wanted to view these tapes at the end of the week. When I said something about giving them to him Monday, he said don’t worry about it. We’re going to view them over the long weekend. So, finally on Tuesday, I went up and handed them to him and gave him a receipt.”
(R. 1074-75.) The prosecutor asserted that defense counsel did not request the discs until the Thursday before trial and that the prosecutor did not know that they were in the box that contained them before he informed defense counsel of their presence. He also stated that, although the State had a duty to disclose, it did not have a duty to deliver the evidence to defense counsel. He noted that defense counsel had never come to look at much of the physical evidence, although the prosecutor had informed defense counsel of its location. The prosecutor maintained that there had been no attempt to prevent Jackson from reviewing the discs and that he had not known that the discs were there. The court then stated that, by his own admission, defense counsel had known about the discs for 12 days and had had possession of them for 10 days.[12] The court further noted, in denying defense counsel’s motion for a continuance, that the trial had just been recessed for three days and another two-day recess was “logistically” unsound and was unwarranted. (R. 1084.)
“‘To prove a Brady [v. Maryland, 373 U.S. 83 (1963),] violation, a defendant must show that “ ‘(1) the prosecution suppressed evidence; (2) the evidence was favorable to the defendant; and (3) the evidence was material to the issues at trial.’”’ Freeman v. State, 722 So.2d 806, 810 (Ala.Crim.App.1998) (quoting Johnson v. State, 612 So.2d 1288, 1293 (Ala.Crim.App.1992)). In the Brady context, ‘evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.’ United States v. Bagley, 473 U.S. 667, 682, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985).”
Revis v. State, 101 So.3d 247, 274-75 (Ala.Crim.App.2011).
Rule 16.1(c), A.R.Crim.P., relates to the discovery of tangible objects and requires, among other things, that the prosecution, upon proper motion by the defendant, “shall, within fourteen (14) days after the request has been filed in court as required by Rule 16.4(c), or within such shorter or longer period as may be ordered by the court, on motion, for good cause shown, permit the defendant to analyze, inspect, and copy or photograph books, papers, documents, photographs, tangible objects, controlled substances, buildings or places, or portions of any of these things, which are within the possession, custody, or control of the state/municipality and: (1) Which are material to the preparation of defendant’s defense.... ”
“This Court has repeatedly stated that it ‘views the failure to comply with [the discovery principles embodied in Rule 16, A.R.Crim.P. (formerly Rule 18, *52 A.R.Crim.P.Temp.),] with particular disfavor and condemnation.’ Morrison v. State, 601 So.2d 165, 173 (Ala.Cr.App.1992); McLemore v. State, 562 So.2d 639, 645 (Ala.Cr.App.1989); Buchannon v. State, 554 So.2d 477, 486 (Ala.Cr.App.), cert. denied, 554 So.2d 494 (Ala.1989), overruled on other grounds, Pardue v. State, 571 So.2d 333 (Ala.1990). We have also made it clear, however, that not every violation of Rule 16 requires the suppression of the undisclosed evidence. E.g., Buchannon, 554 So.2d at 486; Fortenberry v. State, 545 So.2d 129, 142 (Ala.Cr.App.1988), affirmed, 545 So.2d 145 (Ala.1989), cert. denied, 495 U.S. 911, 110 S.Ct. 1937, 109 L.Ed.2d 300 (1990); McCrory v. State, 505 So.2d 1272, 1279 (Ala.Cr.App.1986). Instead, Rule 16.5 ‘gives a trial judge a number of options to consider in imposing sanctions on a party who has failed to comply with the court’s discovery order.’ Clifton v. State, 545 So.2d 173, 178 (Ala.Cr.App.1988).
“Rule 16.5 provides in pertinent part:
“ ‘If at any time during the course of the proceedings it is brought to the attention of the court that a party has failed to comply with this rule or with an order issued pursuant to this rule, the court may order such party to permit the discovery or inspection; may grant a continuance if requested by the aggrieved party; may prohibit the party from introducing evidence not disclosed; or may enter such order as the court deems just under the circumstances.’
“Whether and to what extent a trial court imposes sanctions for non-compliance with Rule 16 rest ‘within the sound discretion of the court.’ McCrory v. State, 505 So.2d at 1279.”
Pettway v. State, 607 So.2d 325, 330-31 (Ala.Crim.App.1992) (footnote omitted). Moreover, “ ‘the trial court should not impose a sanction which is harsher than necessary to accomplish the goals of the discovery rules.’ McCrory v. State, 505 So.2d at 1279.” Pettway v. State, 607 So.2d at 332. See also Jennings v. State, 965 So.2d 1112, 1123-24 (Ala.Crim.App.2006).
Here, the State did not fail to disclose evidence, because defense counsel had the discs in his possession prior to trial; rather, Jackson challenges the timeliness of the discovery.
“In Travis v. State, 776 So.2d 819 (Ala.Crim.App.1997), this Court stated:
“‘The State did not fail to disclose any Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), material, neither did it ultimately fail to turn over material discoverable under Rule 16, Ala.R.Crim.P., although it did not always do so as promptly as it should have.
“‘In Thomas v. State, 508 So.2d 310 (Ala.Cr.App.1987), upon similar facts, this Court concluded that the appellant was actually challenging the timeliness of the State’s compliance with the trial court’s discovery order. The Court concluded:
“ ‘ “ ‘The appellant provides no evidence that the untimeliness of the State’s compliance prejudiced her case. Moreover, this court has found that even if the State failed to comply with an order for discovery, the items may still be admissible because the State offered the defense counsel an opportunity to inspect and examine them in accordance with Rule 18.5(a), Alabama Temporary Rules of Criminal Procedure. Clemons v. State, 491 So.2d 1060 (Ala.Cr.App.1986).’
“‘“Robinson v. State, 528 So.2d 343 (Ala.Cr.App.1986).”
“‘508 So.2d at 313.’
*53 “776 So.2d at 867. See also Parker v. State, 777 So.2d 987, 939 (Ala.Crim.App.2000) (Parker’s contention that the State violated the court’s discovery order directing the State ‘to produce or to make available at the discovery conference the results of any scientific or expert test to be used at trial,’ as well as Rule 16.1, Ala.R.Crim.P., by revealing test results on the first day of trial lacked merit because the thorough cross-examination by defense counsel was not prejudiced). ‘ “Discovery matters are within the sound discretion of the trial judge. Williams v. State, 451 So.2d 411 (Ala.Cr.App.1984). The court’s judgment on these matters will not be reversed absent a clear abuse of discretion and proof of prejudice resulting from the abuse. Ex parte Harwell, 639 So.2d 1335 (Ala.1993).” Parker v. State, 777 So.2d 937, 938 (Ala.Crim.App.2000).’ Belisle v. State, 11 So.3d 256, 277 (Ala.Crim.App.2007).”
Smith v. State, 112 So.3d 1108, 1135-36 (Ala.Crim.App.2012). The trial court did not abuse its discretion by denying Jackson’s motion for a continuance because Jackson had possession of the discs for at least a week prior to making his motion and the trial had just been recessed for three days. Moreover, there was no showing that the evidence was exculpatory. There is no indication that either Jackson or his vehicle appeared on the discs.[13]
 It also appears that the discs had been available to defense counsel earlier, because they were in a box that was located in a room to which Jackson had been given access to examine a great deal of the State’s evidence. However, he did not do so. “ ““ “Invited error has been applied to death penalty cases. ‘An invited error is waived, unless it rises to the level of plain error.’ Ex parte Bankhead, 585 So.2d 112, 126 (Ala.1991).”’” See Saunders v. State, 10 So.3d 53, 88 (Ala.Crim.App.2007), quoting Scott v. State, 937 So.2d 1065, 1075 (Ala.Crim.App.2005), quoting in turn Adams v. State, 955 So.2d 1037, 1050-51 (Ala.Crim.App.2003), rev’d on other grounds, 955 So.2d 1106 (Ala.2005).’” Thompson v. State, 153 So.3d 84, 104 (Ala.Crim.App.2012), quoting Doster v. State, 72 So.3d 50, 84 (Ala.Crim.App.2010). Had there been any error, it would have been harmless, because the discs were available to the defense earlier, had the defense examined the evidence; thus, any error would have been invited by the defense’s inaction. This was neither error nor plain error.
IX.
Jackson alleges that the trial court erred by failing to give limiting instructions as to the jury’s consideration of highly prejudicial evidence of prior crimes. Jackson refers to the evidence concerning his alleged shooting into Courtney Amos’s car, several days prior to the instant offense, while Jackson was a passenger in a car with Elice Jackson. Amos testified concerning the shooting, and there was expert testimony that the bullets involved in that shooting were fired from the same gun that fired the bullets in the instant offense.
There was no objection at trial as to this evidence, nor was there any request for a limiting instruction as to the jury’s consideration of this evidence; therefore this issue is due to be evaluated pursuant to the plain-error rule. Rule 45A, Ala. R.App. P. Jackson was made aware of this evidence prior to trial. He filed a pretrial motion for funds to secure an ex *54 pert to examine the ballistics evidence, and this motion was granted. (C. 92, 4.) Moreover, at a pretrial hearing, the prosecutor gave notice on the record as to its intent to introduce evidence concerning the shooting that occurred a few days before the instant offense, and the evidence was “relevant to [the State’s] case in chief.” (R. 41.) The State thereafter gave written notice of its intent to introduce evidence “dealing-with [Jackson’s] prior criminal history and any and all evidence regarding [Jackson’s] attempted murder charge in the Birmingham Division of Jefferson County that occurred just days before the incident made the basis of the above-referenced cases, said evidence relevant to show motive, opportunity, intent, preparation, plan, knowledge, identity or absence of mistake or accident.” (Supp. R. 336.) The prosecutor affirmed at a pretrial hearing that the defense had received the evidence as part of “their package of discovery — they know about it.” (R. 42, 56-57.)
In the present case, Jackson did not object to the admission of any of the evidence of his alleged shooting into Amos’s vehicle. The State gave no reasons at trial for the admission of the evidence. On appeal, the State alleges that this prior offense was admissible as part of the res gestae of the present offense. There is no indication that Jackson’s shooting into the vehicle of an unrelated party to whom he allegedly owed money, which occurred several days prior to this offense, would be part of the res gestae of this offense. However, the list of exceptions to the exclusionary rule, as listed in Rule 404(b), is not exhaustive, and prior bad acts or offenses can be admitted for other reasons that do not go to show the defendant’s bad character or simply the likelihood that he committed the instant offense. See e.g. Wimberly v. State, 934 So.2d 411, 426-27 (Ala.Crim.App.2005); Nicks v. State, 521 So.2d 1018, 1025 (Ala.Crim.App.1987). Here, the prior offense linked Jackson to the instant offense through ballistics evidence indicating that the bullets in both offenses were discharged from the same weapon; this was especially relevant because the murder weapon was never recovered. Thus, in Tyson v. State, 784 So.2d 328 (Ala.Crim.App.2000), this Court found that the State’s argument that evidence indicating that the weapon used in the present offense was also used in another shooting was admissible under the identity exception was not the correct rationale because that the State made no attempt to address the similarities of the offenses. 784 So.2d at 344. However, the evidence was admissible “as intrinsic, direct evidence of the charged crime — not as Rule 404(b) evidence.” 784 So.2d at 345. “The record shows that the evidence of the [collateral] shooting was admitted, not for the purpose of showing Tyson’s bad character and showing that he acted in conformity with that character by shooting [the collateral crime’s victims], but for the purpose of establishing Tyson’s connection to the murder weapon.” 784 So.2d at 345-46.
As to the trial court’s failure to sua sponte charge the jury with limiting instructions, in Ex parte Billups, 86 So.3d 1079 (Ala.2010), the Alabama Supreme Court determined that it was plain error for the trial court to fail to give proper limiting instructions concerning the admission of the evidence of Billups’s involvement in the murders of four men that had occurred three days after the murder that was the subject of the present conviction. The Court further considered, prior to making that determination, whether the evidence of the four murders was admissible under any exception that might warrant a limiting instruction. In Billups, the State had given notice that it intended to *55 introduce evidence of the prior “Avanti East killings ... ‘based upon the close proximity, the fact that the same weapon was used, and the fact that [the offenses] are very similar.’ ” 86 So.3d at 1081. In Billups, extensive evidence was presented concerning the prior murders by eyewitnesses as well as forensics testimony. Billups objected, and the court gave the following limiting instructions to the jury:
“ ‘Ladies and gentlemen, let me tell you one thing about this testimony. You’re hearing testimony today about another incident that allegedly occurred, not the same one that Mr. Billups is actually charged with in this case.
“ ‘The law is clear that evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action and conformity therewith. In other words, evidence of other crimes allegedly committed by the defendant cannot be used to show bad character.
“ ‘The evidence being presented regarding other acts allegedly committed by the defendant can be considered by you only for the purpose of determining either motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.
“ ‘I’m going to repeat those for you. But if you think the evidence from the other case is relevant to the issues of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident in Stevon Lockett’s death, then you can consider this evidence.
“ ‘But it cannot be used by you for any other purpose; all right?’
“Additionally, the trial court stated the following in its final instructions to the jury:
“ ‘Now, as I instructed you during the trial, there’s been some testimony regarding an allegation of other crimes. Evidence of other crimes, wrongs or acts is not admissible to prove the character of a person in order to show action and conformity therewith. In other words, evidence of the other crimes allegedly committed by the defendant cannot be used to show bad character. It cannot be used to show bad character. The evidence being presented regarding other acts allegedly committed by the defendant can be considered by you only for the purpose of determining motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident, as I have instructed you.- If you think the evidence from the other case is relevant to the issues of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident in Stevon Lockett’s death, then you can consider it. But it cannot be used by you for any other purpose.’ ”
86 So.3d at 1082. Billups did not object to these instructions. The Court determined that the trial court’s overly broad language charged the jury that it could consider the other killings for numerous improper purposes in that case. The Court stated:
“‘[A]n instruction should advise the jury on the purposes for which prior acts are admitted, meaning uses that are plausible in the case at hand, and should not include a laundry list of every conceivable use.’ 1 Christopher B. Mueller and Laird C. Kirkpatrick, Federal Evidence § 4:30 at 789 (3d ed. 2007) (emphasis added). In this case, however, the jury was allowed to consider the evidence regarding Billups’s involvement in the Avanti East killings for several implausible purposes, including, among *56 others, opportunity and absence of mistake or accident. For example, Billups made no argument at trial that Lockett’s killing was the result of an accident or that he lacked the opportunity to kill Lockett; rather, Billups’s defense was that another person, Charles Cooper, was responsible for Lockett’s murder.
“By simply reciting the complete ‘laundry list’ of permissible theories under Rule 404(b), the trial court’s instruction in this case gave the jury inadequate guidance. See Ex parte Belisle, 11 So.3d 323, 333 (Ala.2008) (‘[A]n appellate court “presume[s] that the jury follows the trial court’s instructions unless there is evidence to the contrary.”’ (quoting Cochran v. Ward, 935 So.2d 1169, 1176 (Ala.2006))).”
86 So.3d at 1086. The Court thereafter found that, under the particular circumstances of that case, the trial court’s failure to give proper limiting instructions constituted plain error. In Ex parte Billups, the jury was affirmatively given incorrect guidance for considering evidence. The jury was presumed to have followed these erroneous instructions.
Alabama’s appellate courts have consistently held that error arises when erroneous instructions or overly broad instructions are given for the consideration of evidence of collateral offenses. See R.C.W. v. State,, 168 So.3d 90, 97 (Ala.Crim.App.2012) (finding that the instructions by the trial court allowed the jury to consider collateral-act evidence for purposes not at issue in the case) (and cases cited therein). In the present case, the jurors were not given incorrect instructions, and the evidence was admissible as substantive evidence that tied Jackson to the instant shootings by ballistics evidence. See Johnson v. State, 120 So.3d 1119 (Ala.2006) (holding that there was no plain error in the court’s failure to sua sponte give limiting instructions regarding Johnson’s prior bigamy conviction because it was substantive evidence of her conviction for murder that was made capital because it arose out of or was related to the victim’s role as a witness before a grand jury in the bigamy prosecution against Johnson). See also Revis v. State, 101 So.3d 247 (Ala.Crim.App.2011) (finding no plain error in the court’s failure to give limiting instructions concerning the admission of Revis’s worthless-check charges because they were introduced to explain the reason he was in jail and his drug usage was part of the res gestae and established motive).
Moreover, here, there was no request for such an instruction. See also Windsor v. State, 110 So.3d 876, 883 (Ala.Crim.App.2012) (finding as harmless error the trial court’s failure to give limiting instruction that were requested by Windsor). Moreover, the Alabama Supreme Court in Ex parte Billups spoke to the exclusionary rule as follows:
“In Huddleston v. United States, 485 U.S. 681, 108 S.Ct. 1496, 99 L.Ed.2d 771 (1988), the United States Supreme Court stated that, when evidence of a defendant’s other crimes, wrongs, or acts is introduced under Rule 404(b), Fed.R.Evid., ‘the trial court shall, upon request, instruct the jury that the similar acts evidence is to be considered only for the proper purpose for which it was admitted.’ 485 U.S. at 691-92, 108 S.Ct. 1496 (citing United States v. Ingraham, 832 F.2d 229, 235 (1st Cir.1987) (emphasis added)).4
[[Image here]]
“4 Rule 404(b), Ala. R. Evid., is identical to Rule 404(b), Fed.R.Evid. ‘[Cjases interpreting the Federal Rules of Evidence will constitute authority for construction of the Alabama Rules of Evi *57 dence.’ Advisory Committee’s Notes, Rule 102, Ala. R. Evid.”
86 So.3d at 1085 (emphasis added).
Here, because Jackson failed to request limiting instructions although he was aware that the evidence was to be introduced, there is a strong presumption that his substantial rights were not, or probably were not, adversely affected. Because Jackson sought and was granted funds to procure an expert to examine this ballistics evidence and because the evidence was properly admissible, his failure to pursue a challenge to a limitation of its admissibility was akin to a waiver. Similarly, in Perkins v. State, 808 So.2d 1041 (Ala.Crim.App.1999), affirmed, 808 So.2d 1143 (Ala.2001), vacated on other grounds, Perkins v. Alabama, 536 U.S. 953, 122 S.Ct. 2653, 153 L.Ed.2d 830 (2002), Perkins alleged that, even if the evidence of all the collateral offenses and bad acts introduced was admissible, it was reversible error for the trial court to fail to give the jury limiting instructions concerning its consideration of this evidence. This Court noted that “[b]ecause Perkins did not request a limiting instruction, we may review this claim only for plain error. Rule 45A, Ala. R.App. P.” 808 So.2d at 1092. In finding that the court’s failure to sua sponte instruct the jury concerning the reasons it could consider the evidence was not plain error, this Court stated:
“We recognize that ‘[wjhere evidence is admissible on a certain point only, the trial court should advise the jury to consider it on that point alone.’ King v. State, 521 So.2d 1360, 1362 (Ala.Cr.App.1987). However, ‘[w]hen such evidence is admitted against an appellant, it is the sole responsibility of the appellant to request the court to instruct the jury as to the limited and proper purpose for which such evidence is admitted. If the appellant failed to request such an instruction, she may be considered to have waived the right to the protective instruction.’ Miller v. State, 405 So.2d 41, 47 (Ala.Cr.App.1981). See also Minor[ v. State,] 780 So.2d 707 [(Ala.Crim.App.1999)]; Varner v. State, 497 So.2d 1135 (Ala.Cr.App.1986); Weaver v. State, 466 So.2d 1037 (Ala.Cr.App.1985); Robinson v. State, 361 So.2d 379 (Ala.Cr.App.), cert. denied, 361 So.2d 383 (Ala.1978).
“Perkins failed to request a limiting instruction regarding the collateral crimes evidence, even after being repeatedly told by the prosecutor that the State would not object to such an instruction. Thus, ‘[bjased on established precedent [set forth above] we conclude that the trial court’s failure to instruct the jury that evidence of [Perkins’s collateral crimes] could be used only for the limited purpose of [showing his intent] was not plain error.’ [Minor v. State, 780 So.2d 707, 773 (Ala.Crim.App.1999), reversed, Ex parte Minor, 780 So.2d 796 (Ala.2000)].[14] Plain error is ‘error that is so obvious that the failure to notice it would seriously affect the fairness or integrity of the judicial proceedings.’ Ex parte Trawick, 698 So.2d 162, 167 (Ala.1997), cert. denied, 522 U.S. 1000, 118 S.Ct. 568, 139 L.Ed.2d 408 (1997). Here, the error was not so ‘egregious’ that it ‘has or probably has *58 substantially prejudiced’ Perkins. Trawick, 698 So.2d at 167.”
Perkins v. State, 808 So.2d 1041, 1092-93 (Ala.Crim.App.1999).
Thus, in Perkins, the defendant’s failure to request limiting instructions “even after being repeatedly told by the prosecutor that the State would not object to such an instruction,” 808 So.2d at 1093, indicated a waiver by Perkins. Such a waiver established that Perkins’s substantial rights were not prejudiced. Similarly, Jackson never requested limiting instructions although he was notified by the State as to the possible reasons for the admission of this evidence. At trial, defense counsel attempted to discount any evidence that the bullets were fired from the same weapon and may not have wanted an instruction to the jury reinforcing that it could consider the shooting to tie Jackson to the murder weapon. See United States v. Waldrip, 981 F.2d 799 (5th Cir.1993) (holding that whether a court’s failure to instruct on the limited use of prior-conviction evidence was error was to be determined on a case-by-case basis). There is no indication of plain error in the record as a result of the trial court’s failure to give the jury limiting instructions without any indication from Jackson that he wanted such an instruction. “‘To rise to the level of plain error, the claimed error must not only seriously affect a defendant’s “substantial rights,” but it must also have an unfair prejudicial impact on the jury’s deliberations. United States v. Young, 470 U.S. 1, 16-17 n. 14, 105 S.Ct. 1038, 1047 n. 14, 84 L.Ed.2d 1, 13 n. 14 (1985).’” Perkins v. State, 808 So.2d at 1093, quoting Hyde v. State, 778 So.2d 199, 209 (Ala.Crim.App.1998). The lack of a limiting instruction in this case did not rise to this level.
X.
Jackson argues that the admission of expert testimony regarding toolmarks evidence was improper because, he says, there was insufficient evidence concerning the expert’s qualifications or the reliability of the methodology.
A.
Jackson first contends that the State failed to establish the qualifications of its expert as to toolmarks and firearms identification, Heather Harrelson. Jackson further argues that the court failed to make any ruling as to her qualifications to be an expert. Jackson failed to make any objection at trial on either of these grounds, so these matters are due to be analyzed under the plain-error rule. Rule 45, Ala. R.App. P.
The record indicates that before testifying as to her testing of her examinations and conclusions, Harrelson stated that she was employed as the firearms and tool-marks section chief. As to her prior education and experience, she testified:
“I received my Bachelor of Science from the University of South Alabama and my Master of Science from Alabama A & M University. I’ve also been certified for firearms and toolmarks examination by the Department of Forensic Sciences. I’ve completed courses at the Henry Lee Institute of Forensic Sciences and in shooting scene reconstruction, evidence photography, and crime scene investigation.”
(R. 867-68.) She also stated that she had testified as an expert in Alabama courts several dozen times. On redirect examination, she identified the following professional organizations in which she was a member: “the Association of Firearms and Toolmarks Examiners, the International Association for Identification, the American Academy of Forensic Sciences, and the *59 Alabama State Association of Forensic Sciences.” (R. 905.) Although Jackson alleges that the State did not prove that her training was specifically in firearms and toolmarks examination or that her prior testimony as an expert had been specifically related to firearms and toolmarks examination, the evidence concerning her qualifications was sufficient to establish her as an expert in this area. After the State had presented evidence of her qualifications, Jackson could have challenged them or questioned the witness if he doubted her expertise.
Moreover, there was no error in the trial court’s failure to state that it found that the witness qualified as an expert. In Revis v. State, 101 So.3d 247 (Ala.Crim.App.2011) (opinion on return to remand), this Court addressed a claim that a witness was not properly qualified to testify as an expert in firearms and toolmarks and that the trial court failed to state that she was such an expert. This Court had stated: ,
“Here, the trial court did not abuse its discretion in determining that the firearms and toolmarks witness should be allowed to testify concerning the tests that were undertaken in determining that the rifle that discharged the test-fired hulls was the same weapon that discharged the casings gathered from the scene and the bullets that were removed from Stidham’s body.
“The witness fully testified concerning her educational background, training, and credentials. She also stated that she had been working as a firearms and toolmark examiner for six years and had worked on over one thousand cases.
“Rule 702, Ala.R.Evid., provides:
“ ‘If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.’
“Moreover, the Committee’s Notes to this rule affirm that under Rule 702, as under preexisting law, the determination of whether a witness qualifies as an expert and should be allowed to testify as such rests largely within the discretion of the trial court. Griffin v. Gregory, 355 So.2d 691 (Ala.1978); Hagler v. Gilliland, 292 Ala. 262, 292 So.2d 647 (1974). There is no requirement that the court specifically state that it finds the witness to be qualified as an expert.
“In the present case, the witness’s testimony established that she was qualified to testify as to the ballistics comparison, and the record indicates that this testimony would have aided the jury in its understanding of the evidence and its determination. Thus, the trial court did not abuse its discretion in allowing her testimony.”
101 So.3d at 292.
Similarly, in this case, the witness was qualified to testify as an expert in firearms and toolmarks, and the trial court was not required to specifically state that it found her qualifications to be sufficient.
B.
Jackson also contends that the testimony concerning the firearms and toolmarks evidence was inadmissible because, he says, the State did not sufficiently prove the methodology of the examination or the reliability of these methods. Jackson did not raise this claim at trial; therefore, it is due to be evaluated pursuant to the plain-error rule. Rule 45, Ala. R.App. P.
At trial, Harrelson testified that she examined the cartridge cases retrieved from the scene of the present offense to *60 each other and determined that they were all fired from the same gun. She testified that she conducted the analysis under a “forensic comparison microscope” that is “basically just like a regular microscope that’s connected together by an optical bridge which allows you to look at two images at the same time under the same magnification.” (R. 876.) She stated that she looked for microscopic markings on the cartridge cases in order to identify the casings as having been fired from the same gun. As to the projectiles, the bullets from Officer Smith’s body, Officer Burpo’s bullet proof vest, and the Amos shooting were examined. Harrelson stated that she conducted “a class and microscopic comparison” on them that is “basically determining if they are the same type or caliber and then examining the individual microscopic markings on them.” (R. 881.) She testified that the bullet from Officer Bur-po’s vest was used as the “reference bullet” and that the other two were compared to it. (R. 882.) She explained the examination with particularity as to the lands and grooves on the bullets.
There is no indication that Harrel-son’s methodology is unreliable. Moreover, in his brief, Jackson relies on an article concerning a challenge to ballistics evidence under Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), and United States v. Green, 405 F.Supp.2d 104 (D.Mass.2005). However, this reliance is misplaced, because these articles do not address the proper method to analyze such a claim in Alabama. See Revis v. State, 101 So.3d at 291 (“‘“Identification based upon a comparison of breechface imprints, firing pin impressions, and extractor and ejector marks, [has] achieved recognition by the courts.... ” A. Moenssens and F. Inbau, Scientific Evidence in Criminal Cases 195 (2d ed. 1978). In Alabama, a properly qualified expert should be permitted to testify whether a particular shell was fired from a specific firearm based upon his comparison of the distinctive marks on the shell with the physical features of the firearm. See Douglas v. State, 42 Ala.App. 314, 329, 163 So.2d 477, 492 (1963), cert. denied, 276 Ala. 703, 163 So.2d 496 (1964), reversed on other grounds, 380 U.S. 415, 85 S.Ct. 1074, 13 L.Ed.2d 934 (1965). See also 2 Wigmore, Evidence § 417(a) at 495 (Chadbourn rev. 1979); 29 Am.Jur. P.O.F. Firearms Identification § 13 (1972).’”).[15]
Thus, in this case, there was no error based on Harrelson’s failure to further explain the methodology of her examination or its reliability.
XI.
Jackson argues that testimony regarding fingerprint evidence was erroneously admitted because, he says, the State failed to provide sufficient evidence of the methods used to match fingerprints or the reliability of those methods. In his reply brief, Jackson explains that, contrary to the State’s response to his argument, he was not challenging the expert’s qualifications; rather, he was challenging the failure to provide evidence of the methodology and its reliability.
*61 The admissibility of fingerprint evidence is governed by Rule 702, Ala.R.Evid., and such evidence is admissible “[i]f scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.” In Culver v. State, 22 So.3d 499 (Ala.Crim.App.2008), Culver contended that “the trial court erred when it allowed into evidence testimony that a thumbprint filmed on the 8mm videotape had been identified as Cul-ver’s. Culver argue[d] that the testimony about procedures used to ‘capture’ the image of the thumbprint from the videotape did not meet the requisite standards of reliability and that the testimony was inadmissible.” However, this Court determined that “[although an image of the thumbprint was used for comparison to Culver’s known print in this case, [and] no scientific testing or experiments were involved,” the evidence was admissible under Rule 702 “[bjecause the testimony about the print identification constituted specialized knowledge that would have been helpful to the jury.” 22 So.3d at 522.
“‘The question of admissibility of evidence is generally left to the discretion of the trial court, and the trial court’s determination on that question will not be reversed except upon a clear showing of abuse of discretion.’” Lewis v. State, 24 So.3d 480, 491 (Ala.Crim.App.2007) (opinion on return to remand), quoting Ex parte Loggins, 771 So.2d 1093, 1103 (Ala.2000).
Here, there was no abuse of discretion by the trial court as to the admission of the fingerprint evidence, because the evidence involved a specialized knowledge that would benefit the jury. Moreover, the two witnesses who testified regarding this evidence established their qualifications to conduct this testing.
XII.
Jackson alleges that the trial court’s decision to prohibit the defense from arguing that the State failed in its investigation violated his right to present a defense. Specifically, Jackson refers to the police officers’ failure to show Vannie Newton a photographic lineup following the offense. Newton did not see the offense, but went out onto her porch after hearing the shots and saw Jackson, Sr., and another man loading the truck and then driving away.
At trial, defense counsel, when cross-examining Cpl. Bartle, sought to question him concerning whether Newton was shown a photographic lineup. The following transpired:
“Q. ... Was Ms. Newton able to identify anybody out of a photo lineup?
“A. Ms. Newton was able to identify a group of people, which was the Jack-sons.
“Q. Did you give her—
“A. She was not shown a specific photo lineup, no.
“Q. Did you give her a photo lineup where she can identify specifically which individuals were these two individuals that she saw out there on that occasion? Did you give her separate lineups—
“A. No, sir, I did not.
“Q. —of Demetrius Jackson, Jr., Demetrius Jackson, Sr. and Elice Jackson?
“A. No, sir. I didn’t see the need to.
“Q. You didn’t see the importance of her being able to identify which two individuals she saw?
“A. Not after interviewing Elice and Demetrius, Sr. Because that’s when I focused my investigation on that man.
*62 “[Defense counsel]: And, Judge, I’m going to object as that’s nonresponsive. And I want to make a motion outside the presence of the jury right now.”
(R. 1056-57.) Thereafter, outside the presence of the jury, the following transpired:
“[Defense counsel]: And, Judge, I asked him a simple yes or no question. When he goes on to talk about, I talked to these individuals, one of them being a deceased material witness in this case, to [imply] to this jury that he’s somehow gained information of the guilt of this defendant, he has caused such a prejudice to deny this defendant a fair trial under the U.S. Constitution of the United States. Under the 6th, 8th, 10th and 14th Amendment of the U.S. Constitution, he’s been denied a fair trial. That response was nonresponsive. It was a yes or no question. And they just keep trying to harp on trying to make all kinds of inferences from the Elice Jackson statement, that after Elice, we knew it was Demetrius, and we put it on him. And it’s just another way of saying— trying to get in the fact that Elice Jackson gave them information that this defendant was the perpetrator in the crime. And it’s prejudiced this jury, and we can’t get a fair trial now.
“This investigator has been around long enough to know better than to do that, and that was just very inappropriate. And I move for a mistrial. We can’t receive a fair trial with this type activity.
“THE COURT: All right. Response from the State?
“[Prosecutor]: As Sergeant Friday would say: ‘Just the facts, ma’am.’ Once [defense counsel] starts arguing with this witness, he gets whatever that argument brings. If he — his question wasn’t, did you show — well, actually, his question was initially, did you show lineup? No, I did not. That was the answer.
“You didn’t see the importance? The importance becomes argument. He wants to argue with this witness. He does so at his peril. This witness will then argue with him about what this witness feels is important versus what [defense counsel] feels is important. That’s [defense counsel’s] question: Importance. He provided that answer.
“[Defense counsel], if you want him to just testify to the facts, ask him facts. If you want him to argue about the importance of witnesses and what he feels is important versus what you feel is important, ask him that question. He’s going to tell you.
“[Defense counsel]: I didn’t ask him the reason, Judge. I didn’t ask him for a reason.
“THE COURT: All right. All right. Here’s my ruling. Here’s my ruling. All right. I will sustain your objection regarding testimony of the interviews conducted with Elice Jackson. I will instruct the jury to disregard the witness’s last response. And I will deny your motion for mistrial. And I will instruct the witness to listen to the questions and answer the questions asked of you.”
(R. 1057-59.) The prosecutor then added that defense counsel should not be allowed to ask Cpl. Bartle why he did not present the photographic lineup to Newton; the reason was that Cpl. Bartle knew that he did not do so because he had talked with Elice Jackson who had told him that Jackson was no longer there. The prosecutor argued that if defense counsel did not want the jury to know about Elice Jackson’s statement concerning Jackson’s presence, he should refrain from opening the door by his questions. The trial court instructed *63 the jury to disregard Cpl. Bartle’s last response.
On redirect examination, the prosecutor referred to defense counsel’s question as to why Cpl. Bartle did not feel that it was important to show Newton the photographic lineup, and asked the witness why he did not feel that it was necessary. Defense counsel objected on grounds that it called for inadmissible evidence. A lengthy discussion ensued during which defense counsel argued that the State was attempting to introduce inadmissible testimony. Defense counsel argued that Elice Jackson was dead and therefore could not be confronted as to his statements made to Cpl. Bartle and that the testimony by Bar-tie was hearsay.[16] Moreover, he argued that the testimony would be unduly prejudicial. The prosecutor responded that, because defense counsel would argue in closing that the police were negligent, the State should be allowed to show that the police had information that supported their decision to refrain from showing Newton a photographic lineup. Defense counsel argued that “[njever is the burden on us. So we’ve got to show the things they didn’t do to prove their burden, and that’s always my job, is to show the things they did not do to prove their burden of proof.” (R. 1101-02.) The trial court sustained defense counsel’s objection concerning any statements made by Elice Jackson to Cpl. Bartle. The State then requested a limitation on defense counsel’s closing argument as to any alleged negligence or incompetence of the police based on this failure to show Newton a photographic lineup. The trial court then held that “no references be made regarding the failure to show Ms. Vannie Newton a photo lineup.” (R. 1109.) Defense counsel excepted on grounds that the ruling denied Jackson his right to a fair trial.
Here, the trial court did not improperly limit Jackson’s theory of defense when it refused to allow him to argue, or to attempt to draw inferences from, facts that were not in evidence. See Lemley v. State, 599 So.2d 64, 74 (Ala.Crim.App.1992) (“When defense counsel sought to argue, in closing to the jury, that the firing of pellet guns was prohibited by local ordinance, the trial court instructed him not to make that argument because (1) there was no evidence of any ordinance and (2) even if there were such an ordinance, it would be irrelevant to the facts of this case.”). Here, there was no evidence of negligence by the police as to the failure to show Newton a lineup. Compare Beemon v. State, 75 So.3d 687, 697-98 (Aa.Crim.App.2010) (in determining whether Beemon’s self-serving statement established a reasonable theory of defense such that lesser-included-offense instructions should have been given, this Court stated that among the considerations were whether the contention is implausible and whether the other evidence at trial substantiated the claim, citing Ex parte McWhorter, 781 So.2d 330, 342 (Aa.2000) (“McWhorter’s theory that he was intoxicated was unreasonable based, in part, upon the fact that no evidence presented at trial corroborated this claim).”). See also Harbin v. State, 14 So.3d 898, 912 (Ala.Crim.App.2008) (“Under Harbin’s theory of the case then, he stabbed Harris three separate times while holding a knife over seven inches long without knowing it. This theory is simply not reasonable.”).
As to his argument that his cross-examination was improperly limited, the record indicates that the jury was instructed to disregard only Cpl. Bartle’s testimony concerning his decision to focus his investigation on Jackson after speaking to Elice *64 Jackson and Jackson, Sr. His testimony that he did not show Newton a photographic lineup remained before the jury for its consideration. Neither Jackson nor the State was allowed to introduce this testimony, which Jackson concedes was inadmissible. Therefore, as to his inference that his cross-examination was limited, the record indicates that this was not the case. If Jackson intended to elicit testimony as to why Cpl. Bartle did not feel that it was important to show Newton the lineup, he would not have received a response indicating negligence. There was no evidence to support an argument that the police were negligent in this regard. Newton testified that she was inside when the shots were fired and that she did not see the men who fired the shots. Therefore, there was no reason to show her a photographic lineup. Thus, his cross-examination was not improperly limited.
“In Barrett v. State, 918 So.2d 942 (Ala.Crim.App.2005), this Court stated:
“'“The question of admissibility of evidence is generally left to the discretion of the trial court, and the trial court’s determination on that question will not be reversed except upon a clear showing of abuse of discretion.” Ex parte Loggins, 771 So.2d 1093, 1103 (Ala.2000).
“ ‘ “To be competent and admissible, evidence must be relevant— that is, evidence must tend to prove or disprove the issues before the jury. Rule 401, Ala. R. Evid. The determination of the relevancy and admissibility of evidence rests largely in the sound discretion of the trial judge. The trial judge is obliged to limit the evidence to that evidence that would be necessary to aid the fact-finders in deciding the issues before them, and to preclude evidence that is too remote, irrelevant, or whose prejudice outweighs its probative value. Loggins v. State, 771 So.2d 1070, 1077-78 (Ala.Crim.App.1999), aff’d, 771 So.2d 1093 (Ala.2000).”
“‘Harrington v. State, 858 So.2d 278, 293 (Ala.Crim.App.2002).’
“918 So.2d at 946.”
Cochran v. State, 111 So.3d 148, 173-74 (Ala.Crim.App.2012).
Moreover, “[t]he Alabama Supreme Court has held that ‘[a] trial court has broad discretion in determining the relevancy of evidence and whether that evidence is inadmissible because its prejudicial effect substantially outweighs its probative value, and its ruling on these issues will not be disturbed on appeal absent a clear showing of abuse of that discretion.’ Ex parte Dennis, 730 So.2d 138, 143 (Ala.1999).” D.W.H. v. State, 103 So.3d 850, 855 (Ala.Crim.App.2012).
Moreover, if the trial court had allowed defense counsel to ask Cpl. Bartle why he did not consider it important to show Newton the lineup, the court would have been obliged to allow the State to ask Cpl. Bartle on cross-examination why he did not consider it to be important. See Johnson v. State, 820 So.2d 842, 869 (Ala.Crim.App.2000) (“We find Johnson’s argument to be contrary to the theory of defense he presented at trial. Johnson called four witness in his defense who were, at the time of trial, housed either in a state prison facility or a county jail. Clearly, if the trial court had limited the State from calling an inmate, then it would have been obliged to limit Johnson’s presentation of his defense.”). See also Smith v. State, 745 So.2d 922, 935 (Ala.Crim.App.1999) (“The rules limiting the prosecution’s ability to impeach prosecution witnesses are equally applicable to the defense. Thus, although the defense may impeach its own witness, it may not do so solely for the *65 purpose of introducing otherwise inadmissible evidence. We believe that was the case here.”).
XIII.
Jackson argues that the State’s closing argument shifted the burden of proof to the defense, undermining his presumption of innocence. Specifically, Jackson refers to three instances in which he alleges the prosecutor shifted the burden of proof and two instances in which Jackson suggests that the prosecutor minimized the State’s burden of proof. These statements all occurred during the guilt phase of the trial.
As to his contentions that the prosecutor’s arguments shifted the burden of proof, Jackson initially cites the following argument by the prosecutor during his closing argument: “Then he gives you this about Chief Mardis. Eric says that he told Chief Mardis about the tape [sic]— about the tag. He says, why didn’t we call Chief Mardis to corroborate what he’s already said? Why didn’t he call him to get him to say he didn’t say that?” (R. 1189.) When this statement by the prosecutor is taken in context, it is apparent that the prosecutor was responding to an argument previously made by Jackson. Jackson had argued that, because Officer Burpo testified that he told Chief Mardis the numbers and letters of the shooter’s license tag just after the offense, the State should have affirmed this fact through Chief Mardis’s testimony.
In Weaver v. State, 678 So.2d 260 (Ala.Crim.App.1995), reversed on other grounds, Ex parte Weaver, 678 So.2d 284 (Ala.1996), the appellant contended that the prosecutor improperly commented in closing argument that two witnesses, who were equally available to both parties, were not called by the defense. This Court found no plain error on this ground and stated:
“While it is true that ‘ “one party may not comment unfavorably on the other party’s failure to produce a witness supposedly favorable to that party if the witness is equally available to both sides,” Hunt v. State, supra, [453 So.2d 1083, 1087 (Ala.Cr.App.1984)],’ Stubbs v. State, 522 So.2d 317 (Ala.Crim.App.1987), the prosecutor’s comments were a reply in kind to defense counsel’s closing argument concerning what two defense witnesses stated to these police officers and what these officers told them. (R. 850-58, 872-74.)
“ ‘Therefore, the district attorney’s remarks were a reply in kind to the argument of defense counsel, and therefore do not violate the general rule that a party may not comment unfavorably on the other party’s failure to call a witness equally available to both sides. See Stockard v. State, 391 So.2d 1049 (Ala.Crim.App.1979).’
“Helton v. State, 433 So.2d 1186 (Ala.Crim.App.1983). See also Dossey v. State, 489 So.2d 662 (Ala.Crim.App.1986).”q
678 So.2d at 279. See also McGriff v. State, 908 So.2d 961, 997-98 (Ala.Crim.App.2000), reversed on other grounds, Ex parte McGriff, 908 So.2d 1024 (Ala.2004) (holding that the prosecutor’s reference to a witness’s failure to testify for defendant was not plain error because the remarks were a reply-in-kind to comments made by defense counsel).
Next, Jackson refers to the following statement by the prosecutor during his guilt-phase closing argument:
“He wants you to look at the surveillance cameras. I think there may be 40 to 50 hours of tape there. He wants you to look at them because he couldn’t find anything. And I guarantee you, if he had found it, you would have seen it. *66 So, please go back there and review all of these tapes for him.... I submit to you [Sandra Windham is] lying. But ... [t]here are no records. Because if there were records, you would have seen them that would have proved that she was there.”
(R. 1192-93.) Following Jackson’s objection to this argument, the trial court charged the jury that the “burden remains on the State throughout.” (R. 1192-93.)
The prosecutor’s comments, when considered in the context of the entire argument, did not shift the burden of proof to Jackson. See Broadnax v. State, 825 So.2d 134, 184-85 (Ala.Crim.App.2000) (holding that the prosecutor did not improperly shift the burden of proof to Broadnax during closing arguments in the guilt phase of capital-murder prosecution, where the prosecutor did not suggest that Broadnax had an obligation to produce any evidence or to prove his innocence but asked the jury to consider the evidence at trial and to determine whether that evidence established reasonable doubt as to Broadnax’s guilt); Minor v. State, 914 So.2d 372, 420-21 (Ala.Crim.App.2004) (holding that the prosecutor’s comments during closing argument of the capital trial did not impermissibly shift the burden of proof but were legitimate comments on the lack of evidence to support the defense’s theory).
Jackson further points to the prosecutor’s comments during his closing argument at the guilt phase in which he stated: “And I submit to you that there’s not one piece of evidence, not one grain of evidence that points to anybody else in the world but this defendant.” (R. 1184.) This comment was not an attempt to shift the burden of proof to Jackson. In Woodward v. State, 123 So.3d 989 (Ala.Crim.App.2011), the prosecutor argued: “ ‘What evidence, before you, from witnesses, exhibits, common sense, disconnect the defendant from the crime? What?’ ” 123 So.3d at 1027. This court determined that “[t]he prosecutor’s comment was directed to the strength of the State’s case and to the corresponding weakness in the defense’s theory of the case, and it was a fair comment based on the prosecutor’s inferences from all the evidence in the case. The comment did not shift the burden of proof, as Woodward argued at trial. See, e.g., Minor v. State, 914 So.2d 372, 423-24 (Ala.Crim.App.2004), and cases cited therein.” 123 So.3d at 1028.
“[T]he control of a closing argument is in the broad discretion of the trial court. Thomas v. State, 601 So.2d 191 (Ala.Cr.App.1992). That court is in the best position to determine if counsel’s argument is legitimate or if it degenerates into impropriety. Thomas, supra. ‘In judging a prosecutor’s closing argument, the standard is whether the argument “so infected the trial with unfairness as to make the resulting conviction a denial of due process.”’ Bankhead v. State, 585 So.2d 97, 107 (Ala.Crim.App.1989), quoting Darden v. Wainwright, 477 U.S. 168, 181, 106 S.Ct. 2464, 91 L.Ed.2d 144 (1986).”
Acklin v. State, 790 So.2d 975, 1002 (Ala.Crim.App.2000).
As to Jackson’s allegation that the prosecutor minimized the State’s burden of proof, he argues that the prosecutor improperly told the jury that the members should rely on their gut feelings and should look for the truth rather than holes or doubt in the case. Jackson makes this argument for the first time on -'appeal; therefore, it must rise to the level of plain error. Rule 45A, Ala. R.App. P. However, the trial court properly instructed the jury as to the reasonable-doubt standard and admonished the jury members that they were not to consider the arguments of *67 counsel as evidence in the case. See Brown, v. State, 11 So.3d 866, 911 (Ala.Crim.App.2007) (finding no plain error in the prosecutor’s comment “ ‘Remember I told you, you would know it in your gut what’s reasonable doubt? You will know it in your gut. And I think you know it in your gut’ ” following instruction not to consider the attorneys’ arguments as to points of law and proper instruction as to reasonable doubt).
“‘A prosecutor’s statement must be viewed in the context of all of the evidence presented and in the context of the complete closing arguments to the jury.’ Roberts v. State, 735 So.2d 1244, 1253 (Ala.Cr.App.1997). Taken in context, the prosecutor’s isolated comment was clearly made in rebuttal to Melson’s counsel’s interpretation of the evidence in his closing argument, which the prosecutor argued was spurious. The prosecutor was attempting to point out to the jury the weaknesses in the theory of the case advanced by Melson’s counsel. Moreover, ‘statements of counsel in argument to the jury must be viewed as delivered in the heat of debate; such statements are usually valued by the jury at their true worth and are not expected to become factors in the formation of the verdict.’ Bankhead [v. State], 585 So.2d [97] at 106 [ (Ala.Crim.App.1989)]. We do not believe that the prosecutor’s comment was intended to mislead the jury, nor do we find that the comment improperly shifted the burden of proof to Melson to prove his innocence.”
Melson v. State, 775 So.2d 857, 884-85 (Ala.Crim.App.1999).
Here, the trial court properly instructed the jury as to the reasonable-doubt standard and its duty as finder of fact, as well as its duty to weigh the evidence. Moreover, there is no indication that the jury was persuaded or encouraged to shift the burden of proof to Jackson.
XIV.
Jackson alleges that it was error for the trial court to refuse to instruct the jury as to any lesser-included offenses of capital murder. Specifically, he argues that the jury should have been instructed as to reckless murder, reckless manslaughter, or heat-of-passion manslaughter.
Although Jackson contends that the jury may have decided that the murder was not intentional because the offense occurred within a short time frame, the evidence indicated that the murder was intentional. Jackson’s hand was in the front pocket of his jacket while Officer Smith was ordering him to place his hands on the hood of her vehicle. He pulled the gun from the pocket and shot her. He then walked over to Officer Burpo, shot him twice, stepped over Officer Smith’s body, and drove away. There is no indication from the evidence that the murder was anything but intentional. “ ‘A capital murder defendant is entitled to a charge on a lesser included offense only where there is a reasonable theory from the evidence that would support such a charge.’ Ex parte Trawick, 698 So.2d 162, 177 (Ala.1997) (citing Anderson v. State, 507 So.2d 580 (Ala.Cr.App.1987)).” Wilson v. State, 142 So.3d 732, 803 (Ala.Crim.App.2012).
“Where the evidence will support a charge on the offense of capital murder, a charge on the lesser-included offense of felony murder is warranted only if a reasonable theory of the evidence indicates that the murder may not have been intentional. See, e.g., Peoples v. State, 951 So.2d 755, 758 (Ala.Crim.App.2006) (‘“‘[F]elony murder does not require intent to kill; the only intent necessary is the intent to commit the underlying felony.’ ” ’ (citations omitted)); *68 Calhoun v. State, 932 So.2d 923, 969 (Ala.Crim.App.2005). In the present case, there was no reasonable theory of the evidence that indicated that the murders were not intentional. Nor was there any evidence that the taking of the gun and the killings were not committed pursuant to one course of conduct.”
Thompson v. State, 153 So.3d 84, 156 (Ala.Crim.App.2012).
Moreover, there is no error in failing to give any lesser-included offense instructions, if they are not merited. Although Jackson argues that his conviction was unconstitutional because the jury was not given a third option when deciding his guilt, this was not the case. See Thompson v. State, 153 So.3d at 155 (finding no rational basis to charge on lesser-included offenses of capital murder despite Thompson’s claim that “according to Beck v. Alabama, 447 U.S. 625, 100 S.Ct. 2382, 65 L.Ed.2d 392 (1980), his death sentence was unconstitutional because, he says, the jury was deprived of a ‘third option’ ”). See also Welch v. State, 630 So.2d 145, 146 (Ala.Crim.App.1993) (“‘When the evidence clearly shows that the appellant is either guilty of the offense charged, or innocent, the charge on a lesser-included offense is not necessary or proper’”) (quoting Hollins v. State, 415 So.2d 1249, 1253 (Ala.Crim.App.1982)). There was no evidence that tended to suggest that Jackson’s conduct was not intentional and that the aggravating circumstances making this offense capital murder did not exist; therefore, no lesser-included offense instructions were warranted.
XV.
Jackson argues that hearsay testimony was improperly admitted as past recollection recorded. Specifically, Jackson refers to Santana Pendleton’s testimony concerning what time Jackson, his father, and his uncle arrived at her house and concerning Jackson’s demeanor at the time of his arrival. He also refers to her testimony regarding Jackson’s instructions to her to inform everyone that he had been at her house at the time of the offense. Jackson submits that her testimony should not have been allowed because she did not remember those specifics at the time of trial and, although the State provided her with the statement she gave on the day of the offense, it was not used to refresh her memory; rather she testified from her statement.
According to Rule 612, Ala. R: Evid., a writing may be used to refresh the memory of a witness. “If the witness possesses insufficient recollection to testify fully and accurately, then the writing may be admitted under the separate doctrine of past recollection recorded.” Rule 612(a), Advisory Committee’s Notes. Rule 803(5), Ala. R. Evid., establishes the use of a recorded recollection as an exception to the hearsay rule and states:
“A memorandum or record concerning a matter about which a witness once had knowledge but now has insufficient recollection to enable the witness to testify fully and accurately, shown to have been made or adopted by the witness when the matter was fresh in the witness’s memory and to reflect that knowledge correctly. If admitted, the memorandum or record may be' read into evidence but may not itself be received as an exhibit unless offered by an adverse party.”
Moreover, the elements of this exception are described in § 116.03(2), C. Gamble, McElroy’s Alabama Evidence (6th ed. 2009), as follows:
“A memorandum or record exhibited to a witness while the witness is on the stand and which purports to be a statement of a past event is admissible as *69 evidence of the truth of the matter stated if the witness testifies that he now knows. Or testifies to facts showing that he now knows, the following:
“(1) That the witness personally observed the event or facts referred to in the memorandum or record and that the memorandum or record was made or seen by the witness either contemporaneously with the event or when the witness’ recollection of the event was fairly fresh. It is not essential, to benefit from past recollection recorded, that the witness shall have made the memorandum or record. The memorandum or record may have been made by another person if the witness saw it when the event was fairly fresh in the witness’ memory.
“(2) That the witness then knew the contents of the memorandum or record and knew such contents to be true and correct. Where the witness testifies that the memorandum or record is in his own handwriting, the witness may testify further that he knows from his general practice of making writings of that kind that what he wrote was true.
“(3) That the witness possesses insufficient recollection, other than the testimony to the matters stated in (1) and (2) above, to enable him to testify fully and accurately.”
In the present case, the prosecutor asked the witness what time she saw Jackson on the day of the offense. She responded that she did not remember. She was then asked if she remembered speaking to the police on the evening of the offense at approximately 7:00. She was shown her statement to the police taken on the day of the offense and asked if it refreshed her memory. She responded, “Not really.” (R. 713.) She then stated that although she did not recall, if it was in the report, then that was her statement. The witness did not specifically recall the events of the day of the offense. She also testified in response to the prosecutor’s questions:
“Q. What time did it say he told you to tell anybody that he left?
“A. About 1:00.
“Q. About 1:00 o’clock?
“A. Uh-huh.
“Q. And this is what you told law enforcement on the day the shooting occurred; right?
“A. (Witness, nods head.)
“Q. And that’s not true, though, is it? Or is it?
“A. Huh-uh.
“Q. I will withdraw that. Now, I will rephrase it. In fact, you said he got there about 11:00 o’clock; right?
“A. If that’s what the paper say. I don’t recall, but yeah.
“Q. That’s what you recall — is that what you recalled that evening, the day this incident occurred?
“A. I mean, I don’t remember telling, like I said. But if the paper said I said it, then I said it.”
(R. 726-27.)
Thus, the witness clearly did not recall the events as to which she gave her statement. Compare Johnson v. State, 823 So.2d 1, 37-8 (Ala.Crim.App.2001) (holding that the State faded to lay sufficient precedent for admission of notes under past-recollection-recorded exception because the record did not show that the witness had an insufficient recollection). She acknowledged that, although she did not remember at the time of trial the events immediately following the shootings, the statement she gave in the aftermath of the offense was in fact what she had said and what had happened, other than her above-stated conceded fabrication. This has *70 been held to be proper. Calhoun v. State, 932 So.2d 923, 960-61 (Ala.Crim.App.2005) (finding that a witness’s statement made immediately after the murder was admissible at trial, where after consulting the statement, the witness still did not remember facts stated by him therein, but acknowledged that he made such statement and knew that statement was correct when he made it).
Thus, Pendleton’s testimony, made with the aid of her prior statement to the police, was proper.
XVI.
Jackson argues that the trial court and the State minimized the reasonable-doubt standard by their statements during voir dire. Specifically, Jackson contends that this occurred during individual questioning of potential jurors who had indicated their belief that the burden of proof should be higher in a capital-murder case than in a shoplifting case. He submits that the prosecutor and the trial court improperly pressured these venire-members to concede that they would not apply the requisite burden of proof. Jackson alleges that by assuring that these potential jurors would not apply a burden of proof that was too heavy, the State left the jurors with an impression that they should not require much proof from the State.
Jackson specifically refers to the trial court’s informing the jurors that they were being questioned individually because they had indicated that they would- hold the State to a higher burden of proof than is required by the law and to the trial court’s use of percentages, i.e., that the burden was not “80 percent, 99 percent, a hundred and ten percent.” (R. 229.) Jackson also refers to the prosecutor’s comment concerning a juror’s application of the beyond-a-réasonable-doubt standard, stating that “you’ll know it in your gut” (R. 432) and that “it may be different for different persons.” (R. 312.) Jackson did not object to these comments at trial and therefore, the plain-error rule applies. Rule 45A, Ala. R.App. P.
The record belies this claim. The jurors were properly instructed as to the State’s burden of proof. The beyond-a-reasonable-doubt standard applies to all criminal cases, whether capital murder or shoplifting. The voir dire examination by the prosecutor was- proper because it is appropriate to question potential jurors as to what standard of proof they feel is correct in a case.
In Broadnax v. State, 825 So.2d 134 (Ala.Crim.App.2000), the appellant argued that the State lessened its burden of proof through the prosecutor’s comments. The prosecutor told the jury that “ ‘the burden of proof is just that. It’s beyond a reasonable doubt. A doubt for which you the jury can give a good, sound, sensible reason. It’s not a mystical doubt, it’s not a magical doubt, it’s not something you can pull from the sky, but it’s a reasonable doubt.’ ” This Court has held:
“Our review of the state’s voir dire examination leads us to conclude that the prosecutor provided his ‘definition’ of reasonable doubt to assist him in learning the veniremembers’ opinions on the state’s burden of proof. We do not find any plain error in this situation. Moreover, the trial court repeatedly instructed the jury that the comments and arguments of counsel were not the law and that they should follow only his instructions on the law. Thus, we find no plain error.”
825 So.2d at 180.
Jackson concedes that the trial court properly charged the jury as to reasonable doubt. Moreover, the trial court’s allu *71 sions to percentages is taken out of context and when its explanations to the individual jurors are read in their entirety, it is clear that the jurors were properly informed as to the standard of proof.
Furthermore, the prosecutor’s comments concerning the juror’s “gut” feelings and subjective determination as to reasonable doubt did not minimize this standard. In Brown v. State, 11 So.3d 866 (Ala.Crim.App.2007), this Court addressed the following:
“The prosecutor made the following argument:
“ ‘Reasonable doubt: You heard me talk about reasonable doubt during the first of this trial. It is a fair standard. It is a standard that each and every one of us would want applied to us if we were charged with a crime; prove the case beyond a reasonable doubt.
‘“But I submit to you, ladies and gentlemen, it doesn’t mean beyond any doubt; it doesn’t mean beyond all doubt; and it doesn’t mean that we have to prove the case to a mathematical certainty. If that was — the only way that could happen, if that was required, we would have to go back in time and see what happened. And if we could do that, we wouldn’t need you, ladies and gentlemen.
“ ‘And you are going to hear about the presumption of innocence. Absolutely, this defendant is presumed innocent. When he walked into the courtroom, he was presumed innocent. But that presumption only stays with him until such time that we prove to you his guilt. And I submit to you that we have. Remember I told you, you would know it in your gut what’s reasonable doubt? You will know it in your gut. And I think you know it in your gut.’
“(R. 558-59.)
“The circuit court specifically instructed the jury that it was not to consider arguments of counsel as the arguments related to the law and that the court would instruct the jury as to the law applicable in the case. The court correctly instructed the jury on reasonable doubt. There is no evidence that the above argument -so infected the trial with unfairness that Brown was denied a fair trial. See Darden v. Wainwright, 477 U.S. 168, 181, 106 S.Ct. 2464, 91 L.Ed.2d 144 (1986). Accordingly, we find no plain error.”
11 So.3d at 909-10 (footnote omitted). See also Belisle v. State, 11 So.3d 256, 306 (Ala.Crim.App.2007) (holding that the prosecutor’s explanation of the State’s burden of proof was proper where the prosecutor argued: “‘Now, bear in mind, it’s not beyond all doubt. That’s not our burden. Our burden is a reasonable doubt. A gut feeling that you know in your gut. You know that he did this.’ Beyond a reasonable doubt. And that’s what we ask for, that’s what we demand in this case. That’s the law. That’s what we’re going to prove to y’all.’ ”) (Emphasis omitted).
In the present case, the trial court also instructed the jurors that the attorneys’ comments were hot to be construed as evidence or the law. The trial court fully and properly charged the jury as to the law concerning reasonable doubt.
XVII.
Jackson argues that the trial court’s instruction to the jury pursuant to Allen v. United States, 164 U.S. 492, 17 S.Ct. 154, 41 L.Ed. 528 (1896) coerced the jury into returning a guilty verdict.
The record indicates that after .deliberating approximately seven hours, the jurors sent the trial court a note explaining *72 that they were unable to reach a decision on either charge. The judge informed the parties that he intended to give the jury an Allen charge and allow them to continue deliberating for a couple of hours. No objections were raised. Thereafter, the court charged the jury as follows:
“THE COURT: Good afternoon, ladies and gentlemen. You have been very hard at work. I appreciate your diligence. This is not nearly as easy as it looks on television, is it? It’s a very difficult decision that you have.
“I have received a note saying that you are unable to decide. And I have some further instructions that I want to give you, and I ask that you listen carefully to my instructions.
“I’m sorry to hear that you’ve been unable to reach a verdict, but I can’t release you from your jury service at this time.
“You should make further efforts to arrive at a verdict. Each juror is entitled to his or her opinion of the evidence.
“But I know you do not wish to put the State to the expense of another trial if that can be avoided. If you cannot agree, then a mistrial would be declared, and this case would have to be tried again. There is no reason to believe that another jury would have better or clearer evidence than has been presented to you.
“This does not mean that you should surrender your honest conviction as to the weight or the effect of any evidence solely because of the opinion of other jurors or because of the importance at arriving at a decision. But you should give careful, respectful consideration to each other’s views and talk over any differences of opinion in a spirit of fairness and candor.
“If possible, you should resolve any differences and come to a common conclusion so that the case may be completed.
“I would be happy to give you any explanatory charge on the law, if you need. It is natural that differences of opinion will arise. When they do, each juror should not only express his or her opinion, but the facts and reasons upon which they base that opinion. By reasoning the matter out, it may be possible for all jurors to agree.
“Now, what I have said to you must not be taken as an attempt on the part of the Court to acquire or force you to surrender your honest and reasonable convictions founded upon the law and evidence in this case.
“My sole purpose is to press upon you your duty and the desirability and importance of reaching a verdict, if you can conscientiously do so.
“All right. You may — I’m going to let you retire and continue your deliberations.”
(R. 12.6-62).
After this charge, defense counsel requested a mistrial because, he argued, the charge placed undue pressure on the jurors. Defense counsel noted that jurors were crying and argued that further deliberations would place too much insistence on them. The trial court then stated:
“All right. For the record, I think this one juror — -and that would be — one juror, notably Juror Number 281 — was emotional during the Court’s recent charge.... She repeatedly nodded in agreement with the State during the time of their closing arguments. She has throughout the proceeding been very — I guess, with her body language, and I think that her emotion at this time is just a continuation of her very obvious body language that she’s displayed during the trial.
*73 ‘Tour motion for mistrial is denied at this time, and I will allow the jury to continue to deliberate.”
(R. 1263-64.) The jury returned with another question approximately an hour later. At that time, the trial court gave the jurors the option of retiring for the day, and the jury was dismissed to return the following morning. After further charges and other unrelated questions from the jury, the jury returned -with a verdict approximately an hour later.
“‘“‘The general rule in Alabama has been that it is not improper for the trial court to urge upon the jury the duty of attempting to reach an agreement or verdict as long as the judge does not suggest which way the verdict should be returned.’” King v. State, 574 So.2d 921, 927-28 (Ala.Cr.App.1990), quoting McMorris v. State, 394 So.2d 392 (Ala.Cr.App.1980), cert. denied, 394 So.2d 404 (Ala.1981), cert. denied, 452 U.S. 972, 101 S.Ct. 3127, 69 L.Ed.2d 983 (1981). An Allen v. United States, 164 U.S. 492, 17 S.Ct. 154, 41 L.Ed. 528 (1896), charge, also known as a “dynamite charge,” is permissible if the language of the charge is not coercive or threatening. Gray-son v. State, 611 So.2d 422, 425 (Ala.Cr.App.1992); King v. State, 574 So.2d at 928.’
“Gwarjanski v. State, 700 So.2d 357, 360 (Ala.Cr.App.1997). Further, ‘[wjhether an “Allen charge” is coercive must be evaluated in the “whole context” of the case.’ Miller v. State, 645 So.2d 363, 366 (Ala.Cr.App.1994).”
Maxwell v. State, 828 So.2d 347, 365 (Ala.Crim.App.2000).
In this case, the trial court gave the jury verbatim the preferable instructions for a hung jury. These instructions are stated in Bates v. State, 659 So.2d 201, 204-05 (Ala.Crim.App.1994), and repeated in McWhorter v. State, 781 So.2d 257, 279-80 (Ala.Crim.App.1999), both of which cite Alabama Pattern Jury Instructions-Criminal, Instruction 1.8, Hung Jury. Here, the trial court “did not suggest which way the verdict should be returned; and he made no threat or coercion to suggest the jury had to return a verdict.” Ex parte Slaton, 680 So.2d 909, 926 (Ala.1996). “The trial judge did not ask the jury what its vote was; he did not suggest which way the verdict should be returned; and he made no threat or coercion to suggest the jury had to return a verdict. The trial court did not violate [the appellant’s] rights in giving this supplemental charge.” Id.
The trial judge was in the best position to evaluate the jurors’ demeanor, and there was no error in his charge to the jury. “ ‘A trial judge’s finding on whether or not a particular juror is biased “is based upon determinations of demeanor and credibility that are peculiarly within a trial judge’s province.” ’ Martin v. State, 548 So.2d 488, 490 (Ala.Crim.App.1988).” Doster v. State, 72 So.3d 50, 71 (Ala.Crim.App.2010) (concerning a challenge for cause of a potential juror).
There was no indication of coercion or impropriety by the trial court in the Allen charge given in the present case.
XVIII.
Jackson argues that the prosecutor committed misconduct by giving his personal opinion as to Jackson’s guilt, as well as by vouching for the credibility of State’s witnesses. Specifically, Jackson contends that the prosecutor improperly vouched for the credibility of Runyan Richardson, a .fellow inmate, with Jackson, and improperly stated that Jackson’s alibi witness, Sandra Windham, was lying. He further alleges that the prosecutor improperly gave *74 his personal opinion during his closing argument that Jackson was guilty. Finally, Jackson alleges that the individual and cumulative effect of these statements by the prosecutor warrant the reversal of his convictions.
Jackson refers to a comment by the prosecutor during his closing argument that “I submit to you she’s lying” concerning the testimony of Jackson’s alibi witness. (R. 1192.) The entire argument, however, reveals that the prosecutor’s argument went to the weakness of the defense’s evidence. The context of this comment was as follows:
“He wants you to look at the surveillance cameras. I think there may be 40 to 50 hours of tape there. He wants you to look at them because he couldn’t find anything. And I guarantee you, if he had found it, you would have seen it. So, please go back there and review all of these tapes for him. If it were there, if it would have shown that he was there in some way or another — she may have been over there. I don’t know if she was or not. I submit to you she’s lying. But it doesn’t — there’s nothing on that that’s going to show you that he was over there. The alibi witness he talked about.
“If there were any records, he could have done it. He walks in here with somebody, we don’t know who they are. He said, if there were any records, they could have got them. She didn’t have any records. There are no records. Because if there were records, you would have seen them that would have proved that she was there.”
(R. 1191-92.) Defense counsel objected after this argument that the argument improperly shifted the burden of proof, and the trial court ruled that it would charge the jury that the burden of proof remains on the State. Jackson did not object further; therefore, this issue must be analyzed under the plain-error rule. Rule 45A, Ala. R.App. P.
Here, the prosecutor was arguing the weakness of Jackson’s defense. In Morris v. State, 60 So.3d 326 (Ala.Crim.App.2010), Morris contended that the prosecutor improperly told the jury that Morris was lying by commenting that Morris presented conflicting defenses. This Court determined:
“This argument by the prosecutor, however, was a legitimate comment on Morris’s theories of defense. ‘ “ ‘Argument by the prosecution concerning omissions and inconsistencies in the defendant’s version of the case is not improper.”” Whitt v. State, 733 So.2d 463, 482 (Ala.Crim.App.1998), quoting Mosely v. State, 628 So.2d 1041, 1042 (Ala.Crim.App.1993), quoting in turn Salter v. State, 578 So.2d 1092, 1096 (Ala.Crim.App.1990), cert. denied, 578 So.2d 1097 (Ala.1991). ‘The prosecutor’s argument regarding the defense’s theory was a fair and legitimate comment on the evidence and a fair response to the argument of the defense.’ Whitt v. State, 733 So.2d at 483.”
60 So.3d at 368. There was no impropriety by this prosecutorial comment.
As to Jackson’s claim that the prosecutor vouched for the credibility of his witnesses, he cites two comments by the prosecutor during his closing argument. First, the prosecutor referred to expert testimony that a gun that had been turned in for testing during the investigation of this case was determined not to have been the weapon used in these offenses. Jackson had questioned this determination, and the prosecutor argued in closing: “When I asked him [presumably the prosecutor], is there any other evidence whatsoever that this gun had anything to do with this case, and he says no, *75 is he lying? Is he lying because he wants the real killer to get away just so he can convict Demetrius Jackson?” (R. 1190). He also cites to the prosecutorial comment during closing concerning the testimony of Jackson’s fellow inmate that “he could have lied to you. But he didn’t.” (R. 1194.) The context of this comment reveals that the prosecutor also cast some aspersion as to this witness, and stated:
“I don’t care what you think of Runyan Richardson. And I can assure you, the State of Alabama’s case ain’t predicated on what Runyan Richardson had to say. That came to us last week. That — my case doesn’t hinge on Runyan Richardson. But just like [cocounsel] said, if he’s going to lie, why not tell the big lie? He says — he said — he said he could have lied to you — I mean, he said he could have given you more details. If this was factual, he could have given you more details. If he had given you more details, then he would have been lying, ladies and gentlemen. So, he could have lied to you. But he didn’t. I don’t care what you do with Runyan Richardson’s testimony.”
(R. 1194.) Jackson did not object to these comments, so they are reviewed for plain error. Rule 45A, Ala. R.App. P.
“ ‘A distinction must be made between an argument by the prosecutor personally vouching for a witness, thereby bolstering the credibility of the witness, and an argument concerning the credibility of a witness based upon the testimony presented at trial. “[PJrosecutors must avoid making personal guarantees as to the credibility of the state’s witnesses.” Ex parte Parker, 610 So.2d 1181 (Ala.1992). See Ex parte Waldrop, 459 So.2d 959, 961 (Ala.1984), cert. denied, 471 U.S. 1030, 105 S.Ct. 2050, 85 L.Ed.2d 323 (1985).’
“DeBruce v. State, 651 So.2d 599, 610 (Ala.Crim.App.1993).”
Thompson v. State, 153 So.3d 84, 161 (Ala.Crim.App.2012).
Here, the prosecutor was arguing the credibility of the witnesses based on the evidence in this case. Therefore, because the prosecutor was not personally vouching for the witnesses or urging the jury to believe them because he believed them, there was no impropriety. See Johnson v. State, 120 So.3d 1130, 1165 (Ala.Crim.App.2009) (“Here, there is no indication in the record that the prosecutor impermissibly vouched for any witness’s credibility as he never suggested that there was evidence undisclosed to the jury that would support a witness’s testimony nor did he ever make personal assurances of a witness’s veracity.”).
Jackson also argues that in two comments during his closing, the prosecutor improperly revealed his opinion that Jackson was guilty. First, he commented: “This defendant, Demetrius Avery Jackson, Jr., is as guilty as sin.” (R. 1184.) He later commented: “And the word ‘verdict’ means the truth. And the truth of the matter is, this defendant is guilty as charged in these indictments.” (R. 1204.) Both of these comments were made in the midst of the prosecutor’s argument that the jury should examine the evidence presented and arrive at its verdict. The prosecutor argued that, in doing so, the jury would determine that the evidence presented by the defense was weak and that the evidence supported a guilty verdict. The prosecutor did not suggest that it was his personal opinion based on matters not known to the jury that Jackson was guilty. Further, the prosecutor did not argue that the jury should trust his interpretation of the evidence rather than its own.
In Ex parte Brown, 74 So.3d 1039 (Ala.2011), the Alabama Supreme Court found *76 no plain error in the prosecutor’s argument to the jury, specifically referring to his opinion of Brown’s guilt, stating: “ ‘My vote was cast a long time ago when I charged him with what I did.’ ” 74 So.3d at 1050. The Court determined:
“In this case, throughout the prosecutor’s closing argument, he recited the evidence, argued his interpretation of the evidence, and stated his belief that the State’s evidence proved beyond a reasonable doubt that Brown was guilty. Although we agree with Brown that the prosecutor’s statement that his vote was cast when he charged Brown with the offenses constituted an improper expression of the prosecutor’s personal opinion, we conclude that when that comment is read in the context of his entire argument it does not rise to the level of plain error. First, the comment was made during the prosecutor’s recitation of the evidence that had been presented to the jury; therefore, the comment does not suggest that the prosecutor’s opinion of Brown’s guilt was based on evidence not presented to the jury. Thus, we cannot conclude that Brown’s ‘right to be tried solely on the evidence presented to the jury’ was jeopardized in this regard.
“Moreover, the prosecutor’s statement, when viewed in the context of his entire closing argument, does not lend itself to the conclusion that the jury should trust the State’s assessment of the evidence rather than its own.”
74 So.3d at 1051.
Here, the prosecutor did not refer to his personal opinion, but rather what the evidence showed. Thus, there was no error.
Moreover, Jackson alleges that these comments by the prosecutor during his closing individually and cumulatively tainted the jury so that it did not base its decision on the evidence. However, as this Court stated in Ferguson v. State, 814 So.2d 925, 950 (Ala.Crim.App.2000), affirmed, 814 So.2d 970 (Ala.2001):
“Lastly, Ferguson contends that the cumulative effect of the prosecutor’s alleged misconduct warrants a reversal of his conviction. Because we find that no single instance of the prosecutor’s conduct was improper, any claim that the alleged improper conduct had a cumulative prejudicial effect on his trial is without merit and does not require a reversal. See Stewart v. State, 730 So.2d 1203 (Ala.Crim.App.1996), aff'd, 730 So.2d 1246 (Ala.), cert. denied, 528 U.S. 846, 120 S.Ct. 119, 145 L.Ed.2d 101 (1999); Hunt v. State, 642 So.2d 999 (Ala.Crim.App.1993), aff'd, 642 So.2d 1060 (Ala.1994).”
As in Hardy v. State, 804 So.2d 247, 282 (Ala.Crim.App.1999), “[w]e have reviewed each allegedly improper comment and have found no error warranting reversal. We have also reviewed the allegedly improper comments collectively, and still find no reversible error.”
XIX.
Jackson argues that the testimony of Cpl. Bartle, the chief investigator on the case, referring to Elice Jackson’s inadmissible statements, made during custodial interrogation, required a mistrial. Jackson contends that although the State argued that Elice Jackson was present with Jackson at the time of the offense, Elice’s statements were inadmissible because he was deceased at the time of trial and the defense never had the opportunity to confront him. He argues that the prosecutor conceded the inadmissibility of Elice’s statements, yet Investigator Bartle testified that, after interviewing Elice Jackson and Jackson, Sr., he focused his investigation on Jackson. Jackson argues that this testimony strongly indicated that Elice Jackson had implicated him in his *77 statements. However, as Jackson acknowledged in his brief on appeal, defense counsel objected to this testimony and, following a discussion with the parties, the trial court ordered the jury to disregard the testimony and then denied Jackson’s motion for a mistrial. Nonetheless, Jackson contends that the instruction to the jury was insufficient to remedy the ineradicable prejudice.
A review of the record indicates that Investigator Bartle’s testimony was made during cross-examination and in response to questioning concerning his failure to present Vannie Newton with a photographic lineup, including a picture of Elice Jackson and Jackson, Sr.; the defense counsel’s questioning implied that Cpl. Bartle was negligent or that he failed to conduct his investigation properly. The following transpired during the cross-examination of Cpl. Bartle:
“Q. Did you give her a photo lineup where she can identify specifically which individuals were these two individuals that she saw out there on that occasion ? Did you give her separate lineups—
“A. No, sir, I did not.
“Q. —of Demetrius Jackson, Jr., Demetrius Jackson, Sr. and Elice Jackson?
“A. No, sir. I didn’t see the need to.
“Q. You didn’t see the importance of her being able to identify which two individuals she saw?
“A. Not after interviewing Elice and Demetrius, Sr. Because that’s when I focused my investigation on that man.
“[Defense counsel]: And, Judge, I’m going to object as that’s nonresponsive. And I want to make my motion outside the presence of the jury right now.”
(R. 1056.)
When the above exchange is taken in context, Cpl. Bartle was explaining his reason for not considering it important to show Newton a lineup. Although it went beyond a “no” answer, he had just responded that he did not show her a lineup, and was explaining the reason for that decision. He did not testify to the specific substance of Elice Jackson’s statements, but the implication of his answers was that Elice’s statement prompted him to investigate Jackson. The trial court correctly gave instructions to the jury to disregard the testimony and asked the members if they could do so. The jury responded affirmatively.
In Ex parte Melson, 775 So.2d 904 (Ala.2000), during the guilt phase of the capital murder trial, a detective testified to hearsay statements by a codefendant that implicated Melson because of the clothing he was wearing at the time of the offense. Melson objected and argued that the statement “was hearsay, [and] would violate his Sixth Amendment right ‘to be confronted with the witnesses against him.’” 775 So.2d at 906. The trial court sustained the objection, denied the motion for a mistrial, instructed the jury to disregard the testimony, and questioned the jurors as to whether they would have any problem doing so. They responded appropriately. The Court determined that there had been no reversible error because “the circuit court’s ruling sustaining Melson’s objection, followed by its instructing the jury to disregard the answer and its questioning the jurors to ascertain if any of them would have a problem following the court’s instructions, removed any possible prejudice suffered by Melson.” 775 So.2d at 907. (Footnote omitted.)
Similarly, in the present case, the trial court’s instructions to disregard the testimony and the jurors’ confirmation that they would do so erased any prejudice to Jackson.
*78 XX.
Jackson argues that the trial court erred by allowing a witness to reveal that Jackson had been held in the county jail while awaiting trial. He alleges that this testimony by Runyan Richardson was irrelevant and unduly prejudicial and was akin to the appearance of a defendant in shackles at trial.
It would not have been a surprise to any juror that Jackson may have been in jail awaiting trial. Further, it was particularly not prejudicial in this case because there was testimony that he had previously been imprisoned and that he was on parole at the time of this offense. Richardson’s testimony concerning statements made by Jackson while they were fellow prisoners were relevant, because Jackson indicated his guilt in these statements. See Gavin v. State, 891 So.2d 907, 972-73 (Ala.Crim.App.2003) (finding that the jail supervisor’s testimony that Gavin admitted his guilt while in jail was relevant and that the prejudicial effect of the testimony did not outweigh its probative value).
Moreover, although a defendant’s appearance before a jury in shackles should be required only when it is a matter of necessity,
“ ‘[t]he decision to restrain a defendant rests with the trial judge, and, absent an abuse of discretion, this Court will not disturb his ruling on appeal ... “Ultimately, however, it is incumbent upon the defendant to show that less drastic alternatives were available and that the trial judge abused his discretion by not implementing them.” ... “It is not always reversible error for a defendant to be handcuffed or shackled in front of the jury.” Perkins v. State, 808 So.2d 1041, 1079 (Ala.Crim.App.1999), aff'd, 808 So.2d 1143, 1145 (Ala.2001).’ ”
McWhorter v. State, 142 So.3d 1195, 1263 (Ala.Crim.App.2011). Thus, Jackson’s allusion to shackling does not automatically signal error.
Richardson’s testimony that he was in jail with Jackson was admitted to explain the circumstances of his knowledge of Jackson’s statements indicating his guilt. This testimony was relevant and any prejudicial effect of testimony that Richardson and Jackson were fellow prisoners did not outweigh the probative value of the testimony.
XXI.
Jackson alleges that the trial court erred in failing to grant a mistrial following Detective Lucas’s testimony that he had been investigating Jackson before the incident leading to this trial. The record indicates that Jackson did not request a mistrial due to this testimony, but he did object and move to exclude it. The trial court sustained Jackson’s objection to Detective Lucas’s testimony, “Well I had been investigating Mr. Jackson.” (R. 793.) The court then instructed the jury to disregard Detective Lucas’s statement. This testimony by Detective Lucas was in response to the prosecutor’s question concerning when the detective had begun looking for Jackson and his vehicle.
“ ‘A declaration of a mistrial indicates a miscarriage of justice and is granted only where it is clearly manifest that justice cannot be insured. Chesson v. State, 435 So.2d 177, 181 (Ala.Cr.App.1983); Long v. State, 370 So.2d 354 (Ala.Cr.App.1979).
“ ‘Where the trial court immediately instructs the jury not to consider a fact, that instruction, in effect, removes or excludes that matter from the jury’s consideration, and the prejudicial effect of the statement is deemed to be cured by such instruction. Bradley v. State, 450 So.2d 173,
*79 176 (Ala.Cr.App.1983); Richardson v. State, 374 So.2d 433 (Ala.Cr.App.1979). The trial judge’s immediate charge to the jury to disregard an impropriety raises a prima facie presumption against error. Kelley v. State, 405 So.2d 728 (Ala.Cr.App.), cert. denied, 405 So.2d 731 (Ala.1981).
“ ‘ “The entry of a mistrial is not lightly to be undertaken. It should be only a last resort, as in cases of otherwise ineradicable prejudice. Where error is eradicable a mistrial is too drastic and is properly denied.” Woods v. State, 460 So.2d 291, 296 (Ala.Cr.App.1984); Chillous v. State, 405 So.2d 58 (Ala.Cr.App.1981).
“ ‘ “When prejudicial remarks have been made, the trial judge is in a better position than the appellate court to determine whether the remarks were so prejudicial as to be ineradicable.” Chambers v. State, 382 So.2d 632, 635 (Ala.Cr.App.), cert. denied, 382 So.2d 636 (Ala.1980).’
“Soriano v. State, 527 So.2d 1367, 1371 (Ala.Crim.App.1988).”
Dotch v. State, 67 So.3d 936, 1004 (Ala.Crim.App.2010) (finding that the trial court’s actions in sustaining Dotch’s objection to the prosecutor’s argument ‘“in which she related some prior misconduct’ ” and instruction to the jury to disregard the comments were sufficient to cure any error).
The testimony in the present case did not so infect the trial that a mistrial was warranted, and there is no indication that the trial court abused its discretion. The jury was properly instructed to disregard the statement by Detective Lucas. “ ‘Jurors are presumed to follow the trial court’s instructions. Holland v. State, 588 So.2d 543, 549 (Ala.Cr.App.1991).’ Bryant v. State, 727 So.2d 870, 874-75 (Ala.Crim. App.1998).” Peraita v. State, 897 So.2d 1161, 1204 (Ala.Crim.App.2003).
XXII.
Jackson argues that the trial court failed to adequately charge the jury on reasonable doubt, in violation of state and federal law, and cites Cage v. Louisiana, 498 U.S. 39, 111 S.Ct. 328, 112 L.Ed.2d 339 (1990) in support of his argument. He alleges that the trial court’s instructions violated Cage and that this error was intensified because the jurors sent a note to the court after commencing deliberations stating: “If you are feeling undecided because of the evidence presented to you, how do you decide on which way you want to vote?” (R. 1264.) This note, he argued, indicated that the jury should have been recharged as to reasonable doubt. He contends that his jury charges submitted as to reasonable doubt, which were refused, would have eradicated the jurors’ confusion.
The record indicates that the trial court charged the jury in its instructions following the guilt phase on reasonable doubt as follows:
“Now, I have told you, ladies and gentlemen, that you must be convinced beyond a reasonable doubt of each of the elements. What’s a reasonable doubt? It means just what it says. A reasonable doubt is a doubt for which you can give a good, sensible reason. It does not mean an imaginary doubt, a speculative doubt, or a mere possible doubt. And when we say that the burden is on the State to convince you from the evidence beyond a reasonable doubt of the guilt of the defendant, that does not mean that the State must convince you to a mathematical certainty because that can never be done when you rely on the testimony of other human beings.
*80 “Reasonable doubt may arise from all the evidence, a lack of evidence, or from any part of the evidence.”
(R. 1246.) The court also charged:
“All right. I told you that reasonable doubt could arise from all the evidence, a lack of evidence, or any part of the evidence. In other words, if after considering all the evidence in this case, you have a doubt about the defendant’s guilt and that doubt has a reason based on the evidence, a lack of evidence, or any part of that evidence, then you should acquit the defendant.
“However, if after considering all of the evidence in this case, you do not have a doubt for which you can assign a good, sensible reason, then you should convict the defendant.”
(R. 1249-50.)
After the jury retired, it sent a note to the court indicating that it was unable to reach a verdict, and the court gave the jury a charge pursuant to Allen v. United States, 164 U.S. 492, 17 S.Ct. 154, 41 L.Ed. 528 (1896). See Issue XVII, supra. The jury resumed its deliberations and again sent out a note to the court, this time stating: “ ‘If you are feeling undecided because of the evidence presented to you, how do you decide on which way you want to vote?’ ” (R. 1264.) The following then transpired:
“[The Court]: I don’t know that that’s— I told the ladies and gentlemen of the jury that I can’t answer a question regarding the facts. They’ve heard all of the facts and evidence that they’re going to hear, that I would answer any questions about the law. That is sort of a failed question about the law.
“I think that my intention is to recharge them in the morning. I think they’re tired, and I think — -so, anything from the State or the defense? “[Prosecutor]: Nothing from the State.
“[Defense counsel]: Based on that question, the defense states that it’s obvious that the jury is saying that not enough evidence was presented to them in this case, based on that question, for them to be convinced beyond a reasonable doubt. So, it’s obvious that the Court should charge them as to evidentiary proof needed for them to find a conviction. The evidentiary proof is, unless you’re convinced beyond a reasonable doubt of the defendant’s guilt, you should find the defendant not guilty. And that — it’s exactly — sounds exactly what they’re saying right here is, we’re — we think there’s — how can we reach a verdict if we don’t think there was enough evidence presented to us?
“THE COURT: I thank you for your interpretation. I thank you for your motion. It’s well received by the Court. So, what is your motion?
“[Defense counsel]: Motion is to charge them on reasonable doubt.
“THE COURT: Oh, all right. I will recharge them on the — I’ll give them the whole full charge again in the morning. Your motion is denied.
“[Prosecutor]: That note doesn’t reflect whether it’s from one individual or them collectively, does it?
“THE COURT: No.
“[Prosecutor]: It’s just on a sheet of paper.
[[Image here]]
“[Prosecutor]: So, we don’t know.
“[Another prosecutor]: Is it signed by the foreperson?
“THE COURT: No.
“[Prosecutor]: Not even signed by the—
“THE COURT: It’s not signed by anyone ....
[[Image here]]
*81 “[Prosecutor]: Judge, the State says that you can’t answer that question, because it has to do with facts, not the law.”
(R. 1264-67.) The jury informed the court that it preferred to be recharged the following morning. Defense counsel again moved for a mistrial, stating that to bring the jurors back to further deliberate “would be only pressure on those jurors that feel the way that’s obviously stated there, that stated they couldn’t reach a verdict before and now they’re saying not enough evidence was presented.” (R. 1271.) Defense counsel then argued:
“It says, ‘If you’re feeling undecided because of the evidence presented to you.’ You’re feeling undecided because of the evidence presented to you. If you’re undecided because of the evidence that’s been presented right here from the witness stand and the exhibits admitted into evidence, that means obviously they do not have enough evidence to convict this defendant, and a mistrial is due to be granted based on these jurors that feel this way and that strongly.”
(R. 1271-72.) The trial court denied the motion for mistrial. The following morning, the trial court encouraged any further questions from the jurors and charged the jury as follows:
“The Court charges the jury that you are the sole and exclusive finders of the facts in this case. And you should apply the facts to the law in this case. The jury should only consider as evidence the testimony that came from this witness stand, plus any exhibits that I have — were admitted into the record. Also, stipulations that were agreed upon. In your deliberations, you are not to consider anything outside of this evidence presented in this courtroom except to use your common everyday sense. If, after full and fair consideration of all the evidence presented in this case, you believe that sufficient evidence has been presented to prove the defendant’s guilt beyond a reasonable doubt, it is your duty to convict the defendant.
“However, after the same full and fair consideration of all the evidence in this case, you believe that there was insufficient evidence presented to prove the defendant’s guilt beyond a reasonable doubt, it is your duty to acquit the defendant. All right?
“I’m going to leave it at that for right now, and then if you have any other questions, I’ll be happy to give you as much or as little as you think you need. All right? If that doesn’t answer your questions, I will expect to hear back from you in just a minute.”
(R. 1274-75.) Within a minute of retiring, the jury returned a note asking for the “five elements needed for both charges.” (R. 1275.) The trial court then determined to instruct the jurors as to the elements of the offense and their duty in weighing the evidence. Defense counsel objected to the court’s failure to give the total charge and stated:
“[Defense counsel]: I was going to ask, you’re not going to give reasonable doubt and all of that stuff?
“[Prosecutor]: No. That’s not what they asked for.
“[Defense counsel]: No, no, no. Judge, if you’re going to give part of it, I think we need to give it in its entirety.
“THE COURT: Well, that was my plan this morning, and y’all didn’t think it needed to be in its entirety. I’m going to give what I think I need to give.
“[Defense counsel]: I want the entire thing given.”
(R. 1276.) The trial court then instructed the jury as to the elements of the offenses *82 and as to its duty to determine the facts and apply the facts to the law. The court reminded the jurors that they were to consider only the evidence, that Jackson is presumed innocent, and that the burden of proving Jackson guilty beyond a reasonable doubt remains on the State. The court again instructed the jury as to the reasonable-doubt standard, stating:
“What is a reasonable doubt? A reasonable doubt means just what it says. It is a reasonable doubt, a doubt for which you can give a good, sensible reason. It does not mean a mere possible doubt, an imaginary doubt or a speculative doubt. And when we say that the burden is on the State to convince you beyond a reasonable doubt, that does not mean that the State must convince you to a mathematical certainty because that can never be done when you rely on the testimony of other human beings.
“Reasonable doubt may arise from all of the evidence, a lack of evidence, or from any part of the evidence. In other words, if after considering all the evidence in this case, you have a doubt about the defendant’s guilt, and that doubt has a reason based on the evidence, a lack of evidence, or from any part of the evidence, then you should acquit the defendant.
“However, if after considering all the evidence in this case, you do not have a doubt for which you can assign a good, sensible reason, then you should convict the defendant.”
(R. 1278-79.)
Initially, we note that the trial court’s jury charge as to reasonable doubt did not violate Cage v. Louisiana, 498 U.S. 39, 111 S.Ct. 328, 112 L.Ed.2d 339 (1990). Rather, the charge is almost identical to the Alabama Pattern Jury Instructions on reasonable doubt.
“ ‘The instruction on reasonable doubt that the trial court provided to the jury here incorporated the language found in the Alabama Pattern Jury Instructions on reasonable doubt. The pattern jury instructions inform jurors that their doubt cannot be based on “a mere guess or surmise” but must be based on “reason and common sense.” It also informs jurors that reasonable doubt that “entitles an accused to an acquittal is not a mere fanciful, vague, conjectural or speculative doubt.” Alabama Pattern Jury Instructions: Criminal, Instructions 1.4 and 1.5 (3d ed. 1994). “‘“A trial court’s following of an accepted pattern jury instruction weighs heavily against any finding of plain error.” ’ Wilson v. State, 111 So.2d 856 (Ala.Crim.App.1999), quoting Price v. State, 725 So.2d 1003, 1058 (Ala.Crim.App.1997), aff'd, 725 So.2d 1063 (Ala.1998), cert. denied, 526 U.S. 1133, 119 S.Ct. 1809, 143 L.Ed.2d 1012 (1999).” Snyder v. State, 893 So.2d 488, 550 (Ala.Crim.App.2003).’ ”
Whatley v. State, 146 So.3d 437, 478 (Ala.Crim.App.2011) (opinion on return to remand), quoting Harris v. State, 2 So.3d 880, 913 (Ala.Crim.App.2007), cert. denied, Harris v. Alabama, 555 U.S. 1155, 129 S.Ct. 1039, 173 L.Ed.2d 472 (2009).
Moreover, the terminology used in Cage was not included in the trial court’s charge, and the courts of Alabama have upheld other charges that contained some of the cited terminology.
“The United States Supreme Court in Cage v. Louisiana held that use of the terms ‘grave uncertainty, actual substantial doubt, and moral certainty’ to define reasonable doubt could be interpreted ‘to allow a finding of guilt based on a degree of proof below that required by the Due Process Clause.’ 498 U.S. at 41, 111 S.Ct. 328. Cf. Victor v. Nebras *83 ka, 511 U.S. 1, 114 S.Ct. 1239, 127 L.Ed.2d 583 (1994) (use of the phrase ‘moral certainty’ in the court’s instruction did not lower the State’s burden of proof).
“ ‘The beyond a reasonable doubt standard is a requirement of due process, but the Constitution neither prohibits trial courts from defining reasonable doubt nor requires them to do so as a matter of course. Cf. Hopt v. Utah, 120 U.S. 430, 440-441, 7 S.Ct. 614, 618-20, 30 L.Ed. 708 (1887). Indeed, so long as the court instructs the jury on the necessity that the defendant’s guilt be proved beyond a reasonable doubt, see Jackson v. Virginia, 443 U.S. 307, 320, n. 14, 99 S.Ct. 2781, 2789, n. 14, 61 L.Ed.2d 560 (1979), the Constitution does not require that any particular form of words be used in advising the jury of the government’s burden of proof. Cf. Taylor v. Kentucky, 436 U.S. 478, 485-486, 98 S.Ct. 1930, 1934-1935, 56 L.Ed.2d 468 (1978). Rather, “taken as a whole, the instructions [must] correctly eonve[y] the concept of reasonable doubt to the jury.” Holland v. United States, 348 U.S. 121, 140, 75 S.Ct. 127, 137, 99 L.Ed. 150 (1954).’
“Victor; 511 U.S. at 5, 114 S.Ct. 1239.
“We have held that use of some of the terms found offensive in Cage does not necessarily constitute reversible error. See Haney v. State, 603 So.2d 368 (Ala. Crim.App.1991). In affirming a reasonable-doubt instruction substantially similar to the challenged instruction we stated:
“ ‘Although the trial court did refer to a reasonable doubt as an “actual doubt,” it did not state that the doubt must be “grave” or “substantial,” as the faulty charge in Cage [v. Louisiana, 498 U.S. 39 (1990) ] instructed. See Cage, 498 U.S. at 40, 111 S.Ct. at 328 (holding that the terms “grave” and “substantial” suggest a higher degree of doubt than that actually required to acquit).’
“Smith v. State, 756 So.2d 892, 922 (Ala.Crim.App.1997).”
Thompson v. State, 153 So.3d 84, 153-54 (Ala.Crim.App.2012) (finding no plain error in the trial court’s instructions on reasonable doubt where judge refused to give Thompson’s three requested instructions and instead used the pattern jury instructions).
The trial court’s refusal to give Jackson’s requested jury charges was not erroneous because the court’s charge fully and appropriately covered the subject of reasonable doubt.
“The principle of law as stated in King[ v. State, 356 So.2d 1220 (Ala.1978) ], and restated in Dillard[ v. State, 371 So.2d 947 (Ala.1979) ], is ‘the refusal of it (requested jury instruction) by the trial court will not constitute prejudicial error if the principle of law expressed therein was substantially and fairly covered elsewhere in the trial court’s charge to the jury.’ ... Dillard, supra at 371 So.2d [at] 948.
“The effect of King is that, if by the oral charge or by other requested jury instructions, the jury is presented a discussion of the reasonable doubt standard as applied to the evidence in its totality, then the failure to give instructions similar to defendant’s charges one and five is not error to reverse. Code 1975, § 12-16-13.
“The trial court in its oral instructions to the jury discussed the reasonable doubt standard as applied to the evidence in its totality and substantially and fairly covered that standard.”
Lambeth v. State, 380 So.2d 923, 924-25 (Ala.1979).
*84 Finally, the question by the jury concerning the inability to decide Jackson’s guilt based on the evidence does not convey a confusion as to the reasonable-doubt standard but an inability to decide whether the evidence proved Jackson’s guilt. Therefore, the court properly informed the jury that it was the decider of the facts, and the jury properly weighed the evidence and returned its verdict. See, e.g., Carpenter v. State, 404 So.2d 89, 98-99 (Ala.Crim.App.1980) (“Furthermore, the trial court thoroughly and correctly instructed the jury as to the definition of ‘reasonable doubt.’ For the trial court to have instructed the jury as the appellant requested would have been to invade their province as weighers of the evidence or finders of fact.”).
XXIII.
Jackson argues that the State failed to establish the chain of custody for certain evidence, specifically the fingerprint evidence, including the prints from the hood of Officer Smith’s vehicle, as well as the known prints of Jackson, Jackson, Sr., and Elice Jackson that were used for comparison. He contends that gaps in the chain of custody raise serious doubts as to the accuracy of the analyses performed in determining that the prints on the hood of Officer Smith’s vehicle came from Elice Jackson. By footnote in his brief on appeal, Jackson also challenges the chain of custody as to the bullets and casings. Jackson failed to object to the chain of custody of any evidence at trial; and therefore, this matter must rise to the level of plain error. Rule 45A, Ala. R.App. P.
“‘The Alabama Supreme Court in Ex parte Holton, 590 So.2d 918 (Ala.1991), addressed the requirements for a chain of custody:
“ ‘ “Proof of [an] unbroken chain of custody is required in order to establish sufficient identification of the item and continuity of possession, so as to assure the authenticity of the item. [Ex parte Williams, 548 So.2d 518, 520 (AIa.1989) ]. In order to establish a proper chain, the State must show to a ‘reasonable probability that the object is in the same condition as, and not substantially different from, its condition at the commencement of the chain.’ McCray v. State, 548 So.2d 573, 576 (Ala.Crim.App.1988).”
“ ‘590 So.2d at 919-20. Later, in Hale v. State, 848 So.2d 224 (Ala.2002), the Supreme Court reexamined its holding in Holton after the 1995 codification of § 12-21-13, Ala.Code 1975. The Supreme Court stated:
“ ‘ “Section 12-21-13, AIa.Code 1975, provides:
“ ‘ “ ‘Physical evidence connected with or collected in the investigation of a crime shall not be excluded from consideration by a jury or court due to a failure to prove the chain of custody of the evidence. Whenever a witness in a criminal trial identifies a physical piece of evidence connected with or collected in the investigation of a crime, the evidence shall be submitted to the jury or court for whatever weight the jury or court may deem proper. The trial court in its charge- to the jury shall explain any break in the chain of custody concerning the physical evidence.’
“ ‘ “(Emphasis added.) This statute, by its terms, applies only to ‘[physical evidence connected with or collected in the investigation of the charged crime. To invoke the statute the proponent of the evidence must first es *85 tablish that the proffered physical evidence is in fact the very evidence ‘connected with or collected in the investigation.’ Moreover,
“ ‘ “ ‘[i]n Land v. State, 678 So.2d 201 (Ala.Cr.App.1995), aff'd, 678 So.2d 224 (Ala.1996), a case which appears to rely on § 12-21-13, this court ruled that where a witness can specifically identify the evidence, and its condition is not an issue in the case, then the State is not required to establish a complete chain of custody in order for the evidence to be admitted into evidence. We stated: “The eyeglasses were admissible without establishing a chain of custody because [the testifying officer] was able to specifically identify them, and their condition was not an issue in the case.” Land, 678 So.2d at 210.’ ”
“ ‘848 So.2d at 228 (emphasis in original).’
“Wilson v. State, 142 So.3d 732, 768-69 (Ala.Crim.App.2012) (opinion on return to remand).”
Scott v. State, 163 So.3d 389, 450 (Ala.Crim.App.2012).
There is no claim by Jackson that any of the evidence was tampered with or that its condition had been altered. Jackson, instead, focuses on the State’s duty to establish the chain of custody. Here, the State provided testimony concerning the gathering of this evidence as well as its handling. Any weaknesses in the links of the chains of evidence address the weight to be afforded the evidence rather than its admissibility. See Revis v. State, 101 So.3d at 289 (“If the State has sufficiently shown each link, ‘but has done so with circumstantial evidence, as opposed to the direct testimony of the “link,” as to one or more criteria or as to one or more links, the result is a “weak” link. When the link is “weak,” a question of credibility and weight is presented, not one of admissibility.’ Ex parte Holton, 590 So.2d 918, 920 (Ala.1991).”). There was no indication, given the testimony of the State’s witnesses, that the fingerprint and ballistics evidence was not authentic or that it had been tampered with.
XXIV.
Jackson argues that the trial court erred in preventing Jackson, Sr., from testifying as to what Jackson said that he intended to do on the morning of the offense. Jackson contends that the trial court improperly found that this testimony would have constituted inadmissible hearsay.[17] He submits that it would have been admissible as an exception to the hearsay rule because it showed his state of mind. The trial court’s ruling, Jackson argues, prevented him from presenting a complete defense because this would have corroborated his alibi defense. Jackson presents this argument for the first time on appeal; thus it is evaluated pursuant to the plain-error rule. Rule 45A, Ala. RApp. P.
Jackson’s argument on appeal reveals its own impropriety. He wanted the testimony to be admitted to support his alibi defense; i.e., for the truth of the matter asserted. He did not intend it to be admitted to show that he was in a particular state of mind on the morning of the offense; rather he sought to show that he drove to the Birmingham courthouse on the morning of the offense. See Ex parte Martin, 931 So.2d 759, 764 (Ala.2004) (“If the victim’s statements to Carey were of *86 fered to prove that Martin was indeed planning on harming or killing the victim, then they were offered for the truth of the matters asserted and are hearsay. If they were offered simply to show circumstances from which one might infer the victim’s state of mind, then the statements were not offered for the truth of the matters asserted therein (that Martin might or might not kill the victim) and they therefore do not fit within the definition of hearsay.”). Compare Stanley v. State, 143 So.3d 230, 289 (Ala.Crim.App.2011) (“[A]s for Mitchell’s testimony as to what her mother told her about leaving for awhile, it also was not offered to prove the truth of the matter asserted. Instead, the testimony was offered to describe Shelly’s physical and emotional condition on the day of the murder.”).
The trial court did not err by this ruling.
XXV.
Jackson argues that he was wrongfully prevented from life-qualifying the prospective jurors. Jackson refers to what he submits was an improper interruption by the prosecutor of his questioning of two potential jurors, as well as the trial court’s sustaining of the prosecutor’s objection to his questioning of a third potential juror. He also submits that he was denied a fair trial because the views of these potential jurors impaired if they served, or would have impaired if they had to be struck, their duties as jurors.
Jackson first cites to a potential juror who had earlier indicated during the general examination that she had a fixed opinion concerning the death penalty. Defense counsel, during subsequent individual questioning, asked whether she would automatically vote for a death sentence if she found that an intentional murder of a police officer had been committed. The prosecutor then stated that there would be a second phase during which mitigating and aggravating evidence would be presented and that the law required that the jurors be able to consider both sentencing options: death and life imprisonment without the possibility of parole. The prospective juror responded, “Thank you for clarifying that.” (R. 234.) Thereafter, she affirmed that she could consider both options. Defense counsel then asked, “My question has to come back as this: If you find that the defendant had intentionally killed a police officer, you could vote for life without parole?” (R. 234.) The prospective juror responded that she could and defense counsel stated, “Okay.” (R. 234.)
Subsequently, defense counsel asked another potential juror, who had earlier indicated that she had a fixed opinion concerning the death penalty during the general examination, the same question, and the prosecutor objected on the ground that defense counsel was asking the question in a vacuum without providing any information concerning the penalty •phase. Defense counsel then rephrased his question and the following transpired:
“[Defense counsel]: If the State of Alabama proved that the defendant intentionally went out and shot and killed a police officer and intended to cause his death, and when you’re given the option of life without parole or the death penalty, do you know that based on the fact that you found that he intentionally killed this police officer, that you’re going to vote for the death penalty in that situation?
“PROSPECTIVE JUROR ...: I can’t say with 100 percent certainty until I actually heard everything. But I would say that I would probably favor that.
“[Defense counsel]: That’s all.”
*87 (R. 369.) Defense counsel moved to excuse this second potential juror for cause. His motion was denied.
“ ‘ “[WJhether a prospective juror in a capital murder case is properly excluded based on the juror’s views concerning the death penalty involves a question of fact. Therefore, a proper review of this determination requires that we give great deference to the trial judge’s discretion, because the judge was present and capable of observing the potential jurors and their responses.” Price v. State, 725 So.2d 1003, 1025 (Ala.Cr.App.1997), aff'd, 725 So.2d 1063 (Ala.1998), citing Wainwright v. Witt, [469 U.S. 412 (1985) ].
“ ‘In Clemons v. State, 720 So.2d 961 (Ala.Cr.App.1996), aff'd, 720 So.2d 985 (Ala.1998), this court stated:
“ ‘ “ ‘Witherspoon v. Illinois, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968), set the early standard for a court’s exclusion for cause of venirepersons who oppose the death penalty. The Court in dicta in Witherspoon limited exclusion for cause to those venirepersons who made it “unmistakably clear (1) that they would automatically vote against imposition of capital punishment ... or (2) that their, attitude toward the death penalty would prevent them from making an impartial decision as to the defendant’s guilt.” Id., 522-23 n. 21, 88 S.Ct. at 1777 n. 21. Subsequently, in Wainwright v. Witt, 469 U.S. 412, 105 S.Ct. 844, 83 L.Ed.2d 841 (1985), the Court clarified or modified its decision in Witherspoon by holding that the state may exclude venirepersons in capital cases whose views would “ ‘prevent or substantially impair the performance of [their] duties as a juror in accordance with his instruction and [their] oath.’ ” Id., 469 U.S. at 424, 105 S.Ct. at 852 (quoting Adams v. Texas, 448 U.S. 38, 45, 100 S.Ct. 2521, 2526, 65 L.Ed.2d 581 (1980)). The new Witt standard dispensed with the Witherspoon reference to “automatic” decision-making, and eliminated the requirement that a venireperson’s bias be proved with “unmistakable clarity.” 469 U.S. at 424, 105 S.Ct. at 852.’ ” ’
“Burgess v. State, 811 So.2d 557, 570 (Ala.Crim.App.1998), reV’d on other grounds, 811 So.2d 617 (Ala.2000).”
Thompson v. State, 153 So.3d 84, 118 (Ala.Crim.App.2012).
Both potential jurors were struck from the jury, so that at most the fact that they were not removed for cause would have been harmless. Broum v. State, 11 So.3d 866, 886-87 (Ala.Crim.App.2007). However, there was no error in the present case in failing to remove these potential jurors for cause. Both indicated that they could properly consider the evidence, as well as both possible sentences, in arriving at their verdict. Although the second potential juror stated that she might favor the death penalty, she also stated that she would not automatically vote to impose the death penalty. Her statements did not reveal such a fixed opinion that she would have been unable to render a fair and impartial judgment.
Moreover, defense counsel’s questioning of these potential jurors was not restricted. Although the prosecutor interrupted his questioning, it is clear that the potential jurors were having difficulties understanding the questioning, and defense counsel’s questions did not fully explain what the jurors would be required to do. See Travis v. State, 776 So.2d 819, 834 (Ala.Crim.App.1997) (“In another instance *88 cited by the appellant as an improper limitation by the trial court of voir dire examination, defense counsel appeared to be inquiring whether the venireperson thought the death penalty was appropriate in cases involving what was simply intentional murder, rather than capital murder. In that instance, the court interrupted defense counsel to clarify counsel’s misstatement.”). There was no improper restriction or limitation of defense counsel’s voir dire examination.
The third prospective juror had responded during group questioning concerning fixed opinions in favor of the death penalty that she “would say yeah, if they’ve gone out and just cold-blooded murdered somebody. Then there are those times when somebody maybe, you know, got in a fight and shot from meanness. I mean, give them a chance. But there are those, yeah, if they’ve gone out and killed somebody’s family member, I say fry them. That’s my opinion.” (R. 189.) Thereafter, during individual questioning, the following transpired:
“[Defense counsel]: I’m talking about, when I asked that question, there was something said to the fact that sounded to us like you had said fry him?
“PROSPECTIVE JUROR ...: I could see him fry, yes.
“[Defense counsel]: And that was—
“[Prosecutor]: You understand we don’t do the frying anymore. We don’t fry them anymore.
“PROSPECTIVE JUROR ...: I thought about that, too, and it was like, Lord, I’m so sorry for saying that.
“[Defense counsel]: So, that tends to show, in my mind, that you have a pretty strong conviction towards the death penalty.
“PROSPECTIVE JUROR ...: And I also said that if I saw — if you killed my son, that’s when I said it. Or my child, my family member, I could probably — or I could see you fry. That’s what I said, yes, I did.
“[Defense counsel]: And the way I was trying to ask it to you earlier, you understand that if you convict someone of capital murder, you’re saying that I found from the evidence beyond a reasonable doubt that he intentionally went out and shot this police officer and intended to kill him, based on if you find that from your verdict?
“PROSPECTIVE JUROR ...: Yes.
“[Defense counsel]: I’m understanding if you find that from your verdict, that he just went out there and — cold-blooded and intentionally caused the death of this police officer, that you would vote for the death penalty. I understood you to say that.
“[Prosecutor]: That was before she was told — explained the law about mitigating—
“[Defense counsel]: Can I ask my questions, [Prosecutor]?
“[Prosecutor]: You’re just trying to put words in her mouth.
“[Defense counsel]: No, I’m not.
“THE COURT: All right. Ask your question.
“[Defense counsel]: I mean, if you found that he intentionally went and coldblooded intentionally killed this police officer, I understood you to say, in all honesty, that you would go for the death penalty?
“[Prosecutor]: Object to the form of that question, Your Honor. And the reason I — my objection is because it does not include taking into consideration the entire penalty phase and any mitigating or aggravating circumstances.
“PROSPECTIVE JUROR ...: But would I not be with other jurors?
*89 “[Prosecutor]: Wait a minute. She’s got to rule first.
“THE COURT: I’ll sustain the objection. You have to talk about — talk about the trial as a whole. If you didn’t find that it was an intentional killing of a police officer, then you couldn’t find him guilty. Then you would move to the next phase, which is the penalty phase. The law does not say that you automatically get the death penalty for the intentional murder of a police officer. The law does not say that.
“PROSPECTIVE JUROR ...: Right.
“THE COURT: The law says that there are two options. And each juror would have to weigh all of the options. Can you weigh all of the options, or is [defense counsel] right? Are you leaning towards killing a police officer, I’m going to give you the death penalty? “PROSPECTIVE JUROR ...: I could do both options.
“THE COURT: All right. Any other questions?
“[Prosecutor]: No.
“THE COURT: [Defense counsel]?
“[Defense counsel]: Nothing further.”
(R. 299-302.) Defense counsel moved to strike this potential juror for cause. The prosecutor responded that the potential juror should certainly be subject to a peremptory strike, but that her statements did not rise to the level justifying a removal for cause. The motion was denied.
Although the trial court denied this motion and no indication of any reconsideration of the denial appears in the transcript of the voir dire or striking of the jury, the supplemental record indicates that this potential juror was removed for cause by the trial court. (Supp. R. 384, 388.) Thus, Jackson suffered no prejudice because he did not have to use one of his peremptory challenges to remove her and she did not serve on his jury. Moreover, it appears that, although the reason is unclear, Jackson received the benefit of his motion because this potential juror was removed for cause.
Therefore, there was no error as to Jackson’s claims concerning these potential jurors.
XXVI.
Jackson argues that the trial court erred in relying on the disruption-of-governmental-function aggravating circumstance. Specifically, Jackson alleges that the prosecutor improperly argued to the jury that as a result of its guilty verdict, the State had proved the aggravating circumstance of the disruption of governmental function. § 13A-5-49, Ala.Code 1975 (“The capital offense was committed to disrupt or hinder the lawful exercise of any governmental function or the enforcement of laws_”). Jackson cites the following comment made by the prosecutor during opening arguments at the penalty phase to support his argument:
“The other aggravating circumstance we intend to offer to you is the capital offense was committed to disrupt or hinder the lawful exercise of any governmental function or the enforcement of laws. Okay? And by your — I will submit to you at this point right now, by your verdict in the guilt phase, we’ve already — you’ve already — we’ve already proved that particular aggravating circumstance. Okay? We had a police officer in her capacity, and she’s killed, and so that’s — we’ve already proved — I submit to you we’ve already proved that particular aggravating circumstance.”
(R. 1298-99.) Thereafter, during closing arguments, the prosecutor argued:
“And the second one we proved to you through the guilt phase, and your ver- *90 diet ratified that proof is one way of looking at it.”
(R. 1307.) Jackson failed to object to these comments; thus they must rise to the level of plain error. Rule 45A, Ala. R.App. P.
In McNabb v. State, 887 So.2d 929 (Ala.Crim.App.2003), this Court addressed an argument by the prosecutor in which he submitted to the jury that because of its verdict of guilt as to the murder of a police officer in the performance of his duty, it had found the existence of the aggravating circumstance of disruption of governmental function. This Court found that, taken in context, this was an argument by the prosecutor that “the evidence presented by the State during the guilt phase, which supported the guilt-phase verdicts, established the two aggravating circumstances. This was not improper.” 887 So.2d at 988. See also Johnson v. State, 120 So.3d 1130, 1155 (Ala.Crim.App.2009) (finding that, although the murder victim was to be a witness against Johnson, this role did not automatically mandate the application of the disrupting-of-governmental-function aggravating circumstance, nonetheless “the same evidence may be used to establish both the underlying aggravation in the offense as the aggravating circumstance, depending on the case”).
“ ‘ “[T]he prosecutor, as well as defense counsel, has a right to present his impressions from the evidence, if reasonable, and may argue every legitimate inference.” ’ Reeves v. State, 807 So.2d 18, 45 (Ala.Crim.App.2000), quoting Rutledge v. State, 523 So.2d 1087, 1100 (Ala.Crim.App.1987), rev’d on other grounds, 523 So.2d 1118 (Ala.1988) (citation omitted). The prosecutor never stated, suggested, or implied that it did not have the burden of proving the aggravating circumstances beyond a reasonable doubt. Moreover, the trial court thoroughly instructed the jury, on several occasions throughout the trial, that opening and closing statements of counsel were not evidence and that the State had the burden of proof, including the burden of proving the aggravating circumstances beyond a reasonable doubt. Jurors are presumed to follow the trial court’s instructions. See, e.g., Taylor v. State, 666 So.2d 36, 70 (Ala.Crim.App.1994), aff'd, 666 So.2d 73 (Ala.1995), cert. denied, 516 U.S. 1120, 116 S.Ct. 928, 133 L.Ed.2d 856 (1996).”
887 So.2d at 988-89.
Similarly, in this case, the prosecutor submitted his argument to the jury based on the evidence. Neither the prosecutor nor the judge told the jury that it had to find the existence of the aggravating circumstance. The jurors were properly instructed on how to construe the attorneys’ arguments and on their duties of determining the existence of, as well as the weighing of, the aggravating and mitigating circumstances. The jurors were also fully instructed on the State’s burden of proving the aggravating circumstances. There was no plain error on this ground.
Jackson also argues that the trial court applied the incorrect standard that had been espoused by the prosecutor in these arguments and made no factual findings as to this aggravating circumstance. However, in the sentencing order, the trial court stated as to this aggravating circumstance:
“The second aggravating circumstance, that the defendant caused the death while attempting to disrupt or hinder the lawful exercise of any governmental function or enforcement of laws was well established in that the deceased Mary Smith was a police officer, in uniform, in a marked patrol vehicle and was answering a call placed to the Fairfield police department.
*91 “... The Court further finds that aggravating circumstance number seven (7) under 13A-5-49(7) does apply in that the capital offense was committed to disrupt or hinder the lawful exercise of any governmental function or the enforcement of laws.”
(Supp. R. 24.) Thus, the trial court considered the evidence and made its finding of the existence of this aggravating circumstance based thereon.
Jackson finally challenges the application of this aggravating circumstance because, he argues, Officer Smith’s initial stop of Jackson was unlawful. He submits that there were no “specific and articulable facts” to justify the stop. Terry v. Ohio, 392 U.S. 1, 21, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). However, there was evidence that the police received a suspicious-persons call and dispatched the two patrol cars. She found Jackson, who was wearing a ski mask that hid his face. Officer Smith approached Jackson and Elice at the designated location pursuant to her duty as an on-duty police officer. Because Officer Smith was shot and killed, the conversation that transpired between her and Jackson before she ordered him to place his hands on the hood is not in the record. However, she had a right to approach and to speak to them. Jackson failed to comply with her order to place his hands on the hood of her vehicle, so he was never seized.
“[T]he Court in Sibron v. New York, 392 U.S. 40 [(1968)], a case decided the same day as Terry v. Ohio, indicated that not every encounter between a police officer and a citizen is an intrusion requiring an objective justification. In that case, a police officer, before conducting what was later found to have been an unlawful search, approached Sibron in a restaurant and told him to come outside, which Sibron did. The Court had no occasion to decide whether there was a ‘seizure’ of Sibron inside the restaurant antecedent to the seizure that accompanied the search. The record was ‘barren of any indication whether Sibron accompanied [the officer] outside in submission to a show of force or authority which left him no choice, or whether he went voluntarily in a spirit of apparent cooperation with the officer’s investigation.’ 392 U.S., at 63, 88 S.Ct., at 1903 (emphasis added). Plainly, in the latter event, there was no seizure until the police officer in some way demonstrably curtailed Sibron’s liberty.”
United States v. Mendenhall, 446 U.S. 544, 553, 100 S.Ct. 1870, 64 L.Ed.2d 497 (1980).
Because Officer Smith was performing her duties as a law-enforcement officer when she was shot and killed by Jackson, the offense was committed to disrupt or hinder the lawful exercise of a government function or the enforcement of laws.
XXVII.
Jackson argues that the presen-tence report was improperly admitted because it contained false information. Jackson refers to statements in the report indicating that Officer Burpo identified Jackson as the man who shot Officer Smith and him. Jackson did not challenge the presentence report at trial; therefore, this error must be analyzed under the plain-error rule. Rule 45A, Ala. R.App. P.
This error in the presentence report did not adversely affect Jackson’s substantial rights and was therefore harmless error. Rule 45, Ala. R.App. P. Although the court properly considered the report, § 13A-5-47(b), Ala.Code 1975, the court was also present for all the testimony, including that of Officer Burpo. Officer Burpo testified that he could not identify Jackson because of the mask; however, he *92 was able to see Jackson’s license tag and to convey the numbers and' letters on the tag. See Wilson v. State, 142 So.3d 732, 800 (Ala.Crim.App.2010) (opinion on return to remand) (“Because Wilson presented mitigation testimony during the penalty phase and the circuit court had access to the reports that were not referenced in the presentence-investigation report, this Court holds that any inadequacy in the presentence-investigation report did not constitute plain error. Rule 45A, Ala. R.App. P.; Sharifi v. State, 993 So.2d 907, 947-49 (Ala.Crim.App.2008) (concluding there was ‘no plain error in the incomplete presentence report as it is clear that the circuit court had access to the omitted information’).”)
In Johnson v. State, 120 So.3d 1130 (Ala.Crim.App.2009), Johnson argued that the presentence report should not have been considered by the court because it contained the parole officer’s opinion that Johnson should be sentenced to death, and the trial court stated that it had considered “all matters” in sentencing Johnson. This Court found no plain error in the trial court’s consideration of the report and stated:
“In Lee v. State, 898 So.2d 790 (Ala.Crim.App.2001), Lee argued that the presentence investigative report improperly included the opinion of the parole officer about his mental state at the time of the offenses, as well as his recommendation that Lee receive ‘the maximum possible sentence.’ 898 So.2d at 860. This Court held that there was no plain error on this ground, because a review of the sentencing orders revealed no indication that the trial court had relied on this opinion. Therefore, this Court held that any error in the inclusion of this recommendation by the parole officer was at most harmless, stating:
“ ‘ “The defendant contends that the trial judge should not have considered the presentence investigation report because it contains the parole officer’s recommendation of punishment.
Nowhere in the record does there appear any objection to this or any other portion of the pre-sentence report. However, this court has neither found nor been cited to any authority for the parole officer’s recommendation. Although we do not approve or condone such a recommendation, we find that even if such recommendation constitutes error, we would find that error harmless in this case. Rule 45, A.R.A.P. ‘[T]he mere presence of information in the pre-sentence report which should not be considered for the purpose of enhancing punishment is not, per se, prejudicial.’ Johnson v. State, 521 So.2d 1006, 1013 (Ala.Cr.App.1986), affirmed, 521 So.2d 1018 (Ala.), cert. denied, 488 U.S. 876, 109 S.Ct. 193, 102 L.Ed.2d 162 (1988).’”
“898 So.2d at 860, quoting Kuenzel v. State, 577 So.2d 474, 527 (Ala.Crim.App.1990).”
120 So.3d at 1195-96. See also Henderson v. State, 584 So.2d 841, 861 (Ala.Crim.App.1988) (“Where matters are included in a pre-sentence report which are not proper for determining sentence, but the trial court does not consider the improper matters in determining the sentence, there is no error. See Thompson v. State, 503 So.2d 871, 880-81 (Ala.Cr.App.1986), affirmed, 503 So.2d 887 (Ala.1987), cert. denied, 484 U.S. 872, 108 S.Ct. 204, 98 L.Ed.2d 155 (1987).”).
Moreover, in Arthur v. State, 711 So.2d 1031 (Ala.Crim.App.1996), Arthur alleged that the presentence report should not have been considered because it contained impermissible victim impact evidence. *93 This Court found no plain error and stated:
“In Ex parte Rieber, 663 So.2d 999 (Ala.1995), the Alabama Supreme Court addressed a case wherein the appellant argued that the trial court had improperly considered victim impact statements made by the victim’s husband that were included in the presentence investigation report, including the husband’s statements concerning the ways in which his wife’s murder had affected him and his family. There were further statements concerning his opinions about the crime, about the defendant, and about the appropriateness of the death sentence in that case. The Alabama Supreme Court noted that these statements consisted of three paragraphs that comprised 2 pages of a 37-page report. Moreover, there was no indication in the trial court’s sentencing order that it had considered the victim’s husband’s statement in sentencing the victim, or that it had based the appellant’s sentence, even in part, on that statement.”
711 So.2d at 1091-92.
Similarly, in the present case, there is no indication that the trial court considered those brief comments in sentencing Jackson. Moreover, the court was well aware of the evidence. The error in the presentence report was harmless; it did not amount to plain error.
XXVIII.
Jackson argues that the trial court’s consideration of his juvenile record in sentencing him was improper because, he says, it was not relevant to any mitigating or aggravating circumstance. Jackson refers to a case-action-summary entry dated March of 2008 ordering that his juvenile records be released. The court stated at sentencing that it ordered those records as a supplement to the probation report. However, the court stated: “I want to be very clear, though, that I am not using these in any regard to negate the mitigating statutory circumstances regarding prior criminal history. I have only considered the prior — adult prior criminal history.” (R. 1372.) There was no impropriety by the court in ordering that the juvenile records be released. Ex parte Lynn, 477 So.2d 1385, 1386 (Ala.1985) (“ ‘[EJvidence of a juvenile adjudication is available for character proof only under the limited scope of post-conviction sentencing hearings or probationers’ reports.’ ”). See also Baker v. State, 906 So.2d 210, 237-38 (Ala.Crim.App.2001), reversed on other grounds, Ex parte Baker, 906 So.2d 277 (Ala.2004) (finding no error as to Baker’s claim that “the district attorney had improper uses for the information in the appellant’s juvenile records” because the claim was not supported by the record and “although the record and reports did concern the appellant’s activities as a juvenile, it was proper for the district attorney to acquire the records and submit them to the court”).
The trial court’s sentencing order states the aggravating circumstances that were found by the trial court, as well as the existence or nonexistence of the mitigating circumstances. There is no mention of any juvenile adjudications or record. Therefore, Jackson’s suggestion that the trial court considered his juvenile record as an aggravating circumstance is mere speculation. See Lawson v. State, 33 Ala.App. 343, 345, 33 So.2d 388, 390 (1948) (finding that the trial court based its decision on reasonable inferences from the evidence “rather than on surmise or guesswork”).
“ ‘Speculation from a silent record will not support a finding of prejudice. Ex parte Walker, 972 So.2d 737, 755 *94 (Ala.2007), cert. denied, Walker v. Alabama, 552 U.S. 1077, 128 S.Ct. 806, 169 L.Ed.2d 608 (2007). A reviewing court can not presume error from a silent record. “ ‘This court is bound by the record and not by allegations or arguments in brief reciting matters not disclosed by the record.’ Webb v. State, 565 So.2d 1259, 1260 (Ala.Cr.App.1990). See also Acres v. State, 548 So.2d 459 (Ala.Cr.App.1987). Further, we cannot predicate error from a silent record. Owens v. State, 597 So.2d 734 (Ala.Cr.App.1992); Woodyard v. State, 428 So.2d 136 (Ala.Cr.App.1982), aff'd, 428 So.2d 138 (Ala.), cert. denied, 462 U.S. 1136, 103 S.Ct. 3120, 77 L.Ed.2d 1373 (1983).” Whitley v. State, 607 So.2d 354, 361 (Ala.Crim.App.1992).’
“Dotch v. State, 67 So.3d 936, 961 (Ala.Crim.App.2010). See also Saunders v. State, 10 So.3d 53, 77 (Ala.Crim.App.2007), cert. denied, 556 U.S. 1258, 129 S.Ct. 2433, 174 L.Ed.2d 229 (2009) (‘ “The defendant cannot successfully argue that error is plain in the record when there is no indication in the record that the act upon which error is predicated ever occurred.” Ex parte Watkins, 509 So.2d 1074, 1077 (Ala.1987).’).”
Revis v. State, 101 So.3d 247, 262 (Ala.Crim.App.2011).
XXIX.
Jackson alleges that the evidence concerning his prior shooting of Amos was inadmissible because, he says, it did not fall properly within the identity exception to the exclusionary rule. Specifically, Jackson argues that because the offense was not committed in a novel or peculiar manner, it was inadmissible under the identity exception to Rule 404(b), Ala. R. Evid.
However, as previously discussed in Issue IX of this opinion, the prior shooting was relevant to this offense because the ballistics evidence from the prior shooting by Jackson tied him to the present offense. The evidence indicated that the bullets fired in both offenses came from the same gun and that Amos, who knew Jackson, had positively identified him as the man who had shot him. This evidence was particularly relevant because the gun used in the present offense was never recovered. The evidence was properly admitted, not under the identity exception, but as “as intrinsic, direct evidence of the charged crime — not as Rule 404(b) evidence.” Tyson v. State, 784 So.2d 328, 345 (Ala.Crim.App.2000). In Tyson, this court found as unpersuasive the State’s argument that evidence that the weapon used in the present offense was also used in another shooting was admissible under the identity exception. This court determined that the State made no attempt to address the similarities of the offenses. 784 So.2d at 344. However, the evidence was admissible because “[t]he record shows that the evidence of the [collateral] shooting was admitted, not for the purpose of showing Tyson’s bad character and showing that he acted in conformity with that character by shooting [the collateral crime’s victims], but for the purpose of establishing Tyson’s connection to the murder weapon.” 784 So.2d at 345-46.
The list of exceptions contained in Rule 404(b), Ala. R. Evid., is not exhaustive, and evidence that is outside this list may be admissible if the evidence is relevant and its probative value is not outweighed by its prejudicial effect. Here, the evidence that the same gun previously used by Jackson was used to kill Officer Smith and to wound Officer Burpo was relevant; moreover, because the gun was never recovered, the probative value of the evidence *95 was not outweighed by its prejudicial effect.
XXX.
Jackson argues that the trial court improperly failed to find that his age was a mitigating factor. Jackson was 21 years old at the time of the offense and was thus an adult in Alabama.
This court has found in other cases that the mitigating circumstance concerning a defendant’s age, § 13A-5-51(7), Ala.Code 1975, did not exist where the defendant was 21 years old at the time of the offense. See e.g., Maples v. State, 758 So.2d 1, 31 (Ala.Crim.App.1999); Hall v. State, 979 So.2d 125, 167-68 (Ala.Crim.App.2007); Ex parte Boyd, 715 So.2d 852, 855-56 (Ala.1998). Moreover, courts have found that the age mitigating circumstance did not apply to defendants younger than Jackson.[18] See, e.g., Thompson v. State, 153 So.3d 84 (Ala.Crim.App.2012) (Thompson was 18 years old at the time of the offense and his conviction was upheld).
In this case, the trial court properly determined that the mitigating circumstance in § 13A-5-51(7) did not exist, as evidenced by the totality of the circumstances, including such factors as Jackson’s prior criminal history and the facts surrounding this offense.
XXXI.
Jackson argues that the trial court erred by refusing to give the jury the following charge he requested on attempted murder: “An attempt to commit murder requires the perpetrator to act with the specific intent to commit murder; a general felonious intent is not sufficient. Wells v. State, 768 So.2d 412 (Ala.Crim.App.1999).” (C. 102.)
The record indicates that the trial court instructed the jury that “[t]he indictment in this case charges that Demetrius Avery Jackson, Jr., on this occasion, attempted to cause the death of Eric Burpo by shooting him with a gun, and in doing the act or acts which caused his death [sic], he attempted to do it by an intentional act.” (R. 1285.) The judge instructed: “In order to be guilty of an attempt to commit murder, you must first find — first of all find beyond a reasonable doubt that Demetrius Avery Jackson, Jr. was the person who was present and committed these acts and that he had the intent to kill Eric Burpo, and he attempted to cause his death by shooting at him with a firearm, and he failed to accomplish that purpose.” (R. 1286, 1242.) The trial court charged the jury as to attempted murder, setting forth the elements, including “that in committing the act which was intended to cause the death of Eric Burpo, the defendant acted with intent.” (R. 1243, 1287.) Moreover, the jury was instructed specifically as to the requisite intent in a case of murder (including attempted murder) by the court as follows: “Again, a person acts intentionally when it is his purpose to cause the death of another person. Intent to cause death to another person may be inferred from the use of a deadly weapon or from other attendant circumstances.” (R. 1287, 1243-44.)
Thus, the jury was properly instructed as to the element of intent required to prove the charge of attempted murder. Rule 21.1, Ala.R.Crim.P., provides in part:
*96 “The refusal of a requested written instruction, although a correct statement of the law, shall not be cause for reversal on appeal if it appears that the same rule of law was substantially and fairly given to the jury in the court’s oral charge or in other charges given at the request of the parties.”
Moreover,
“ ‘ “A trial court has broad discretion in formulating its jury instructions, providing they are an accurate reflection of the law and facts of the case. Coon v. State, 494 So.2d 184 (Ala.Cr.App.1986). When requested charges are either fairly and substantially covered by the trial judge’s oral charge or are confusing, misleading, ungrammatical, not predicated on a consideration of the evidence, argumentative, abstract, or a misstatement of the law, the trial judge may properly refuse to give such charges, Ex parte Wilhite, 485 So.2d 787 (Ala.1986).”
‘“Ward v. State, 610 So.2d 1190, 1194 (Ala.Cr.App.1992).’ ”
Peoples v. State, 951 So.2d 755, 762 (Ala. Crim.App.2006), quoting Hemphill v. State, 669 So.2d 1020, 1021 (Ala.Crim.App.1995) (emphasis omitted).
It should be noted that Jackson failed to object at trial as to this ground and indicated that he was satisfied with the court’s instructions to the jury. Rule 45A, Ala. R.App. P. Here, there was no error, plain or otherwise, concerning the court’s instructions on the element of intent to commit attempted murder.
XXXII.
Jackson argues that the trial court violated his right to trial by jury when it overrode the jury’s verdict. He cites Ring v. Arizona, 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002), in support of his argument. He argues that there was no unanimous finding beyond a reasonable doubt by the jury of any aggravating circumstance; that the jury was improperly instructed that it had already determined the existence of the aggravating circumstance of disrupting governmental functions by its verdict; that the jury’s failure to state which aggravating circumstance or circumstances it had found allowed the court' to consider additional aggravating circumstances possibly not found by the jury; that the jury did not find beyond a reasonable doubt that the aggravating circumstances outweighed the mitigating circumstances; and that the trial court was required to accept the mitigating circumstances found by the jury.
In Apprendi v. New Jersey, 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000), the United States Supreme Court held that any fact that increases a sentence above the statutory maximum must be presented to a jury and proven beyond a reasonable doubt. The Supreme Court extended this holding to death-penalty eases in Ring v. Arizona.
A.
Jackson alleges that the jury never found the existence of any aggravating circumstance beyond a reasonable doubt. He contends that because the jury returned a recommendation of life imprisonment without parole and did not use a special verdict form, there is no indication that it found the existence of any aggravating circumstance. Jackson notes that the jury’s verdict of guilt did not trigger the application of any aggravating circumstance.[19]
*97 However, because the jury voted on whether to impose the death penalty, it must have found the existence of at least one aggravating circumstance. The jurors were properly instructed that they could not consider the death penalty unless they found the existence of at least one aggravating circumstance. Duke v. State, 889 So.2d 1, 42-43 (Ala.Crim.App.2002), reversed on other grounds, Duke v. Alabama, 544 U.S. 901, 125 S.Ct. 1588, 161 L.Ed.2d 270 (2005). Their determination as to the death penalty, made thereafter, did not have to be unanimous. As this Court stated in Blackmon v. State, 7 So.3d 397 (Ala.Crim.App.2005):
“Blackmon also argues that the decision in Apprendi mandates that a special verdict form be used so that the jury can designate what aggravating circumstance or circumstances it found to exist. We specifically addressed and rejected this argument in Bryant v. State, 951 So.2d 732, 737 (Ala.Crim.App.2003) (opinion on return to remand). We stated:
“ ‘[Bryant] contends that the United States Supreme Court’s decisions in Apprendi and Ring mandate the use of such verdict forms.
“ ‘This Court has rejected similar claims in previous death-penalty decisions. See, e.g., Walker v. State, 932 So.2d 140, 159 (Ala.Crim.App.2004); Adams v. State, 955 So.2d 1037, 1105 (Ala.Crim.App.2003). The Alabama Supreme Court has likewise rejected this argument. The Supreme Court has held, in numerous cases, that the jury’s verdict finding a defendant guilty of capital murder during the guilt phase of his trial indicated that the jury had unanimously found a proffered aggravating circumstance included within the § 13A-5-40(a), Ala.Code 1975, definition of the particular capital-murder offense charged in the indictment. See, e.g., Ex parte Hodges, 856 So.2d 936 (Ala.2003); Ex parte Waldrop, 859 So.2d 1181 (Ala.2002); Stallworth v. State, 868 So.2d 1128 (Ala.Crim.App.2001) (opinion on return to second remand), cert. denied, 868 So.2d 1189 (Ala.2003). But see Ex parte McGriff, 908 So.2d 1024, 1039 (Ala.2004) (authorizing prospective use of a penalty-phase special interrogatory). Moreover, in Ex parte McNabb, 887 So.2d 998 (Ala.2004), the Supreme Court held that even a non-unanimous recommendation of death by the jury proved that the jury, including the jurors who voted against the recommendation of death, had unanimously found the existence of a proffered aggravating circumstance, even though the circumstance was not included within the definition of the particular capital-murder offense charged in the indictment, because the trial court had specifically instructed the jury that it could not proceed to a vote on whether to impose the death penalty unless it had already unanimously agreed that the aggravating circumstance existed.’
“Bryant, 951 So.2d at 750-51.
“In this case the only aggravating circumstance that was alleged and found to exist was that the murder was especially heinous, atrocious, or cruel as compared to other capital murders. See § 13A-5-49(8), Ala.Code 1975. This aggravating circumstance was not an element of the capital offense. However, the circuit court instructed the jury in the penalty *98 phase that it could not proceed to a vote on whether to impose the death penalty unless it first determined that the aggravating circumstance that the offense was especially heinous, atrocious, or cruel was present. The circuit court’s instructions in regard to this issue were very specific and thorough. The jury recommended, by a vote of 10 to 2, that Blackmon be sentenced to death.”
7 So.3d at 417-18. (Footnote omitted).
Thus, the jury here found the existence of at least one aggravating circumstance because it proceeded to vote on whether to impose a death sentence. “ ‘The law is well settled that this Court will presume that the jury followed the trial court’s instructions unless there is evidence to the contrary.’ Wootten v. Ivey, 877 So.2d 585, 590 (Ala.2003).” Bradley v. State, 925 So.2d 232, 237 (Ala.2005).
B.
Jackson contends that the jury was improperly and repeatedly told that.its verdict was advisory, which, he argues is improper because, if the jurors failed to unanimously find the existence of at least one aggravating circumstance, it would have to return a sentence of life imprisonment without the possibility of parole.
“ ‘In Alabama the trial judge is the sentencing authority, and the jury’s advisory verdict is a recommendation that is not binding on the judge. § 13A-5-47(a), (e), Ala.Code 1975; Ex parte Carroll, 852 So.2d 821, 826-27 (Ala.2001).’” Jackson v. State, 133 So.3d 420, 447 (Ala.Crim.App.2012), quoting Woodward v. State, 123 So.3d 989, 1033 (Ala.Crim.App. 2011). Moreover, this Court has previously determined that a trial court’s instruction to the jury that its verdict is advisory or a recommendation does not violate Ring v. Arizona. In Irvin v. State, 940. So.2d 331 (Ala.Crim.App.2005), this Court opined:
“Irvin argues that Ring prohibits the trial judge from instructing the jury that its verdict is advisory. Rejecting a similar claim in Duke v. State, 889 So.2d at 43 (Ala.Crim.App.2002) (opinion on return to remand), this Court noted:
“ ‘Duke also argues that Ring requires penalty-phase relief when the jury is told that its verdict is “advisory” or merely a “recommendation.” Contrary to Duke’s contention, Ring does not address the advisory nature of a jury’s sentencing recommendation. Duke’s jury was properly informed that under Alabama law, its verdict was an advisory one. See § 13A-5-46, Ala.Code 1975. Thus, the jury was not misled regarding its role in the sentencing decision. See Caldwell v. Mississippi, 472 U.S. 320, 328-29 (1985); Ex parte Taylor, 666 So.2d 73, 88 (Ala.1995), cert. denied, 516 U.S. 1120 (1996).’
“Here, the circuit court properly instructed the jury of its role under § 13A-5-46, Ala.Code 1975, taking care to emphasize the fact that its verdict was merely advisory did not absolve the jury of its responsibility in determining the appropriateness of the death sentence. Indeed, the court instructed the jury:
“ ‘The weighing and comparihg of aggravating and mitigating circumstances requires the exercise of good, sound judgment on your part. It is not a matter of unbridled discretion.
“ ‘A human life hangs in the balance. It is a matter of calm reflection, not for indulgence of emotion. You’re to weigh the aggravating and mitigating circumstances and honestly and rationally evaluate the two options before you in light of those cir *99 cumstances. Your verdict, as always, is based on the evidence.’
[[Image here]]
“Our review of the record indicates that the circuit court properly instructed the jury of its role in the sentencing process under Alabama law. The court’s instructions did not run afoul of either Caldwell v. Mississippi 472 U.S. 320, 105 S.Ct. 2633, 86 L.Ed.2d 231 (1985), or Darden v. Waimvright, 477 U.S. 168, 106 S.Ct. 2464, 91 L.Ed.2d 144. (1986). No basis for relief exists as to this claim.”
940 So.2d at 366.
Therefore, this issue has previously been decided adversely to Jackson’s claim.
C.
Jackson alleges that the trial court unconstitutionally relied on aggravating circumstances that were not found by the jury. He also contends that a special verdict form should have been used so that the jurors could indicate which aggravating circumstances they had determined existed.
The record does not indicate that the trial court found different aggravating circumstances than those found by the jury. Even had the trial court found the existence of another aggravating circumstance not found by the jury, it’s doing so would not be erroneous. See McGowan v. State, 990 So.2d 931, 1003-05 (Ala.Crim.App.2003) (noting that jury found that the murder occurred during the commission of a robbery and the trial court properly determined that the murder was especially heinous, atrocious, or cruel).
Moreover, in Blackmon v. State, 1 So.3d 397 (Ala.Crim.App.2005), the same issue regarding the necessity for special verdict forms was raised and rejected:
“Blackmon also argues that the decision in Apprendi mandates that a special verdict form be used so that the jury can designate what aggravating circumstance or circumstances it found to exist. We specifically addressed. and rejected this argument in Bryant v. State, 951 So.2d 732, 737 (Ala.Crim.App.2003) (opinion on return to remand). We stated:
“ ‘[Bryant] contends that the United States Supreme Court’s decisions in Apprendi and Ring mandate the use of such verdict forms.
‘“This Court has rejected similar claims in previous death-penalty decisions. See, e.g., Walker v. State, 932 So.2d 140, 159 (Ala.Crim.App.2004); Adams v. State, 955 So.2d 1037, 1105 (Ala.Crim.App.2003). The Alabama Supreme Court has likewise rejected this argument. The Supreme Court has held, in numerous cases, that the jury’s verdict finding a defendant guilty of capital murder during the guilt phase of his trial indicated that the jury had unanimously found a proffered aggravating circumstance included within the § 13A-5^40(a), Ala.Code 1975, definition of the particular capital-murder offense charged in the indictment. See, e.g., Ex parte Hodges, 856 So.2d 936 (Ala.2003); Ex parte Waldrop, 859 So.2d 1181 (Ala.2002); Stallworth v. State, 868 So.2d 1128 (Ala.Crim.App.2001) (opinion on return to second remand), cert. denied, 868 So.2d 1189 (Ala.2003). But see Ex parte McGriff, 908 So.2d 1024, 1039 (Ala.2004) (authorizing prospective use of a penalty-phase special interrogatory). Moreover, in Ex parte McNabb, 887 So.2d 998 (Ala.2004), the Supreme Court held that even a non-unanimous recommendation of death by the jury proved that the jury, including the jurors who voted against *100 the recommendation of death, had unanimously found the existence of a proffered aggravating circumstance, even though the circumstance was not included within the definition of the particular capital-murder offense charged in the indictment, because the trial court had specifically instructed the jury that it could not proceed to a vote on whether to impose the death penalty unless it had already unanimously agreed that the aggravating circumstance existed.’ ”
7 So.3d at 417-18 (footnote omitted).
Therefore, based on the foregoing authority, this issue lacks merit.
D.
Jackson also argues that the trial court improperly made a factual determination by finding that the aggravating circumstances outweighed the mitigating circumstances. He argues that such a factual determination should be made by the jury.
However,
“ ‘the weighing process is not a factual determination or an element of an offense; instead, it is a moral or legal judgment that takes into account a theoretically limitless set of facts and that cannot be reduced to a scientific formula or the discovery of a discrete, observable datum. See California v. Ramos, 463 U.S. 992, 1008, 103 S.Ct. 3446, 77 L.Ed.2d 1171 (1983) (“Once the jury finds that the defendant falls within the legislatively defined category of persons eligible for the death penalty, ... the jury then is free to consider a myriad of factors to determine whether death is the appropriate punishment.”); Zant v. Stephens, 462 U.S. 862, 902, 103 S.Ct. 2733, 77 L.Ed.2d 235 (1983) (Rehnquist, J., concurring in the judgment) (“sentencing decisions rest on a far-reaching inquiry into countless facts and circumstances and not on the type of proof of particular elements that returning a conviction does”).’
“Ex parte Waldrop, 859 So.2d 1181, 1189 (Ala.2002).”
Thompson v. State, 153 So.3d 84, 179 (Ala.Crim.App.2012). See also Blackmon v. State, 7 So.3d at 417 (“Also, in Ex parte Waldrop, 859 So.2d 1181 (Ala.2002), the Alabama Supreme Court stated: ‘[T]he determination whether the aggravating circumstances outweigh the mitigating circumstances is not a finding of fact or an element of the offense. Consequently, Ring and Apprendi do not require that a jury weigh the aggravating circumstances and the mitigating circumstances.’ 859 So.2d at 1190.”).
Therefore, this issue lacks merit.
XXXIII.
Jackson argues that Alabama’s judicial override statute is standardless and results in arbitrary, as well as cruel and unusual, punishment. However, the United States Supreme Court has decided that the Alabama system of sentencing in capital-murder eases is constitutional, stating:
“The Alabama statute provides that the weighing process ‘shall not be defined to mean a mere tallying of aggravating and mitigating circumstances for the purpose of numerical comparison,’ Ala. Code § 13A-5-48 (1994), which is no less than what the Constitution requires, see Proffitt [v. Florida], 428 U.S. [242], at 258, 96 S.Ct. [2960], at 2969 [(1976)] (joint opinion of Stewart, Powell, and Stevens, JJ.). The disparate treatment of jury verdicts simply reflects the fact that, in the subjective weighing process, the emphasis given to each decisional criterion must of necessity vary in order to account for the particular circumstances of *101 each case. See Eddings v. Oklahoma, 455 U.S. [104], at 112, 102 S.Ct. [869], at 875 [(1982)] (‘[A] consistency produced by ignoring individual differences is a false consistency’). In any event, Harris does not show how the various statements affect her case. She does not bring an equal protection claim, and she does not contest the lower courts’ conclusion that her sentence is proportionate to that imposed in similar cases. The sentiments expressed in unrelated cases do not render her punishment vio-lative of the Eighth Amendment.
“The Constitution permits the trial judge, acting alone, to impose a capital sentence. It is thus not offended when a State further requires the sentencing judge to consider a jury’s recommendation and trusts the judge to give it the proper weight. Accordingly, we affirm the judgment of the Alabama Supreme Court.”
Harris v. Alabama, 513 U.S. 504, 514-15, 115 S.Ct. 1031, 130 L.Ed.2d 1004 (1995). Moreover, Alabama courts have consistently held that our system of sentencing in capital cases does not constitute cruel and unusual punishment. See e.g., Scott v. State, 937 So.2d 1065, 1085 (Ala.Crim.App.2005); Martin v. State, 931 So.2d 736, 754 (Ala.Crim.App.2003). Thus, Jackson’s contention that Alabama’s sentencing system in capital-murder cases is standardless and constitutes cruel and unusual punishment lacks merit.
XXXIV.
Jackson alleges that his constitutional rights were violated by what he says was prejudicial media coverage of his case. He refers to the media coverage of the victim’s funeral and coverage alluding to both inadmissible statements by Elice Jackson as well • as his death. He also notes that a large number of the venire-members “had heard something about this case.” (Jackson’s brief, at 171.) He contends that his motion for a change of venue based on prejudicial pretrial media coverage should have been granted. He further argues that the failure to sequester the jury compounded this error.
The showing of prejudice that must be made in order to require a change of venue as a result of pretrial publicity has been explained as follows:
“ ‘In connection with pretrial publicity, there are two situations which mandate a change of venue: 1)' when the accused has demonstrated “actual prejudice” against him on the part of the jurors; 2) when there is “presumed prejudice” resulting from community saturation with such prejudicial pretrial publicity that no impartial jury can be selected. Sheppard v. Maxwell, 384 U.S. 333, 86 S.Ct. 1507, 16 L.Ed.2d 600 (1966); Rideau[ v. Louisiana, 373 U.S. 723, 83 S.Ct. 1417, 10 L.Ed.2d 663 (1963) ]; Estes v. Texas, 381 U.S. 532, 85 S.Ct. 1628, 14 L.Ed.2d 543 (1965); Ex parte Gray-son, 479 So.2d 76, 80 (Ala.), cert. denied, 474 U.S. 865, 106 S.Ct. 189, 88 L.Ed.2d 157 (1985); Coleman v. Zant, 708 F.2d 541 (11th Cir.1983).
“ ‘The “actual prejudice” standard is defined as follows:
“ ‘ “To find the existence of actual prejudice, two basic prerequisites must be satisfied. First, it must be shown that one or more jurors who decided the case entertained an opinion, before hearing the evidence adduced at trial, that the defendant was guilty. Irvin v. Dowd, 366 U.S. [717,] 727, 81 S.Ct. [1639,] 1645, [6 L.Ed.2d 751, 758-59 (1961) ].. Second, these jurors, it must be determined, could not have laid aside these preformed opinions and ‘ren *102 der[ed] a verdict based on the evidence presented in court.’ Irvin v. Dowd, 366 U.S. at 723, 81 S.Ct. at 1643 [6 L.Ed.2d at 756].”
“ ‘Coleman v. Zant, 708 F.2d at 544.
“1... [The defendant] relies on the “presumed prejudice” standard announced in Rideau, and applied by the United States Supreme Court in Estes and Sheppard. This standard was defined by the Eleventh Federal Circuit Court of Appeals in Coleman v. Kemp, 778 F.2d 1487 (11th Cir.1985), cert. denied, 476 U.S. 1164, 106 S.Ct. 2289, 90 L.Ed.2d 730 (1986). The court stated: “Prejudice is presumed from pretrial publicity when pretrial publicity is sufficiently prejudicial and inflammatory and the prejudicial pretrial publicity saturated the community where the trials were held.” 778 F.2d at 1490 .... See also Holladay v. State, 549 So.2d 122, 125 (Ala.Cr.App.1988), affirmed, 549 So.2d 135 (Ala.), cert. denied, 493 U.S. 1012, 110 S.Ct. 575, 107 L.Ed.2d 569 (1989).
“ ‘In determining whether the “presumed prejudice” standard exists the trial court should look at “the totality of the surrounding facts.” Patton v. Yount, 467 U.S. 1025, 104 S.Ct. 2885, 81 L.Ed.2d 847 (1984); Murphy v. Florida, 421 U.S. 794, 95 S.Ct. 2031, 44 L.Ed.2d 589 (1975); Irvin v. Dowd, 366 U.S. 717, 81 S.Ct. 1639, 6 L.Ed.2d 751 (1961). The presumptive prejudice standard is “rarely” applicable, and is reserved for only “extreme situations.” Coleman v. Kemp, 778 F.2d at 1537. “In fact, our research has uncovered only a very few ... cases in which relief was granted on the basis of presumed prejudice.” Coleman v. Kemp, 778 F.2d at 1490.’
“Hunt v. State, 642 So.2d 999, 1042-44 (Ala.Crim.App.1993).
“ ‘The burden of showing actual prejudice or community saturation with prejudicial publicity lies with the appellant. Sheppard v. Maxwell, 384 U.S. 333 (1966). In addition, the appropriate method to establish the existence of adverse publicity or actual prejudice is through voir dire examination of potential jurors. Anderson v. State, 362 So.2d 1296 (Ala.Cr.App. 1978); Ex parte Grayson, 479 So.2d 76 (Ala.), cert. denied, 474 U.S. 865 (1985).’
“Hart v. State, 612 So.2d 520, 527 (Ala.Crim.App.1992).
“ ‘[T]he determination of whether or not to grant a motion for change of venue is generally left to the sound discretion of the trial judge because he has the best opportunity to assess any prejudicial publicity against the defendant and any prejudicial feeling against the defendant in the community which would make it difficult for the defendant to receive a fair and impartial trial.’
“Nelson v. State, 440 So.2d 1130, 1132 (Ala.Crim.App.1983).”
Scott v. State, 163 So.3d 389, 412 (Ala.Crim.App.2012).
There is no allegation by Jackson of actual prejudice, and he has failed to show that he could not receive a fair trial because the community was so saturated with prejudicial pretrial publicity. There is no indication that the media coverage Jackson refers to was any more than factual accounts, devoid of implication or accusation.
In Woodward v. State, 123 So.3d 989 (Ala.Crim. App 2011), this Court stated:
“Certainly the shooting of a Montgomery police officer during the course of a *103 traffic stop and the arrest and upcoming trial of the accused shooter generated widespread media coverage. That fact, alone, however, could not support a finding of presumed prejudice. The media coverage, moreover, contained largely factual reports about the shooting and the events surrounding Officer Houts’s death and about the investigation and prosecution. The reports were not inherently prejudicial, inflammatory, or sensational....
“The presumptive-prejudice standard recognized in Rideau v. Louisiana) 373 U.S. 723, 83 S.Ct. 1417, 10 L.Ed.2d 663 (1963), is to be applied only in extreme situations in which a defendant can show that he or she cannot receive a fair trial because the community was so saturated with prejudicial pretrial publicity. Woodward did not make a showing that his case is in that rare category. We hold that the trial court did not abuse its substantial discretion when it denied Woodward’s motion for a change of venue.”
123 So.3d at 1051.
Although a large number of potential jurors had heard of the case, only a few of them knew specifics of the offense, and none indicated that he or she knew anything regarding Elice Jackson or statements made by him. There was no showing of extreme saturation of the community with pretrial publicity and there is no indication that any serving juror had been tainted by pretrial publicity. Thus, Jackson has failed to prove any error on this ground.
XXXV.
Jackson argues that the trial court improperly allowed uniformed police officers to pack the courtroom and thereby denied him a fair trial. Jackson failed to object on this ground at trial; therefore, any error in this regard must rise to the level of plain error. Rule 45A, Ala. R.App. P. On appeal, he cites Holbrook v. Flynn, 475 U.S. 560, 570-71, 106 S.Ct. 1340, 89 L.Ed.2d 525 (1986), and Woods v. Dugger, 923 F.2d 1454, 1460-61 (11th Cir.1991), in support of his claim. However, Jackson’s reliance on these cases is misplaced.
In Holbrook v. Flynn, a habeas corpus petitioner complained about the effect on the jury of the presence of a security force consisting of four uniformed state troopers, two deputy sheriffs, and six committing-squad officers. The case dealt with a jury’s determination of the defendant’s guilt derived from the need for such a large security squad. The Court found that it “simply cannot find an unacceptable risk of prejudice in the spectacle of four such officers quietly sitting in the first row of a courtroom’s spectator section. Even had the jurors been aware that the deployment of troopers was not common practice in Rhode Island, we cannot believe that the use of the four troopers tended to brand respondent in their eyes ‘with an unmistakable mark of guilt.’ ” 475 U.S. at 571.
Woods v. Dugger was clearly specific to its circumstances. The case involved the presence of a large number of uniformed probation officers following the death of a probation officer. The Court looked to the record and found that, based on the extensive pretrial publicity, the voir dire questioning, as well as the specific circumstances of the small community involved, the presence of the uniformed officers had deprived Woods of a fair trial. The Court stated:
“Turning to the record, we note that the trial was held in Union County, Florida. Union County is a small rural county in Northern Florida. Just over ten thousand people live in Union County, but one-third of those are prisoners. *104 Tate Rose, What Life, is Like in a Place Where Half the Residents are Behind Bars, Chicago Tribune, October 21, 1985, at Tempo Sect. p. 1, col. C. In the neighboring counties of Bradford and Union there are four state prisons which employ twenty-two hundred workers, and the prisons are responsible for $71 million of the local economy. Stuart, A Town’s Fact of Life: The Death Row Prison, New York Times, April 6, 1984 at Sect. A, p. 14, col. 1. The Florida Statistical Abstract also reports that Union County is one hundred percent rural, Florida Statistical Abstract 3 n. 2, 13 (Shermyen, ed. 1989), and that thirty-two hundred people are employed outside of the home. Id. at 171.
“The jury was drawn exclusively from Union County. Richard Dugger, the State Secretary of Corrections, told the New York Times, in a reference to the town of Starke in neighboring Bradford County, ‘The only time the community takes note of what’s going on at the prison ... is when a guard is killed.’ Nordheimer, ‘Town Pays Little Mind to Executions,’ New York Times, Sept. 8, 1984, at Sect. 1, p. 6, col. 3.
“Union County took note of the murder of Corrections Officer Dennard. Prior to his death, he was interviewed by the St. Petersburg Times. He told the paper that the Union Correctional Institution was dangerously understaffed and that he wanted to be transferred because he feared for his safety as a prison guard. Officer Dennard’s death became a focal point for the lobbying efforts of a group called the United Correctional Employees in their demands for the government to hire more correctional officers. United Press International, June 23,1983. After Officer Dennard’s death, his sister began a petition that she reported was ‘going like hot cakes’ and had gathered hundreds of signatures. United Press International, May 28, 1983. By the time of Mr. Woods’ trial, defense counsel told the court that the petition had 5,000 signatures, not all of which, however, were from Union County residents. The petition stated ‘its [sic] time we started punishing the guilty and protecting the innocent’ and demanded the death penalty for those who kill prison guards. Id.
“The effect of the killing on this community is evidenced in the answers obtained on voir dire. Of the forty-one potential jurors excused either peremptorily or for cause, six immediately excused themselves. Consequently, the record reveals no information about these six. Of the remaining thirty-five potential jurors who were eventually excused: thirty-three had relatives or close friends who worked in the prison, or the jurors had worked in the prison themselves; twenty-one of the excused jurors had heard of the case; nine knew a witness; and one was a witness who was not called by either side. Within the actual jury: four jurors and one alternate juror neither had heard of the case nor had any relatives working in the prison system; four jurors had not heard of the case, but had either worked in the prison system themselves or had relatives currently working in the system; three jurors and one alternate juror both had heard of the case and had relatives currently working in the system; and, finally, one juror had heard of the case but had no relatives or friends working in the system.
“In addition, the gallery of the courtroom was filled with spectators. The defense counsel raised several objections to the presence of prison guards in the gallery, and the court ordered a videotape and photographs taken of the gallery. The photos reveal that the gallery *105 had four rows which could each seat about ten or eleven people. Virtually every seat was occupied, and several people were standing in the back of the courtroom. About half of the spectators appear to be wearing prison guard uniforms.”
923 F.2d at 1457-58 (footnotes omitted).
Here, there is no indication in the record that a large number of officers were present or of any prejudicial effect or influence caused by the presence of any officers. Moreover, there was no objection by Jackson as to the presence of the officers; although this does not preclude review on appeal, it does weigh against a finding of prejudice. See Ex parte Jackson, 68 So.3d 211, 213-14 (Ala.2010). As previously stated, there was no showing of undue prejudice caused by pretrial publicity. See Issue XXXIV. The jury was necessarily aware that the victims were police officers who were on duty at the time of the offense. See Centobie v. State, 861 So.2d 1111, 1127 (Ala.Crim.App.2001) (“Considering the fact that the appellant was charged with the capital offense of killing a police officer, along with overpowering, kidnapping, and beating two law-enforcement officers and shooting a third officer, we conclude that allowing an ‘additional’ number of law-enforcement officers to be seated in the courtroom was not an abuse of the trial court’s discretion. No plain error occurred in this regard.”).
There was no plain error as a result of the presence of law-enforcement officers.
XXXVI.
Jackson argues that the admission of the audio recording of the emergency 911 call violated his right to confront the witnesses against him and also constituted inadmissible hearsay. At trial, defense counsel stated that he had no objection to the admission of this exhibit; therefore its admission must constitute plain error to require reversal. Rule 45A, Ala. R.App. P.
This recording was not admitted to prove the truth of the matter asserted but rather to explain why Officer Smith and Officer Burpo were dispatched to the scene of the offense.
“As we stated in Wilson v. State, 571 So.2d 1237, 1240-41 (Ala.Crim.App.1989), rev’d on other grounds, 571 So.2d 1251 (Ala.1990):
“ ‘ “[M]any statements have been admitted as exceptions to the hearsay rule upon the rationale that such statements were admitted for some purpose other than to prove the truth of the statements.” [C. Gamble, McElroy’s Alabama Evidence § 242.01(1) (3d ed. 1977) ]. See also Clontz v. State, 531 So.2d 60, 61 (Ala.Cr.App.1988) (wherein a probation officer was allowed to testify that he first became aware the defendant was not at his address through a telephone call from the appellant’s mother, because “the testimony was not introduced as proof of the matter asserted, but rather as the motive behind the probation officer’s beginning his investigation”); Molina v. State, 533 So.2d 701, 714 (Ala.Cr.App.1988), cert. denied, 489 U.S. 1086, 109 S.Ct. 1547, 103 L.Ed.2d 851 (1989) (wherein a police officer was allowed to testify to information concerning a vehicle suspected to be involved in drug activity, received through a radio dispatch, because it was not offered to prove the truth of the contents of the dispatch, but “to explain the reason he pursued and subsequently stopped the defendant”); Petite v. State, 520 So.2d 207, 211 (Ala.Cr.App.1987) (a radio broadcast, stating that a burglary was in progress, was not hearsay as it was *106 not introduced to prove the truth of the matter asserted, “but rather for the purpose of explaining why Officer Stafford went to the property”); Thomas v. State, 520 So.2d 223, 226 (Ala.Cr.App.1987) (wherein an officer was allowed to identify people he spoke with and places he went before finding the defendant, because “[t]he fact of the conversations ... was offered to explain the officer’s actions and presence at the scene — not for the truth of the matter asserted”).’ “More recently in Deardorff v. State, 6
So.3d 1205, 1217 (Ala.Crim.App.2004), we stated:
“ ‘A review of the record demonstrates that Agent Montgomery’s testimony and Karen and Greg’s testimony about Turner’s will, and particularly the addendum to the will, was given in context of the investigation of the case and the reasons for the actions the police took. It was by definition not hearsay and it was properly admitted into evidence. We have considered cases presenting similar circumstances and have found no error in the admission of the testimony. For example, in Smith v. State, 795 So.2d 788 (Ala.Crim.App.2000), a police officer testified that, during a search of the house belonging to the defendant’s mother, she told him that the defendant had put some clothes in the washing machine; Smith argued that the testimony was prejudicial hearsay. We held:
“ ‘ “[T]his statement was elicited to establish the reasons for the officer’s action and the reasons the officers searched certain areas of the trailer. It was not offered for the truth of the matter asserted and was not hearsay. ‘The fact of the conversations in this case was offered to explain the officer’s actions and presence at the scene — not for the truth of the matter asserted. Accordingly, it was not hearsay. Clark v. City of Montgomery, 497 So.2d 1140, 1142 (Ala.Cr.App.1986).’ Thomas v. State, 520 So.2d 223 (Ala.Cr.App.1987).”
“ ‘795 So.2d at 814.
“ ‘In D.R.H. v. State, 615 So.2d 1327 (Ala.Crim.App.1993), the appellant argued that hearsay had erroneously been admitted when the officers were permitted to testify about what the confidential informant had told them. We disagreed, found that the evidence was not hearsay, and stated, “[The officers’] testimony was received to show the reasons for the officers’ actions and how their investigation focused on a suspect. Sawyer v. State, 598 So.2d 1035 (AIa.Cr.App.1992).” 615 So.2d at 1330. In accord, Miller v. State, 687 So.2d 1281, 1285 (Ala. Crim.App.1996).’
“The challenged testimony was by definition not hearsay and was properly admitted into evidence.”
Robitaille v. State, 971 So.2d 43, 58-59 (Ala.Crim.App.2005).
Moreover, the recording of the 911 call would have been admissible as an exception to the hearsay rule because it constituted a present-sense impression. Rule 803(1), Ala. R. Evid. Furthermore, there was testimony from the dispatching officer that these calls were recorded and maintained in the regular course of business, so that it was also admissible as a business-record exception to the hearsay rule. Rule 803(6), Ala. R. Evid. See Baker v. State, 87 So.3d 587, 595-96 (Ala.Crim. App.2009) (“Hall testified that the City recorded communications that came in from 911 or from police, fire, or paramed *107 ics and that it did so in the ordinary course of business. Based on this testimony, the State established that the audio recording of the 911 telephone call was made in the regular course of the City’s business. Therefore, the State established that the recording was a business record pursuant to Rule 803(6), Ala. R. Evid.”).
Moreover, it was cumulative of testimony by Officer Burpo as well as of the dispatching officer. See Brown v. State, 74 So.3d 984, 1000 (Ala.Crim.App.2010).
 As to Jackson’s claim that the recording of the 911 call violated his confrontation rights, this claim lacks merit, because the call was not testimonial'.
“The Confrontation Clause of the Sixth Amendment provides: ‘In all criminal prosecutions, the accused shall enjoy the right ... to be confronted with the witnesses against him.’ In Crawford v. Washington, 541 U.S. 36, 53-54, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004), we held that this provision bars ‘admission of testimonial statements of a witness who did not appear at trial unless he was unavailable to testify, and the defendant had had a prior opportunity for cross-examination.’ A critical portion of this holding, and the portion central to resolution of the two cases now before us, is the phrase ‘testimonial statements.’ Only statements of this sort cause the declarant to be a “witness’ within the meaning of the Confrontation Clause. See id, at 51, 124 S.Ct. 1354. It is the testimonial character of the statement that separates it from other hearsay that, while subject to traditional limitations upon hearsay evidence, is not subject to the Confrontation Clause.
[[Image here]]
“Without attempting to produce an exhaustive classification of all conceivable statements — or even all conceivable statements in response to police interrogation — as either testimonial or nontes-■timonial, it suffices to decide the present cases to hold as follows: Statements are nontestimonial when made in the course of police interrogation under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency. They are testimonial when the circumstances objectively indicate that there is no such ongoing emergency, and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution.”
Davis v. Washington, 547 U.S. 813, 821-22, 126 S.Ct. 2266, 165 L.Ed.2d 224 (2006) (footnote omitted).
The 911 call in this case was made to provide information to enable police to respond to a perceived ongoing emergency. Therefore, the call was not testimonial and its admission did not run afoul of Jackson’s rights to confrontation.
XXXVII.
Jackson argues that the trial court improperly relied on his prior convictions in imposing his sentence without determining if Jackson had been represented by counsel in the proceedings leading to those convictions. Specifically, Jackson argues that, because the record is silent as to whether he was represented by counsel at the times of his prior convictions, the State has failed to meet its burden of proof as to the prior convictions for the aggravating circumstance that he was “under sentence of imprisonment” when he committed the charged offenses. § 13A-5-49(l), Ala.Code 1975. Jackson raises this issue for the first time on appeal; therefore, this claim is due to be analyzed pursuant to the plain error rule. Rule 45A, Ala. R.App. P.
*108 Jackson refers to cases dealing with proof of prior convictions under the Habitual Felony Offender Act. Rule 26.6(b)(3)(iii), Ala. R.Crim. P. However, the Committee Comments to this rule expressly state that sentencing in eases involving the death penalty is treated differently and is governed by Beck v. State, 396 So.2d 645 (Ala.1980), and §§ 13A-5-39 through 13A-5-59, Ala.Code 1975. The prior convictions were presented by Jackson’s probation officer and were included in the presentence report that was properly considered by the trial court. § 13A-5-47(b), Ala.Code 1975 (“Before making the sentence determination, the trial court shall order and receive a written pre-sen-tence investigation report. The report shall contain the information prescribed by law or court rule for felony cases generally and any additional information specified by the trial court. No part of the report shall be kept confidential, and the parties shall have the right to respond to it and to present evidence to the court about any part of the report which is the subject of factual dispute. The report and any evidence submitted in connection with it shall be made part of the record in the case.”). Thus, Jackson could have contested the prior convictions or the proof thereof, but he failed to do so.
“In making the determination of sentence, the trial judge must take into consideration the presentence investigation report and any evidence submitted in connection with it, in addition to the evidence presented at trial and during the sentence hearing. See § 13A-5-47(d) and (e).” Kuenzel v. State, 577 So.2d 474, 525 (Ala.Crim.App.1990) (finding that the trial court properly considered presentence report although it contained victim-impact evidence). Moreover, “[t]he inclusion of the defendant’s criminal history in the pre-sentence investigation report was proper. Thompson[ v. State], 503 So.2d [871,] 880 [ (Ala.Crim.App.1986) ].” Kuenzel v. State, 577 So.2d at 527. There is no indication of error or prejudice to Jackson on this ground.
XXXVIII.
Jackson argues that the failure to ensure that a complete and accurate record of the capital proceedings was transcribed and compiled constituted error. He submits that the record indicates that there were a number of off-the-record discussions and cites certain discussions that occurred during jury selection and during the guilt-phase jury-charge conference. He fails to state any specific prejudice caused by any off-the-record discussion.
“When [the appellant] is represented on appeal by counsel other than the attorney at trial, the absence of a substantial and' significant portion of the record, even absent any showing of specific prejudice or error, is sufficient to warrant reversal. Ex parte Godbolt, [546 So.2d 991 (Ala.1987) ] adopting the rule established in United States v. Selva, 559 F.2d 1303 (5th Cir.1977). ‘We do not advocate a mechanistic approach to situations involving the absence of a complete transcript of the trial proceedings. We must, however, be able to conclude affirmatively that no substantial rights of the appellant have been adversely affected by the omissions from the transcript.’ Ex parte Godbolt, 546 So.2d at 997, quoting with approval, United States v. Selva, 559 F.2d at 1305-06.”
Ingram v. State, 779 So.2d 1225, 1281 (Ala.Crim.App.1999). Moreover, this Court has stated, quoting Calhoun v. State, 932 So.2d 923 (Ala.Crim.App.2005):
“ ‘As we stated in Wynn v. State, 804 So.2d 1122, 1143-44 (Ala.Crim.App.), cert. denied, 804 So.2d 1152 (Ala.2001):
*109 “ ‘ “[I]t should have been apparent to the defense during the trial that the court reporter was not recording certain sidebars.... Defense counsel could have easily reminded the trial court that it had granted his motion for full recordation of the proceedings and remedied the omissions at that time. Therefore, this error was invited by the appellant.” ’ ”
Stanley v. State, 143 So.3d 230, 297 (Ala.Crim.App.2011).
Here, Jackson, although his counsel on appeal is different from his trial counsel, alleges no specific prejudice caused by the failure to transcribe certain discussions and fails to indicate what occurred during these instances that required transcription for review. Nor did he request transcription at the time of the discussions. There is no indication of error or any probable adverse effect on Jackson’s substantial rights.
Jackson further contends that the failure of the record to indicate that the veni-re was sworn constituted error. However, the record indicates that the venire was sworn (R. 105) and definitively shows that the petit jury was sworn. (R. 469.) Morris v. State, 60 So.3d 326, 384 (Ala.Crim. App.2010). Therefore there was no error.
XXXIX.
Jackson asserts a bare allegation that his constitutional rights to due process, a fair trial, and a reliable sentence were violated by the State’s failure to disclose certain institutional records and by the trial court’s denial of.his motion for discovery of those records. He refers to his jail, prison, parole, mental-health, and social-services records, which were held by the State. He alleges that those records contained mitigating evidence and therefore he was entitled to them; however, he fails to proffer what the mitigating evidence might be. Jackson’s discovery motion was a laundry list of these types of potential records. As to this motion, the trial court stated:
“Well, I guess as to the motion for discovery of the institutional records and files necessary to a fair trial — let me see here — the accused requests the Court order the individual’s name below to produce for inspection and copying documents specified herein. I guess that I am going to show that motion — I am not going to plan on — my plan is not to contact all of these people. I don’t even know what they have in records. So if you know of specific records, you let me know. But overall, I am going to show this motion denied. And if there are records that you have difficulty subpoenaing or any lack of cooperation from any institutional records, let me know. Motion for adequate sequestration of jurors.”
(R. 28.) Although the trial court denied this motion, it granted Jackson’s motion asking the State to allow him open-file discovery.
In State v. Stallworth, 941 So.2d 327 (Ala.Crim.App.2006), Stallworth requested all juvenile, criminal, and mental-health records relating to all 47 State’s witnesses. This Court likened the request to that in Jackson v. State, 910 So.2d 797 (Ala.Crim. App.2005), and determined that the defendant is not entitled to such broad and unfettered discovery. Moreover, this Court stated that “ ‘ “[a]s a general rule, the government need not disclose evidence available to the defense from other sources or evidence that the prosecution could not reasonably be imputed to have knowledge of or control over. Mills v. Singletary, 63 F.3d 999 (11th Cir.1995), cert. denied, 517 U.S. 1214, 116 S.Ct. 1837, 134 L.Ed.2d 940 (1996); United States v. Moore, 25 F.3d 563 (7th Cir.), cert. denied, 513 U.S. 939, *110 115 S.Ct. 341, 130 L.Ed.2d 297 (1994).” ’ ” 941 So.2d at 336. Jackson does not claim that the State withheld any particular or specific record.
“ ‘ “In Alabama, there is no constitutional right to discovery in a criminal case. Rule 16, Alabama Rules of Criminal Procedure, affords an accused, a limited right of discovery in a pending criminal action. The extent of discovery is within the discretion of the trial court.” ’ ” Belisle v. State, 11 So.3d 256, 274 (Ala.Crim.App.2007), quoting Ex parte Land, 775 So.2d 840 (Ala.Crim.App.1998), overruled on other grounds, 775 So.2d 847 (Ala.2000).
'“Discovery matters are within the sound discretion of the trial court, and this Court will not reverse a trial court’s rulings on discovery issues unless there has been a clear abuse of discretion. Home Ins. Co. v. Rice, 585 So.2d 859 (Ala.1991). Further, this Court has held that, to be entitled to a reversal of a judgment for an abuse of discretion, the party claiming abuse must establish that it was prejudiced by the alleged abuse. See Valley Properties, Inc. v. Strahan, 565 So.2d 571, 583 (Ala.1990).”
Ex parte Harwell, 639 So.2d 1335, 1336 (Ala.1993).
Here, Jackson has failed to show any prejudice resulting from the denial of this motion; thus, there is no indication of abuse of discretion by the trial court.
XL.
Jackson alleges that the trial court erred by allowing the chief investigator, Cpl. Bartle, to sit at the prosecution’s table and to remain in the courtroom throughout the trial. Jackson did not object on this ground at trial; thus, this matter is to be examined pursuant to the plain-error rule. Rule 45A, Ala. R.App. P.
“Rule 9.3, Ala.R.Crim.P., states:
“ ‘(a) Witnesses. Prior to or during any proceeding, the court, on its own motion or at the request of any party, may exclude witnesses from the courtroom and direct them not to communicate with each other, or with anyone other than the attorneys in the case, concerning any testimony until all witnesses have been released by the court.’
“The Committee Comments to this rule establish that ‘The power to exclude and separate witnesses is entirely a matter of discretion with the trial court. Teague v. State, 245 Ala. 339, 16 So.2d 877 (1944); Beddow v. State, 39 Ala.App. 29, 96 So.2d 175 (1956), cert. denied, 266 Ala. 694, 96 So.2d 178 (1957), cert. denied, 355 U.S. 930, 78 S.Ct. 412, 2 L.Ed.2d 414 (1958). By invoking the rule, the court is not compelled to exclude all witnesses but may be selective as appropriate.’
“Further, Rule 615, Ala.R.Evid., states:
“ ‘At the request of a party the court may order witnesses excluded so that they cannot hear the testimony of other witnesses and it may make the order of its own motion. This rule does not authorize exclusion of (1) a party who is a natural person, (2) an officer or employee of a party which is not a natural person designated as its representative by its attorney, (3) a person whose presence is shown by a party to be essential to the presentation of the party’s cause, or (4) a victim of a criminal offense or the representative of a victim who is unable to attend, when the representative has been selected by the victim, the victim’s guardian, or the victim’s family.’
“The Comments to this rule explain that two of the categories which do not *111 authorize exclusion are ‘a party that is not a natural person is entitled to have a representative present. This person is to be an officer or employee of the party and is to be designated by the party’s attorney. Allowing such a witness to be present is consistent with historic Alabama practice. An example of this would be when a police officer, who has been in charge of the state’s investigation, is allowed to remain in the courtroom despite the fact that the officer will be a witness. See, e.g., Portomene v. United States, 221 F.2d 582 (5th Cir.1955).’ Also, ‘as provided under a preexisting statute, in a criminal case, the victim of the crime is exempted from the general rule of witness exclusion. See Ala.Code 1975 § 15-14-55. If the victim is unable to attend the trial, then the victim, the victim’s guardian, or the victim’s family can select a representative, and that representative would be exempted from the rule. See Ala.Code 1975, § 15-14-56 (grounds for permitting a victim’s representative to attend are: death of the victim; disability; hardship; incapacity; physical, mental, or emotional condition; age; or other inability).’ ”
Johnson v. State, 120 So.3d 1130, 1213 (Ala.Crim.App.2009) (holding it was not error for the chief investigator and the victim’s mother to be allowed to remain in the courtroom throughout the trial).
This issue was also addressed in Morris v. State, 60 So.3d 326 (Ala.Crim.App.2010), and decided adversely to the appellant.
“The record establishes that Detective Russell was the chief investigator or ‘on-call homicide detective’ in this case (R. 348-49), and, as such, he was the ‘official “law enforcement representative” ’ and allowed to remain in the courtroom by Rule 615, Ala. R. Evid. Centobie v. State, 861 So.2d at 1130. The trial court did not abuse its discretion in allowing Detective Russell to remain in the courtroom despite the fact that Detective Russell testified at trial. ‘In Ex parte Lawhorn, 581 So.2d 1179, 1181 (Ala.1991), the Alabama Supreme Court stated that “Alabama appellate courts have time and again refused to hold it an abuse of discretion on the part of the trial court to allow a sheriff, police chief, or similarly situated person who will later testify to remain in the courtroom during trial.” See also Jackson v. State, 502 So.2d 858 (Ala.Crim.App.1986); Johnson v. State, 479 So.2d 1377 (Ala.Crim.App.1985); Chesson v. State, 435 So.2d 177 (Ala.Crim.App.1983), and authorities cited in those cases.’ Id.”
60 So.3d at 382-83.'
There was no error in allowing Cpl. Scott Bartle’ to be present in the courtroom, plain or otherwise.
■ XLI.
Jackson argues that the pretrial death qualification of the jury violated his right to an impartial guilt-phase jury. He argues that this practice results in a conviction-prone jury and discriminates against minorities and women. He cites Justice Marshall’s dissent in Lockhart v. McCree, 476 U.S. 162, 106 S.Ct. 1758, 90 L.Ed.2d 137 (1986)..
“We have repeatedly upheld the practice of death-qualifying prospective jurors in a capital-murder case.
“ ‘ “In Lockhart v. McCree, 476 U.S. 162, 106 S.Ct. 1758, 90 L.Ed.2d 137 (1986), the Supreme Court held that the Constitution does not prohibit states from ‘death qualification’ of juries in capital cases and that so qualifying a jury does not deprive a defendant of an impartial jury. 476 U.S. at 173, 106 S.Ct. at 1764. Alabama Courts have consistently held likewise. *112 See Williams v. State, 556 So.2d 737 (Ala.Crim.App.1986), rev’d in part, 556 So.2d 744 (Ala.1987); Edwards v. State, 515 So.2d 86, 88 (Ala.Crim.App.1987); Martin v. State, 494 So.2d 749 (Ala.Crim.App.1985).” ’
“Lee v. State, 44 So.3d 1145, 1161-62 (Ala.Crim.App.2009), quoting Sockwell v. State, 675 So.2d 4, 18 (Ala.Crim.App.1993).
“‘A jury composed exclusively of jurors who have been death-qualified in accordance with the test established in Wainwright v. Witt, 469 U.S. 412, 105 S.Ct. 844, 83 L.Ed.2d 841 (1985), is considered to be impartial even though it may be more conviction prone than a non-death-qualified jury. Williams v. State, 710 So.2d 1276 (Ala.Cr.App.1996). See Lockhart v. McCree, 476 U.S. 162, 106 S.Ct. 1758, 90 L.Ed.2d 137 (1986). Neither the federal nor the state constitution prohibits the state from ... death-qualifying jurors in capital cases. Id.; Williams; Haney v. State, 603 So.2d 368, 391-92 (Ala.Cr.App.1991), aff'd, 603 So.2d 412 (Ala.1992), cert. denied, 507 U.S. 925, 113. S.Ct. 1297, 122 L.Ed.2d 687 (1993).’
“Davis v. State, 718 So.2d 1148, 1157 (Ala.Crim.App.1995) (footnote omitted).”
Scott v. State, 163 So.3d 389, 425 (Ala.Crim.App.2012).
There was no error in allowing the jury to be death-qualified.
XLII.
Jackson argues that the evolving standards of decency have rendered Alabama’s method of execution unconstitutional. He makes the bare allegation that “Alabama’s undeveloped procedures for administering lethal injection pose a substantial risk of inflicting pain.” (Jackson’s brief, at 178-79.) He asserts that the method of execution violates the Eighth and Fourteenth Amendments because it constitutes cruel and unusual punishment.
“Recently, in Thompson v. State, 153 So.3d 84 (Ala.Crim.App.2012), this court stated:
“ ‘Effective July 1, 2002, Alabama’s primary method of execution is lethal injection involving a three-drug protocol. Section 15-18-82.1(a), Ala.Code 1975. Section 15-18-82.1(c), Ala.Code 1975, provides: “A death sentence shall be executed by lethal injection, unless the person sentenced to death affirmatively elects to be executed by electrocution.” Section 15-18-82.1(h), Ala.Code 1975, also provides: “In any case in which an execution method is declared unconstitutional the death sentence shall remain in force until the sentence can be lawfully executed by any valid .method of execution.”
“ ‘The constitutionality of Alabama’s method of execution has been addressed by the United States Supreme Court and the Alabama Supreme Court. In Ex parte Belisle, 11 So.3d 323 (Ala.2008), the Alabama Supreme Court stated:
“ ‘ “The Supreme Court upheld the constitutionality of Kentucky’s method of execution, Baze [v. Rees], 553 U.S. [35], 62, 128 S.Ct. [1520] 1538 [170 L.Ed.2d 420 (2008) ], and noted that ‘[a] State with a lethal injection protocol substantially similar to the protocol we uphold today would not create a risk that meets this standard.’ Baze, [553 U.S. at 61], 128 S.Ct. at 1537. Justice Ginsburg and Justice Souter dissented from the main opinion, arguing that ‘Kentucky’s protocol lacks basic safeguards used by other States to confirm that an inmate is unconscious before injection of the *113 second and third drugs.’ Baze, 553 U.S. at 114, 128 S.Ct. at 1567 (Ginsburg, J., dissenting). The dissenting Justices recognized, however, that Alabama’s procedures, along with procedures used in Missouri, California, and Indiana ‘provide a degree of assurance — missing from Kentucky’s protocol — that the first drug had been properly administered.’ Baze, 553 U.S. at 121, 128 S.Ct: at 1571 (Ginsburg, J., dissenting).
“ ‘ “The State argues, and we agree, that Belisle, like the inmates in Baze, cannot meet his burden of demonstrating that Alabama’s lethal-injection protocol poses a substantial risk of harm by asserting the mere possibility that something may go wrong. ‘Simply because an execution method may result in pain, either by accident or as an inescapable consequence of death, does not establish the sort of “objectively intolerable risk of harm” that qualifies as cruel and unusual.’ Baze, 553 U.S. at 50, 128 S.Ct. at 1531. Thus, we conclude that Alabama’s use of lethal injection as a method of execution does not violate the Eighth Amendment to the United States Constitution.”
“ ‘11 So.3d at 339.
“ ‘Alabama’s method of lethal injection does not constitute cruel and unusual punishment, and Thompson is not entitled to relief on this claim.’ ”
Jackson v. State, 133 So.3d 420, 454-55 (Ala.Crim.App.2009) (opinion on return to remand), quoting Thompson v. State, 153 So.3d at 180-81 (footnote omitted). Therefore, Jackson’s claim lacks merit.
XLIII.
Jackson argues that the trial court erred in its sentencing order by referring to facts from another case in its findings concerning the nonstatutory mitigating circumstances and by failing to consider the evidence of nonstatutory mitigating circumstances that he presented during the sentencing hearing. Jackson also claims that the trial court failed to properly consider the jury’s advisory verdict of life imprisonment without the possibility of parole as a mitigating circumstance.
The trial court’s sentencing order contained in the supplemental record includes facts derived from another case. Specifically the section of the court’s order purporting to address the nonstatutory mitigating circumstances names family members of a different defendant and discusses evidence that was not presented in this case. Further, it does not address the nonstatutory mitigating evidence that was presented. § 13A-5-47(d), Ala.Code 1975 (“Based upon the evidence presented at trial, the evidence presented during the sentence hearing, and the pre-sentence investigation report and any evidence submitted in connection with it, the trial court shall enter specific written findings concerning the existence or nonexistence of each aggravating circumstance enumerated in Section 13A-5-49, each mitigating circumstance enumerated in Section 13A-5-51, and any additional mitigating circumstances offered pursuant to Section 13A-5-52.”). A trial court is required to consider the nonstatutory mitigating evidence.
“It is not. required that the evidence submitted by the accused as a non-statutory mitigating circumstance be weighed as a mitigating circumstance by the sen-tencer, in this case, the trial court; although consideration of all mitigating circumstances is required, the decision of whether a particular mitigating circumstance is proven and the weight to be given it rests with the sentencer. *114 Cochran v. State, 500 So.2d 1161 (Ala.Crim.App.1984), aff'd in pertinent part, remanded on other part, 500 So.2d 1179 (Ala.1985), aff'd on return to remand, 500 So.2d 1188 (Ala.Cr.App.), aff'd 500 So.2d 1064 (Ala.1986), cert. denied, 481 U.S. 1033, 107 S.Ct. 1965, 95 L.Ed.2d 537 (1987).”
Haney v. State, 603 So.2d 368, 389 (Ala.Crim.App.1991).
As to the court’s consideration of the jury’s advisory verdict of life imprisonment without parole by a vote of 10 to 2, the trial court stated in its order:
“The Court in considering the nonbinding recommendation of the jury to affix the sentence at life without the possibility of parole finds this to be the most compelling non-statutory mitigating circumstance. The Court does not take lightly the recommendation of a jury, as a trial by jury is one of the most fundamental rights in our justice system. However, the Court’s experience and handling of dozens of Capital cases compels this Court to conclude that the non-statutory mitigating circumstance of the jury recommendation is outweighed by the aggravating circumstances as presented in the evidence in this case.”
(Supp. R. 27.)
This finding by the trial court does not comply with the requirements of Ex parte Carroll, 852 So.2d 833 (Ala.2002), and Ex parte Taylor, 808 So.2d 1215 (Ala.2001), because it fails to adequately set out specific reasons for giving the jury’s recommendation the weight that it gave it. In Ex parte Tomlin, 909 So.2d 283 (Ala.2003), the Alabama Supreme Court stated:
“ ‘The weight to be given [a jury’s recommendation of life imprisonment without the possibility of parole] should depend upon the number of jurors recommending a sentence of life imprisonment without parole.’ Carroll, 852 So.2d at 836. In Carroll, we found that a jury’s 10-2 vote for a sentence of life imprisonment without the possibility of parole demonstrated ‘overwhelming support’ of such a sentence. 852 So.2d at 837. Therefore, it is only logical to conclude that a unanimous recommendation like the one here provides even more ‘overwhelming support’ of such a sentence and, therefore, must be afforded great weight.
“ ‘The weight to be given [a jury’s recommendation of life imprisonment without the possibility of parole] should depend ... also upon the strength of the factual basis for such a recommendation in the form of information known to the jury.’ Carroll, 852 So.2d at 836. Here, the State does not question ‘the strength of the factual basis for [the jury’s] recommendation.’ Indeed, the State argues only that ‘the [trial] court considered factual information known to the jury in finding the existence of one aggravating factor — first degree murder wherein two persons were killed.’ State’s brief, at 34-35. Thus, we must conclude that the jury’s recommendation rested upon an adequate factual basis.
“ ‘[T]he jury’s recommendation [of life imprisonment without the possibility of parole] may be overridden based upon information known only to the trial court and not to the jury, when such information can properly be used to undermine a mitigating circumstance.’ Carroll, 852 So.2d at 836.”
909 So.2d at 286-87.
Moreover in Ferguson v. State, 13 So.3d 418 (Ala.Crim.App.2008), this Court explained:
“As we stated in Sneed v. State, 1 So.3d 104, 116 (Ala.Crim.App.2007):
“ ‘In Ex parte Carroll, the Supreme Court held that a jury’s recommenda *115 tion of imprisonment for life without the possibility of parole must be considered as a mitigating circumstance. Although the Supreme Court also stated that a jury recommendation could be overridden based on information that was not known to the jury, it did not state that that was the only circumstance in which a jury recommendation could be overridden.
“ ‘In this case, the trial court considered the jury’s recommendation as a nonstatutory mitigating circumstance and gave it moderate weight. It then stated specific reasons for giving the jury’s recommendation the consideration it gave it, including the appellant’s participation in the robbery-murder and the jury’s vote. Therefore, we conclude that the circuit court complied with both Ex parte Taylor and Ex parte Carroll in overriding the jury’s recommendation.’
“See also McGowan v. State, 990 So.2d 931, 1006 (Ala.Crim.App.2003) (opinion on return to remand) (‘Here, there was no conflicting evidence about who committed the murders, nor did the victims’ family ask that McGowan be sentenced to life imprisonment without parole... See Hodges v. State, 856 So.2d 875 (Ala.Crim.App.2001).’).”
13 So.3d at 432.
In the present case the only reason given by the court is that it had presided over a number of capital murder cases. Cf. Jackson v. State, 133 So.3d 420, 443 (Ala.Crim.App.2009) (opinion on return to remand) (finding that the trial court complied with Carroll and Tomlin because “[w]hen sentencing Jackson to death, the circuit court devoted seven pages of its order to explaining its justification for overriding the jury’s sentencing recommendation. The court stated that it chose not to follow the jury’s recommendation because the jury might have been swayed by the defendant’s family members’ pleas for mercy; the jury could have concluded that the codefendants would be treated differently; the jury could have believed that Jackson did not fire the fatal shot; the jury deliberated for only 35 minutes in the penalty phase; Jackson had a long criminal history although he was only 18 years old at the time of the murder; and the court was privy to information and law that was not available to the jury.” (footnotes omitted). This reason — that the trial court had presided over many capital-murder cases — does not justify overriding the jury’s recommendation. Thus, although the trial court explained its decision in weighing the other aggravating and mitigating circumstances, it is unclear what weight the trial court gave to the jury’s verdict, and the order fails to state that the court considered the nonstatutory circumstances presented by Jackson or what weight these circumstances were accorded. Moreover, the stated reason for overriding the jury’s advisory verdict does not satisfy the decisions in Taylor, Carroll, or Tomlin. Therefore, the trial court should reconsider its decision as to sentencing and reissue its sentencing order. See, e.g., Stanley v. State, 143 So.3d 230, 315 (Ala.Crim.App.2011) (“Thus, although it appears that the trial court considered the evidence Stanley offered as nonstatuto-ry mitigating circumstances, it is not clear from the record whether the trial court found any of the evidence to actually constitute a nonstatutory mitigating circumstance, nor are the trial court’s reasons for overriding the jury’s advisory verdict clearly stated. See Spencer [v. State], 58 So.3d [215] at 252 [ (Ala.Crim.App.2008) ] (remanding for the trial court to amend its sentencing order to clarify its findings regarding the existence or nonexistence of nonstatutory mitigating circumstances and judicial override of jury’s recommendation *116 of life imprisonment without parole).”). See also Ex parte Martin, 931 So.2d 759, 771 (Ala.2004) (remanding the case for a new sentencing order where the trial court stated that it gave great deference to the jury’s verdict but did not state what weight it gave to the jury’s recommendation); Spencer v. State, 58 So.3d 215, 250 (Ala.Crim.App.2008) (“As in Woods[ v. State, 13 So.3d 1 (Ala.Crim.App.2007),] and the cases cited therein, the trial court here did not enter specific findings as to the existence or nonexistence of nonstatutory mitigating circumstances, and the principles espoused in Ex parte Taylor, Ex parte Tomlin, and Ex parte Carroll, and the cases cited therein, were not met as the trial court’s sentencing order did not state that the jury’s recommendation was treated as a mitigating circumstance and did not contain specific findings as to the weight assigned to the jury’s recommendation of life imprisonment without parole or the reasons for the judicial override of that recommendation. Thus, we must remand this case to the trial court for it to amend its sentencing order to clarify its findings regarding the nonstatutory mitigating circumstances and judicial override of the jury’s recommendation of life imprisonment without parole. On remand, the trial court should reweigh the aggravating and mitigating circumstances and resentence Spencer.”).
Based on the forgoing authority, this case is due to be remanded for the trial court to reweigh the aggravating, statutory mitigating, and nonstatutory mitigating circumstances. The court should also state what weight it accords to the jury’s advisory verdict. The trial court should then issue an amended sentencing order that should be submitted to this Court within 42 days of the date of this opinion. Because we are remanding the case, this Court pretermits discussion of Jackson’s claim of cumulative error and this Court’s requisite review pursuant to § 13A-5-53, Ala.Code 1975.
AFFIRMED AS TO CONVICTIONS AND SENTENCE FOR ATTEMPTED MURDER; REMANDED WITH INSTRUCTIONS AS TO SENTENCING ON CAPITAL MURDER.
WINDOM, P.J., and WELCH, KELLUM, and JOINER, JJ., concur.

On Return to Second Remand

BURKE, Judge.
On March 29, 2013, this Court remanded this case, in which the death penalty was imposed on Demetrius Avery Jackson, Jr., to the trial court for resentencing. This Court determined that the trial court’s sentencing order was deficient because it included facts derived from another case; because it failed to address the nonstatuto-ry mitigating evidence that was presented; and because it failed to adequately set out the specific reasons for giving the jury’s recommendation of life imprisonment without the possibility of parole the weight that the court gave it. The circuit court was directed to reweigh the aggravating circumstances, the statutory mitigating circumstances, and the nonstatutory mitigating circumstances.
On return to remand, the circuit court has filed an amended sentencing order in which the court has properly included the facts of the present offense. It considered as evidence of nonstatutory mitigating circumstances the testimony of Jackson’s mother concerning his upbringing and having been abused as a child, as well as his relationship with his father. The court found “that [Jackson’s] home life, and negative influence of the [Jackson’s] father, is a non-statutory mitigating circumstance.” (Record on second return to remand, 7.)
*117 As to the reasons the court afforded the weight to the jury’s advisory verdict that it did, the court stated:
“As for the jury’s recommendation of life in prison without the possibility for parole, the Court considers this to be a very strong nonstatutory mitigating circumstance, especially in light of the fact that the jury made its recommendation by a vote of 10 to 2 in favor of life in prison without the possibility for parole, and the record contains no evidence that the trial court was aware of any information not known to the jury.
“In Ex parte Tomlin, 909 So.2d 283 (Ala.2003), the Alabama Supreme Court stated:
“ ‘The weight to be given [a jury’s recommendation of life imprisonment without the possibility of parole] should depend on the number of jurors recommending a sentence of life imprisonment without parole.” [Ex parte Carroll, 852 So.2d 833, 836 (Ala. 2002).] In Carroll we found that a jury’s 10-2 vote for a sentence of life imprisonment without the possibility of parole demonstrated ‘overwhelming support’ of such a sentence. 852 So.2d at 837....
“ ‘The weight to be given [a jury’s recommendation of life imprisonment without the possibility of parole] should depend ... also upon the strength of the factual basis for such a recommendation in the form of information known to the jury, ... or a recommendation of leniency by the victim’s family.’ Carroll, 852 So.2d at 836.
“ ‘The jury’s recommendation [of life imprisonment without the possibility of parole] may be overridden based on information known only to the trial court and not to the jury, when such information can properly be used to undermine a mitigating circumstance. Carroll 852 So.2d at 836.’
“Tomlin, 909 So.2d at 286-87.
“After a thorough review of the entire record in this case, the Court finds that there was no information known to the Court that was not known by the jury, and no such information was previously cited by this Court in its Sentencing Order.
' “Further, the Court finds that four members of the family of the victim, when speaking to the Court at the sentencing hearing, specifically testified that they were not asking the Court to sentence [Jackson] to death. In fact, the only witnesses at the sentencing hearing to ask for a death sentence were two public officials: a State Representative and the Fairfield Police Chief.
“Just as this Court did in its first sentencing order, this Court again finds no evidence to suggest that the jury’s recommendation was swayed by emotion, prejudice, or any other arbitrary factors.
“Accordingly, this Court gives great weight to the jury’s recommendation and finds that the ‘jury’s 10-2 vote for a sentence of life imprisonment without the possibility of parole demonstrated “overwhelming support” of such a sentence.’ Carroll, 852 So.2d at 837.”
(Record on return to second remand, 7-8.)
Thereafter, in its order, the circuit court reweighed the aggravating, statutory mitigating, and nonstatutory mitigating circumstances, and concluded:
“The Court finds that there are non-statutory mitigating circumstances present in this case. The first is [Jackson’s] difficult family life and history of abuse. The Court gives this nonstatutory mitigating circumstance moderate weight. Similarly, the fact that the family of the *118 deceased did not request a death sentence is given moderate weight as a nonstatutory mitigating circumstance. By themselves, these mitigating circumstances would not outweigh the aggravating circumstances presented in this case.
“However, when coupled with the jury’s recommendation of life imprisonment without the possibility of parole, which the Court gives great weight and finds to be overwhelming support for such a sentence, the Court finds the nonstatutory mitigating circumstances do outweigh the aggravating circumstances.
“Therefore, after consideration of all the matters that were presented to this Court, the presentence investigation report, the testimony given at trial, during the penalty phase before the jury, and at the sentencing hearing before this Court, both in aggravation and mitigation, and after the analysis of the aggravating and mitigating circumstances set out in the court’s original sentencing order and this amended sentencing order, and for the reasons stated in this order, the Court does now find that the aggravating circumstances do not outweigh the mitigating circumstances, and the Court does hereby reverse itself and sentence [Jackson] to life in prison without the, possibility for parole.”
(Record on second return to remand, 8-9.) Thus, the circuit court has sentenced Jackson to life imprisonment without the possibility of parole.
Because Jackson is no longer sentenced to death, the plain-error analysis mandated by § 13A-5-53, Ala. Code 1975, is no longer necessary or appropriate.[1] However, we now consider Jackson’s claim that the cumulative effect of the errors at trial requires reversal of his conviction. Jackson argues simply that “[f]or example, there were repeated instances of improper references to Mr. Jackson’s prior crimes, multiple improper references to hearsay statements of Elice Jackson, several errors undermining the burden of proof, and numerous errors calling into question the reliability of the death sentence.” (Jackson’s brief, at 179.) Jackson includes a footnote that lists numerical references to a number of the issues that he raised in his brief. Jackson’s inclusion of issues concerning the validity and appropriateness of the death penalty to his case are moot.
“[1] “The Alabama Supreme Court has set forth the cumulative-error rule as follows: ‘[W]hile, under the facts of a particular case, no single error among multiple errors may be sufficiently prejudicial to require reversal under Rule 45, if the accumulated errors have “probably injuriously affected substantial rights of the parties,” then the cumulative effect of the errors may require reversal.’ Ex parte Woods, 789 So.2d 941, 942-43 n. 1 (Ala.2001) (quoting Rule 45, Ala. RApp. P.). Applying this standard to Lewis’s allegation of cumulative error, we have scrupulously reviewed the record and find no evidence that the cumulative effect of any of the individually non-reversible errors in this case affected Lewis’s substantial rights at trial.”
‘“Lewis v. State, [24 So.3d 480, 538 (Ala.Crim.App.2006) ].’
“Sharifi v. State, 993 So.2d 907, 946^7 (Ala.Crim.App.2008).”
*119 Petric v. State, 157 So.3d 176, 226 (Ala.Crim.App.2013).
Each of the issues cited by Jackson has been decided adversely to his claim. The cumulative effect of any individually non-reversible errors did not affect Jackson’s substantial rights. See also Ex parte Walker, 972 So.2d 737, 747 (Ala.2007) (“Because Walker has not demonstrated that his claims of prosecutorial misconduct are any stronger when the instances of misconduct are considered cumulatively, we find no error.”).
This Court has previously affirmed Jackson’s attempted-murder conviction and the resulting sentence in our opinion on return to remand. Based on the foregoing, the circuit court’s decision as to Jackson’s capital-murder conviction and sentencing is due to be affirmed.
AFFIRMED.
WINDOM, P.J., and WELCH, KELLUM, and JOINER, JJ., concur.

. Officer Burpo testified that the older man was wearing a gray skull cap and dark clothing.

. Jackson owned a 1987 Chevrolet Caprice Classic automobile with a license tag number 1G0067T. (R. 921.) During the investigation, it was initially believed that Officer Bur-po may have reported the tag as partially being “0068 Tango,” but when running the tag number with a description of the Chevrolet Caprice, the tag was discovered to have contained “0067 Tango.” (R. 1011.)

. Elice Jackson was deceased at the time of trial.

. Subsequently, during redirect examination, Jackson, Sr., admitted that Elice told him what had happened while he was still at the scene.

. At trial Pendleton stated that she did not remember the time; however, she was shown an earlier statement that she had made to police officers that indicated the time.

. Amos described the vehicle as burgundy.

. He later dropped the complaint against El-ice.

. Although the prosecutor explained the reasons for his strikes of all potential jurors, including white veniremembers, because Jackson only argued concerning, and responded to, the prosecutor's reasons for striking black veniremembers, only those will be included.

. He may well have conspired with Jackson, Sr., to hinder the prosecution of Jackson.

. Although the discs are referred to as tapes at times during the trial, the exhibits were in fact discs.

. The record indicates that the Alabama Bureau of Investigation was not efficient in supplying the district attorney’s office with the evidence in its possession, causing the trial court to grant a motion for continuance so *51 that the State could prepare for trial and Jackson could be afforded all of the evidence. (C. 70.) (Supp. R. 28-32.)

. In his reply brief, Jackson argues that defense counsel only had the discs for seven days.

. In his brief, Jackson alleges that three cars appear in the disc and that any of these might be his vehicle.

. We note that Minor v. State, 780 So.2d 707 (Ala.Crim.App.1999), was reversed by the Alabama Supreme Court as to this ground. Ex parte Minor, 780 So.2d 796 (Ala.2000). However, Minor v. State dealt with collateral crimes that were only admissible for impeachment purposes rather than as Rule 404(b) evidence or "evidence highly relevant to a material element of the State’s case” as in Perkins v. State and the present case. 808 So.2d at 1092.

. We note that even if the Daubert analysis had been proper, it would not have applied to this case as Daubert held that the " ‘issue is not whether the field in general uses a reliable methodology, but the reliability of the expert’s methodology in the case at bar.’ 405 F.Supp.2d at 119 (emphasis in original). Because no challenge was made at trial to the admissibility of the testimony now challenged here, the record provides no basis for this court to review the reliability of the expert’s methodology in this case.” United States v. Perkins, 342 Fed.Appx. 403, 410 (10th Cir.2009) (not selected for publication in the Federal Reporter) (finding no plain error as to this issue).

. See supra, Issue II.

. Hearsay is defined by Rule 801(c), Ala. R. Evid. as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted.”

. In Roper v. Simmons, 543 U.S. 551, 125 S.Ct. 1183, 161 L.Ed.2d 1 (2005), the United States Supreme Court determined that the execution of anyone who committed the offense prior to his eighteenth birthday was prohibited. Thus, the mitigating circumstance could apply only to a defendant 18 years old or older at the time of the offense, because only these individuals could be subject to the death penalty.

. To the extent that Jackson argues that the jury was improperly instructed that its verdict had established the aggravating circumstance of disrupting governmental functions or the *97 enforcement of laws, this issue has previously been addressed and settled in this opinion. See Issue XXVI. Because we determined that the jury was not instructed that its verdict automatically established the aggravating circumstance, this claim lacks merit.

. This Court prelermitted discussion of the analysis of this case pursuant to the required statutory guidelines.